# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-60066-CIV-COHN-SELTZER

ABRAHAM INETIANBOR,

    Plaintiff,

vs.

CASHCALL, INC.,

    Defendant.

## AFFIDAVIT OF ABRAHAM INETIANBOR

I, Abraham Inetianbor, under penalty of perjury, do hereby depose and say as follows:

1. My name is Abraham Inetianbor. I am the plaintiff in this case. I am over the age of twenty-one years, have never been convicted of a felony, have personal knowledge of the facts stated herein, and am competent to testify to them.

2. I obtained the loan because my wife was recovering from surgeries. After I paid back the loan and then some, and refused to pay further, CashCall threatened that if I didn't continue to make payments to them, they would make sure I was never able to use my credit again.

3. CashCall also told me that I would be made a scapegoat if I sued, and that suing them would be the biggest mistake of my life. They said that no attorney would take my case and even if I ended up finding one, CashCall had the best attorneys in the country who would make the case disappear. They said that I was too broke to survive in the courtroom and I should go ahead and file my case in court if I wanted to go bankrupt. They said if I sued, the Judge was going to order me to pay the loan balance plus their attorney's fee; and that their attorney's fee would be high and I would spend the rest of my life paying it.

4. After I sued, CashCall's lawyers guaranteed me that the Judge would compel arbitration. They also said all they needed was for the Judge to compel arbitration and then this case would be history.

5. My loan agreement says the Tribe's "consumer dispute rules" apply. There are no such rules. When I asked for the "consumer dispute rules" and Tribal laws, CashCall would not

1

send them. It was not until after the June 21, 2013 arbitration hearing that CashCall finally sent the Tribal laws and still no "consumer dispute rules" to support their loan agreement claims.

6.  I asked CashCall's lawyer how much they are paying Mr. Chasing Hawk to be the arbitrator. The lawyer said it was none of my business.

7.  I found out through my own research that Mr. Chasing Hawk's daughter works for Western Sky. Mr. Chasing Hawk had said in a May 1, 2013 letter that he had no prior connection to any of the parties.

8.  The way I found out that the Chasing Hawk letter was ghostwritten, was because he emailed me the letter on Friday May 3. But when I clicked to open the letter, it was not signed. It was simply a Microsoft Word document. I noticed that he was actually forwarding me another email that someone with a Lakota Cash email address had sent to him. I called Mr. Chasing Hawk to ask him about this. He admitted that CashCall/Western Sky wrote the letter. It was after that that he told me he could not talk to me because CashCall's lawyer told him not to.

9.  After I found out through my own research that Mr. Chasing Hawk's daughter works for Western Sky and about the ghostwritten letter I talked to one of the California lawyers for CashCall who was copied in the email that contained the arbitrator's ghostwritten letter (Dan Baren). He told me that going back to court with this new information was unnecessary because it would only prolong the case and make things worse for me because the Judge wouldn't believe me; and that he thought this was a good time to settle and move on. I refused to settle the matter because I think this process is corrupt and I want the Court to know this because it is hurting other people not just me.

10.  As I advised this Court on April 29, 2013 (Document 56, p. 10), when I spoke with the Tribal Chairman's office by phone I was told that Mr. Webb operates his own business outside of the Tribe – it is not a Tribal business.

11.  After the June 21 hearing, I talked by phone with Kevin Keckler, the Chairman of the Tribe, on June 24, 2013. I wanted to know the companies in the jurisdiction of the Tribe. He directed me to the website www.sioux.org. The list of community businesses is on this web page: http://www.sioux.org/index.php/main/inner/sioux/community_business. Neither CashCall nor Western Sky is on the list.

12.  I spoke to Mona Demery who is a Magistrate and Mediator for the Tribal Court, by phone on June 21, 2013. Ms. Demery told me that Mr. Chasing Hawk had come to her and asked her if the Tribal Court would be interested in starting arbitration. She told me no rules for arbitration have ever been adopted by the Tribal Council. She also told me Mr. Chasing Hawk asked if she knew anything about arbitration or how it worked; she said she could give him a printout of the AAA rules to look at if he wanted and he requested a copy. He never said what he needed it for, but she sensed it was related to my case because it had recently become the talk of the town.

13.  When I tried to exercise my right to have the arbitration before three members of the Tribal Council (Document 36), I found out this was not possible. Ms. Demery informed me

2

by telephone and by letter (dated March 8, 2013, filed at Document 36-37) that the Tribe does not authorize arbitrations.

14. I spoke to other Tribal government representatives, including Raven Thompson and Derek Bartlett. Mr. Bartlett of the Judicial Council told me the following in a telephone call that happened after the June 21, 2013 arbitration hearing: Mr. Webb comes to the Tribe asking for a letter to say his business has immunity when he has legal trouble, but the Tribe has refused to do a letter. Mr. Webb came to the Tribe recently and asked if they could provide a letter for him to use in my case saying the laws of the Tribe supported his lending. When he was denied the letter, he asked the Tribe's Judicial Council to change the laws so that they would support his business and he promised to return the favor. The Tribe has not done this. Mr. Bartlett also told me that from a legal standpoint, Western Sky and CashCall are criminals. From a political standpoint, they have many employees that are members of the Tribe and the Tribe has high unemployment. That is why he, Bartlett, has not had much support in trying to shut down Western Sky. He wanted Western Sky to stop what it was doing or to do it legally.

15. The arbitration was supposed to be regarding my lawsuit against CashCall for false information on my credit report. However, the demand CashCall sent to the arbitrator claims that I still owe CashCall more money. They are still trying to collect the "remaining balance" that the law says I do not owe. I find it threatening that with my limited income, this issue has been sent to an arbitrator who lets the company write his letters, his daughter works for them, and there are no arbitration rules.

16. The amount of money the company sent me for the loan came to $2,525.00 (loan amount of $2,600 minus "fee" of $75). I paid back $3,252.65 on the loan. (Document 1-3).

17. CashCall claims there have been no new facts since the Court's orders allowing arbitration. That is incorrect. As I noted above, many facts have come to light since then. I ask the Court to look at the transcript (Document 73-22) of the June 21, 2013 arbitration telephone hearing because it shows many of these new facts. They include:

   A. I explained how I did not know what the Tribal laws were that were supposed to govern since they are not readily accessible. (Transcript p. 4). Only then did CashCall's lawyer reveal that he had a full set of the Tribal laws and said he would send them. (Transcript p. 5). When I finally did get the copy of those Tribal laws, I found that there are no Tribal "consumer dispute rules" and that there is a criminal usury statute in the Tribal laws that makes the loan illegal.

   B. The arbitrator has already made up his mind that Florida law cannot apply. (Transcript p. 10). I do not understand this since numerous Courts have found that the laws apply of the State where the consumer lives.

   C. The arbitrator believes Western Sky is a Tribal organization. (Transcript p. 11). I do not understand this since Western Sky is incorporated under South Dakota law and is not owned or operated by the Tribal government. When I continued to ask questions about this, CashCall's lawyer interrupted and said "this is outside the scope of the arbitration." (Transcript p. 14).

3

D.   The arbitrator admitted that "my daughter works there... giving out the loans." (Transcript p. 11). He also gave his "theory" that he did not have to disclose this relationship. (Transcript p. 11). Since there are no consumer dispute rules for the arbitration, I do not know how to challenge this or defend my rights. When I tried to ask the arbitrator more questions about this, CashCall's lawyer interrupted and claimed that it was "not an issue for the arbitration." (Transcript p. 12).

E.   I asked the arbitrator if he was licensed by the American Arbitration Association or by the Tribe to be an arbitrator. He admitted he was not licensed by the AAA but claimed that "as a tribal elder anyone can become an arbitrator here as long as you know the rules and regulations of the procedures that we have or the commercial code that we have." (Transcript p. 15). I asked if he would tell me if he was trained or licensed by the Tribe to be an arbitrator and were there Tribal rules for arbitration. He refused to answer saying he agreed with the CashCall attorney that "this is all irrelevant." (Transcript p. 15).

F.   CashCall's lawyer also said that "the arbitration provision requires that the arbitrator be a tribal elder and nothing more than that." (Transcript p. 16). This is false. Among other things, my loan contract says that I have a choice of three tribal Council members to be the arbitrators, and that the Tribal "consumer dispute rules" apply, and that the arbitrator will be an "authorized representative" of the Tribe.

G.   The arbitrator admitted that the owner of Western Sky chose him to be the arbitrator (Transcript p. 17). When I asked if the Tribe was aware of this selection process, the arbitrator said "the tribe has nothing to do with any of this business." (Transcript p. 17).

H.   I asked the arbitrator to write a letter disclosing to this Court his relationship with Mr. Webb (the owner of Western Sky). (Transcript p. 18). Once again the lawyer for CashCall interrupted. When the arbitrator finally spoke he said any such disclosure was "irrelevant." (Transcript p. 19). When I asked him why he did not disclose that his daughter worked for the company and why wouldn't he make a written disclosure, he threatened "if I was in your shoes I wouldn't ask what you're asking." (Transcript p. 20). After CashCall's lawyer again interrupted, the arbitrator added "I gave you the disclosure, what is your problem with that?" (Transcript p. 21). That is incredible to me, that he thinks his letter that the company ghost-wrote for him and that says falsely that he had no prior connection to the parties, was adequate.

I.   The CashCall lawyer also falsely said to the arbitrator that I have "lengthy internet activity." (Transcript p. 21). That is false and I also do not understand why CashCall believes all of these matters can be kept secret by it. The CashCall lawyer also said the arbitrator "needs to know" how "whatever he writes" would probably end up "filed with Judge Cohn." (Transcript p. 21). I have a Constitutional right to access to Court and this Court has the right to know what is happening.

J.   In fact the false and ghostwritten arbitrator letter was originally filed by CashCall (not me) with this Court to justify getting this Court to reverse its prior decision

4

and order arbitration. (Document 57-1). What CashCall knew, but did not tell this Court was that this letter was written by CashCall and Western Sky for the arbitrator and falsely said he had no connection to them, and also failed to say anything about his daughter working for Western Sky.

K. At the end of the hearing, I asked what the rules were for this arbitration and what the Tribe's rule was for the page length of the briefs. At this point the arbitrator said "I think both parties would compromise <u>you don't have to really follow rules and regulations that's why I mentioned it's going to be informal and we'll agree we don't have to follow this and that because if we follow all the rules and regulations we're going to be jammed up here</u>." (Transcript p. 27, emphasis added). The arbitrator also said, "there's no set rules." (Transcript p. 28). I have never agreed to an arbitration without rules.

18. CashCall's lawyer never told the Court that there were no arbitration rules when CashCall asked the Court to order arbitration. CashCall did not tell this Court about all of the other facts above when it demanded arbitration. CashCall knew the arbitrator's letter was ghostwritten but did not tell the Court. CashCall knew the arbitrator's daughter worked for Western Sky but did not tell the Court. CashCall knew the Tribe's own laws were being broken but told this Court nothing about it. I feel very threatened by CashCall's continued arbitration efforts.

I declare under the penalty of perjury that the foregoing is true and correct.

[SIGNATURE PAGE TO FOLLOW]

5

WITNESS my hand and seal this __14__ day of August, 2013.

_____
Abraham Inetianbor

FLORIDA, BROWARD COUNTY

Sworn to (or affirmed) and subscribed before me this day by Abraham Inetianbor.

Date: __Aug 14 2013__

_____
(Official Signature of Notary)

[SEAL]

_____
Thomas Zerella
(Typed/Printed Signature of Notary)

My Commission Expires: __10/27/16__

THOMAS ZERELLA
Notary Public - State of Florida
My Comm. Expires Oct 27, 2016
Commission # EE 214374
Bonded Through National Notary Assn.