UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-60066-CIV-COHN-SELTZER

ABRAHAM INETIANBOR, on behalf of
himself and a class of persons similarly situated,

Plaintiff,

v.                                                      CLASS ACTION

CASHCALL, INC.,

Defendant.

## THIRD AMENDED COMPLAINT

Plaintiff, Abraham Inetianbor, through counsel, hereby submits his Third[1] Amended

Complaint against the Defendant CashCall, Inc. ("CashCall").

## I.  NATURE OF THE ACTION.

1.      Plaintiff brings this lawsuit on behalf of himself, and on behalf of all other

Floridians who have borrowed money from the Western Sky lending enterprise under "consumer

loan" arrangements at usurious interest rates.  Consumer loans are loans of relatively small

amounts of money carrying high interest rates.  Under Florida law, these loans are unlawful.

2.      Prior to terminating the "Western Sky" loan enterprise in Florida, Defendant

controlled an enterprise to make and collect on unlawful loans and to avoid liability for doing so.

---

[1] Plaintiff filed his first Complaint *pro se* in State Court.  *See* Docket No. 1-2.  Plaintiff filed a
first amendment to the Complaint.  Docket No. 1-3.  After removal to this Court, Plaintiff (still acting *pro
se*) moved to file a Second Amended Complaint, Docket No. 34, which motion was denied by this Court
on the grounds that the matter had been sent to arbitration.  *See* Docket No. 35.  Plaintiff moved to file a
Second Amended Complaint again at Docket No. 38, which was allowed by Order filed at Docket No. 46,
since at that juncture the case was back out of arbitration.  The Second Amended Complaint was filed on
April 3, 2013 (Docket No. 48) and alleges claims for defamation of character (Count 1), usury (Count 2),
and violation of the Fair Credit Reporting Act (Count 3).  *Id.*   This Third Amended Complaint is filed
pursuant to the Court's text Order dated February 5, 2015 (Docket No. 115).

3.     Plaintiff brings this claim on his own behalf, and also, on behalf of a class of all persons who obtained "Western Sky" loans in Florida, to recover all amounts collected by the Defendant and for damages, attorneys' fees, and such other relief as allowed by law.  Plaintiff also seeks declaratory and injunctive relief including a declaration that the loans are void, for refunds, and for correction of all affected credit reports of class members.

4.     Aware of the law in Florida, Defendant sought to insulate itself from liability, by declaring that the loan business was protected from the application of any State or Federal law under tribal immunity afforded to the Cheyenne River Sioux Tribe of South Dakota (the "Tribe").  However, the Tribe did not own or operate the lending enterprise, and Western Sky did not make loans to tribal members because the loans were illegal under tribal law and violated the tribal usury statutes. Accordingly, the enterprise is not protected by tribal immunity. Furthermore, the entire Western Sky enterprise was actually just a "front" for the Defendant, CashCall, a private California corporation with no Tribal connection.  The vast majority of the revenues from the enterprise did not go to benefit any Tribal members but rather to line the pockets of John Paul Reddam, the owner and president of CashCall.

5.     Defendant also sought to avoid liability by including a purported arbitration agreement and class action ban that would require individual arbitration under arbitration rules of the Tribe which actually did not exist. The loan agreement and its relevant provisions are unfair, deceptive, false, fraudulent and unenforceable and CashCall should not be able to benefit from the terms in a loan contract that CashCall did not sign.  In fact, CashCall tried to conceal its involvement in the business.

6.     Unlike any other known matter involving a consumer challenge to a consumer lending scheme, the Plaintiff in this case, Mr. Inetianbor, actually sought to proceed with the

2

individual arbitration process described by his contract, when that was ordered by the Court. In this effort Mr. Inetianbor uncovered compelling evidence of a false and fraudulent scheme to include arbitration and class action ban provisions in a contract when in fact the Defendant knew these provisions were an illusion, there was no arbitration process in place, and the Defendant sought to create such an arbitration process out of whole cloth once Mr. Inetianbor called its bluff.

7.     But for Mr. Inetianbor's painstaking efforts to pursue his claim and uncover the true nature of the Western Sky lending scheme and illusory arbitration process, the Defendant would have succeeded with its scheme. In fact, Mr. Inetianbor discovered that Defendant unilaterally had the purported arbitrator selected; this arbitrator, Robert Chasing Hawk, had a daughter who herself worked for the lending enterprise; the arbitrator admitted that there were no consumer rules as promised by the contract to govern the purported process; and to this day CashCall refuses to disclose the terms of the arbitrator's retention or what he was to be paid.

8.     In light of these facts, other courts have found the entire Western Sky loan agreement "promise of a meaningful and fairly conducted arbitration is a sham and an illusion." *Jackson v. Payday Financial, LLC,* No. 12-2617, 2014 WL 4116804, at *8 (7th Cir. Aug. 22, 2014) (reviewing facts recited by the District Court herein).

9.     Likewise the New Hampshire Banking Department, in issuing a Cease and Desist order, found that Western Sky was nothing more than a front for Cashcall to evade licensure by state agencies and exploit Tribal immunity to try to shield its deceptive practices. *In re CashCall, Inc.*, No. 12-308, 2013 WL 3465250 (N.H. Banking Dept. June 4, 2013). There, the New Hampshire Banking Department found that CashCall's scheme to employ Western Sky in this manner constituted unfair and deceptive trade practices. The agency found that CashCall

3

controlled and funded Western Sky's loan origination operation. Western Sky solicited borrowers on a website managed by CashCall and assigned loans shortly after origination to CashCall. Thus CashCall was the actual or *de facto* lender, not Western Sky. *Id.* at *2. "After detailed review of the respondents' business scheme, it appears that Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators." *Id.*

10.     Under these unusual and extraordinary facts, it is equitable and proper to find that the pertinent provisions of the Western Sky loan agreement are unconscionable and unenforceable.  The alternative dispute resolution provisions in the contract reflect a deliberate sham to intimidate borrowers and impair the enforcement of consumer protection laws. Accordingly this Court should strike the offensive language in its entirety and allow Mr. Inetianbor to receive relief both for himself and for the larger class of Florida borrowers.

## II.  JURISDICTION AND VENUE.

11.     This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) as the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and is a class action in which Plaintiff and class members include one or more citizens of a State different from that of Defendant.   The Court also has jurisdiction due to a federal question in light of the Plaintiff's claim under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*

12.     This Court has personal jurisdiction over Defendant because it marketed, offered, made, serviced and/or collected on loans in Florida.

13.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

### III.  PARTIES.

14.     Plaintiff Abraham Inetianbor is a citizen and resident of Oakland Park, Florida.

15.     Upon information and belief, Defendant CashCall is a California corporation with a principal place of business at 1600 S. Douglass Road, Anaheim, CA 92806 and/or 1 City Boulevard West #1000, Orange, CA 92868, and may be served with process at that address. Upon information and belief, CashCall was assigned many of the loans made herein and was the real and *de facto* lender.

16.     Upon information and belief, during the pertinent times Defendant materially controlled and supported a company known as Western Sky Financial, LLC ("Western Sky"), which is or was a limited liability company chartered under the law of and with a principal place of business in South Dakota and with an office address at 612 East St., Timber Lake, South Dakota. Upon information and belief, during the pertinent times, Martin A. Webb ("Webb"), a citizen and resident of South Dakota, was the president of Western Sky.

17.     Upon information and belief, Defendant during the pertinent times was owned by and had as its president, John Paul Reddam, a citizen and resident of California; and during the pertinent times in material respects he directed and controlled the CashCall enterprise.  Reddam was President and CEO of CashCall and owned 100% of its corporate stock and controlled operations at its principal place of business.

18.     Upon information and belief, WS Funding, LLC ("WS Funding") is or was a wholly-owned subsidiary of CashCall.  Reddam is or was the president of WS Funding.  WS

Funding is or was a limited liability company organized under Delaware law.  CashCall has at times asserted that WS Funding bought notes executed between Western Sky and borrowers and assigned the note servicing to CashCall.

19.     Upon information and belief, Delbert Services Corporation ("Delbert") is or was a corporation which has sought from time to time to collect purported debts loans consumers owed to CashCall. Delbert was incorporated under Nevada law with an office address at 7125 Pollock Drive, Las Vegas, NV 89119, and with Mr. Reddam as its sole director and owner.

### IV.  FACTUAL ALLEGATIONS.

### A.     Facts Regarding the Inetianbor Family and the Loan.

20.     Mr. Inetianbor resides with his wife in Oakland Park, Florida.  They have been married since 2007 and have a young daughter.

21.     In the December 2010/January 2011 time period, the Inetianbors were in financial hardship.  During this time period, Mr. Inetianbor saw an ad for "Western Sky" on the television. The TV ad deceptively represented that these were valid and proper loans and because he was in a state of financial hardship, Mr. Inetianbor called the telephone number.  During the telephone call, a Western Sky representative induced him to apply for a loan from Western Sky.

22.     Mr. Inetianbor's Western Sky loan agreement is dated January 5, 2011.  Under that agreement, Western Sky loaned him a net amount of $2,525.

23.     After receiving the loan for $2,525, Mr. Inetianbor diligently paid back approximately $3,252 on this loan – substantially more than he received.

24.     Mr. Inetianbor was informed at or about the time of the loan or shortly after he received it, that the loan was now with CashCall.  Mr. Inetianbor made all his loan payments to

CashCall.  He never made a payment to Western Sky.  In fact, Western Sky was simply operating as a "front" for CashCall, all along.

25.    Eventually Mr. Inetianbor through his own research learned that his loan was unlawful under Florida law and the interest rate was far above the limit allowed by law. However, when he complained to CashCall, they continued trying to collect on the loan, even though he had already paid back more than he had borrowed.

26.    Further, CashCall refused to remove negative information about the loan and the purported debt from Mr. Inetianbor's credit report.  This continuing conduct by CashCall has caused ongoing harm to the Inetianbor family by harming Mr. Inetianbor's credit score.

27.    During this time, CashCall acted with cruelty and arrogance, threatening and intimidating Mr. Inetianbor, who was shocked and outraged by this conduct.

28.    CashCall caused Mr. Inetianbor and his family to suffer great stress and suffering as well as monetary loss.

29.    As State Regulators have found, "Western Sky is nothing more than a front to allow CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."  *In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc., and WS Funding LLC*, Case No. 12-308, Cease and Desist Order by the State of New Hampshire Banking Department, 2013 WL 3465250 (N.H. Banking Dept. June 4, 2013).

30.    In the lending scheme, Western Sky and CashCall "have taken substantial steps to conceal this business scheme from consumers and state and federal regulators." N.H. Order, p. 5.

31.    CashCall set up the Western Sky lending scheme after its previous efforts to profit from high-interest usurious loans failed.  Prior to entering into its "rent-a-tribe" arrangement with

Western Sky in 2009, CashCall previously entered into an analogous "rent-a-bank" arrangement with one or more state-chartered banks. The State of West Virginia filed suit against CashCall for making illegal loans to West Virginia consumers using that scheme. Following a trial, the West Virginia court found that "the purpose of the lending program was to allow Cash Call to hide behind the Bank's charter and its right to export interest rates under federal banking law, as a means for CashCall to deliver its loan product to states like West Virginia with usury laws." *West Virginia v. CashCall,* No. 08-C-1964, Kanawha County Circuit Court, Final Order on Phase II of the Trial, at 25. The Court found that CashCall was the *de facto* lender and enjoined it from making loans in West Virginia without a license and from making or collecting on usurious loans, imposed a civil penalty of $730,000, awarded a judgment of $10,045,687, and declared all loans made by CashCall in West Virginia null and void.

32.    After that setback, CashCall began the purported "rent-a-tribe" tribal lending scheme that used Western Sky as its "front."  However, that scheme was no more legal than was the prior "rent-a-bank" scheme.  Most obviously, in setting up its scheme with Western Sky, CashCall neglected to involve a real Indian Tribe.  Western Sky was merely a private South Dakota LLC.  Accordingly, even other consumer lenders and tribal lenders have distanced themselves from the CashCall/Western Sky scheme and have denounced it as improper.

33.    During the pertinent times, CashCall provided the website hosting services for Western Sky, reimbursed Western Sky for costs associated with the server, reimbursed Western Sky for office, personnel and postage, provided Western Sky with a toll-free number and fax number and an array of marketing services including TV and radio and internet ads, reviewed loan applications to the "Western Sky" website and CashCall funded a reserve account for Western Sky to fund the loans.

34.     In the case brought by the New Hampshire Banking Commissioner, the following factual findings were reported, all of which reflect the fraudulent and sham nature of the enterprise and of the Western Sky loan agreement, and which facts are expressly alleged herein:

- CashCall created all advertising and marketing materials for Western Sky;

- CashCall provided website hosting and support services for Western Sky;

- CashCall reimbursed Western Sky for all costs of maintenance, repair and/or update costs associated with Western Sky's server;

- CashCall reimbursed Western Sky for its office, personnel, and postage, and provided Western Sky with a toll free telephone and fax number;

- Once a consumer applied for a loan, CashCall reviewed the application for underwriting requirements;

- Once a loan application was approved, Western Sky executed a promissory note and debited a so-called "Reserve Account" to fund the promissory note;

- CashCall was required to set up, fund, and maintain the balance in this Reserve Account;

- After a loan was funded, CashCall was obligated to purchase the promissory note from Western Sky;

- CashCall bore all risk of loss on the loans;

- CashCall generally made contact with the consumer within one business day of the consumer filing an application for the loan and once the loan was made;

- Western Sky accepted no payments from consumers on the loans;

- CashCall serviced the loans;

- CashCall was responsible for tracking all consumer complaints regarding the loans;

- CashCall agreed to indemnify Western Sky for all costs arising or resulting from any and all civil, criminal or administrative claims or actions relating to the loans, including but not limited to fines, costs, assessments, and/or penalties which could arise in any jurisdiction;

- As compensation for services provided, Western Sky paid CashCall 2.02% of the face value of each approved and executed loan transaction plus any additional charges, with a net minimum payment of $100,000 per month;

- CashCall paid Western Sky 5.145% of the face value of each approved and executed loan credit extension and/or renewal, as well as a minimum monthly administration fee of $10,000;

- CashCall took "substantial steps to conceal this business scheme from consumers and state and federal regulators," and the scheme "prevents consumers from understanding which entity is making the loans";

- Western Sky did not identify its relationship with CashCall or WS Funding on its website or in any marketing materials;

- The promissory notes identified the lender as Western Sky with an address of Timber Lake, South Dakota; and

- The promissory notes stated that the loan agreement was "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation."

35.     Defendant organized and instituted a sophisticated business enterprise in an effort to evade the fact that consumer loans are illegal under Florida law.

36.     Defendant ensured that television advertisements were placed to be seen by Florida residents and controlled or approved various websites that offered loans to Florida consumers.

37.     Defendant made loans to borrowers outside of South Dakota.  Defendant marketed loans over the Internet and through television advertising designed to reach potential borrowers who resided off the reservation and outside of South Dakota.  The borrowers were not members of the Tribe. During the entirety of a loan transaction and the relationships between borrowers and these companies, the borrowers were located off the reservation and outside of South Dakota.  All communications between Defendant and borrowers occurred via mail or over the telephone or the internet.

10

38.     In a typical loan transaction, a potential borrower contacted Western Sky and/or CashCall over the telephone or the internet to apply.   A potential borrower sent his or her application and background information to the company, which then considered the application to determine whether to approve it.   Loan decisions were made off the reservation.   The approval or denial of a loan application was communicated to a potential borrower over the telephone or the internet.   If a potential borrower's application was approved and the borrower accepted the loan, the funds were transferred to the borrower's bank located off the reservation.

39.     Upon information and belief, all Western Sky loans were immediately assigned to CashCall and all borrower payments were made to CashCall and collection efforts and electronic withdrawals from borrower bank accounts were made by CashCall.   When CashCall made withdrawals from borrowers' bank accounts for repayment of loans, those were taken from the accounts at banks located off the reservation.   If borrowers missed payments or failed to repay their loans, CashCall and/or related entities such as Delbert made collection efforts off the reservation and outside of South Dakota.

40.     Prior to ending Western Sky operations in Florida, Defendant regularly engaged in and was involved in soliciting, making and collecting loans to and from consumers, in amounts varying from approximately $300 to $3,000.   The loans were payable in monthly installments and ranged from approximately 12 to 84 months. The loans had annual percentage rates ("APRs") of approximately 90% to over 300%.

41.     Defendant participated in maintaining a website, www.westernsky.com, which offered loans to consumers.   The website showed the following table of loans:

| Loan Product | Borrower Proceeds | Loan Fee | APR | Number of Payments | Payment Amount |
|---|---|---|---|---|---|
| | | | | | |

| $10,000 | $9,925 | $75 | 89.68% | 84 | $743.49 |
|---|---|---|---|---|---|
| $5,075 | $5,000 | $75 | 116.73% | 84 | $486.58 |
| $2,600 | $2,525 | $75 | 139.22% | 47 | $294.46 |
| $1,500 | $1,000 | $500 | 234.25% | 24 | $198.19 |
| $850 | $500 | $350 | 342.86% | 12 | $150.72 |

42.     Consumers applied for loans directly through the website.  As part of obtaining a loan, consumers entered into a purported form loan agreement with Western Sky electronically via the website. This loan agreement was called the "Western Sky Consumer Loan Agreement." The Agreement was not signed by the customer by hand, nor was it provided to the customer in a printed, paper copy.

43.     Western Sky disbursed the loan's proceeds by electronically depositing the proceeds directly into the consumer's checking or other bank account.

44.     The Agreement recited that the consumer authorized Western Sky (or an assignee such as CashCall) to debit and withdraw electronically funds from the consumer's bank account for the scheduled monthly installments due. By this authorization, the consumer also purportedly authorized withdrawal electronically of other funds from the consumer's account for payment of additional fees or charges.

45.     Upon information and belief, during the loan application process when some consumers obtained loans, the consumers' computers were communicating with a server located in California (not on any Indian reservation) owned or operated by CashCall; this was the case even when loans were purportedly issued by Western Sky.

46.     Western Sky routinely assigned loans to CashCall.  Upon information and belief, after Plaintiff herein entered into his loan, Western Sky assigned it to CashCall.

47.     On or about December 28, 2009, CashCall through a subsidiary and Western Sky entered into an "Agreement for the Assignment and Purchase of Promissory Notes."  The terms reflected that Western Sky assigned all of its loans "on a daily basis" to the CashCall subsidiary (Agreement, p. 1) which paid Western Sky a monthly "administration fee" of $10,000 and also paid it $100,000 a month (p. 2) and was to "reimburse Western Sky for all costs of maintenance, repair and/or update costs associated with Western Sky Financial's server."  (Id.).  CashCall funded a "Reserve Account" initially funded at $100,000 and to be funded thereafter based on the value of purchased notes (Id., p. 3), was responsible for "all collection efforts" (Id., p. 4) and CashCall indemnified Western Sky for any civil or criminal claims.  (Id.).  Also on or about December 28, 2009, a subsidiary of CashCall and Western Sky entered into a "Promissory Note," and an "Agreement for Service."

**B.      History of Plaintiff's Claim in Arbitration.**

48.     The history of the Plaintiff's claim in arbitration further reflects how the loan agreement and all of its provisions are false and fraudulent.

49.     After the Court initially ordered arbitration, the Defendant acting on its own arranged for Mr. Robert Chasing Hawk to be the arbitrator.

50.     Plaintiff never agreed with CashCall for Mr. Chasing Hawk to be the arbitrator in my dispute.  CashCall picked him on its own.

51.     Mr. Chasing Hawk had never before arbitrated a consumer dispute, and he was not licensed or qualified as an arbitrator by any known authority.

13

52.     Plaintiff asked CashCall how much they were paying Mr. Chasing Hawk to be the arbitrator.  CashCall said it was none of Plaintiff's business.  CashCall would not send Plaintiff a copy of any contract with Mr. Chasing Hawk or records of what they were paying him.  To this day, such information has not been produced.

53.     Plaintiff found out through his own research that Mr. Chasing Hawk's daughter worked for the lending enterprise. Mr. Chasing Hawk had previously said in a May 1, 2013 letter that he had no prior connection to any of the parties.  This statement was inaccurate for several reasons – first, because his daughter worked for the lender, second, because the company actually wrote the letter he sent, and third, because he had long been in contact with Mr. Webb.

54.     The May 1 letter was "ghostwritten" for the arbitrator to pretend was his own. Mr. Chasing Hawk emailed Plaintiff the letter on Friday May 3, 2013.  But when the Plaintiff opened the attached letter, it was not signed.  It was simply a Microsoft Word document.  The Plaintiff noticed that in the email, Mr. Chasing Hawk was actually forwarding him another email that someone at a Lakota Cash email address had sent to Mr. Chasing Hawk.

55.     The email to Mr. Chasing Hawk was sent from a Lakota Cash "HR" (human resources) email address. Making matters worse, the email was copied on the Bogue law firm, which had filed corporation papers for Webb's companies and responded to consumer complaints for him in the past, and to Dan Baren who was the in-house counsel for CashCall.

56.     Thus when Mr. Chasing Hawk said he had "no preexisting relationship with either party," this was palpably false as he was signing a letter written for him by Defendant's enterprise.

57.     The Plaintiff's loan agreement says the tribe's "consumer dispute rules" apply to the purported alternative dispute resolution process.   Yet neither CashCall nor Mr. Chasing

Hawk ever provided the Plaintiff with the "consumer dispute rules" that were supposedly governing.

58.     This entire dispute started with the Plaintiff's lawsuit against CashCall merely alleging false information on his credit report.  However, the demand CashCall sent to the arbitrator claimed that the Plaintiff still owed CashCall more money. Incredibly, CashCall was still trying to collect the "remaining balance" that the law says the Plaintiff does not owe.  The amount of money the company loaned came to $2,525.00 (loan amount of $2,600 minus "fee" of $75). By December 2011, the Plaintiff had paid back $3,252.65 on the loan.  Thus the Plaintiff had paid back significantly more than he borrowed yet CashCall sought to pervert the arbitration process to claim a right to even more money.

59.     During the arbitration process, Mr. Chasing Hawk admitted that his adult daughter works for Martin Webb as a loan officer at the loan organization.

60.     The "preliminary hearing" in the arbitration occurred by telephone on Friday, June 21, 2013.  The Plaintiff called in and tape-recorded the hearing and Mr. Chasing Hawk said that he tape-recorded it as well.

61.     In the hearing, Mr. Chasing Hawk admitted that his daughter worked "giving out the loans." He also admitted that the owner (Martin Webb) came to him a few months before, unilaterally and without Plaintiff's involvement, asking Mr. Chasing Hawk to be the arbitrator.

62.     At the hearing, the Plaintiff expressed his concern that the parties should not be making rules as they go  and asked for clarification as to what the rules were.  Mr. Chasing Hawk finally said "I think both parties would compromise you don't have to really follow rules and regulations that's why I mentioned it's going to be informal and we'll agree we don't have to follow this and that because if we follow all the rules and regulations we're going to be jammed

up here."  Plaintiff did not agree to this arrangement.  Mr. Chasing Hawk also said "there's no set rules." In other words, the language in the loan agreement saying arbitration would be under the Tribe's "consumer dispute rules" was false.

63.     Due to Defendant's egregious and willful misconduct and unfair and deceptive business practices, the Plaintiff was put in the middle of a completely unfair arbitration proceeding, at great stress to himself as he was then proceeding *pro se*.

64.     In light of these facts, the entire dispute resolution provisions of the Western Sky loan agreement should be stricken and declared void, including all of the arbitration terms, tribal jurisdiction terms, and class action ban terms of the contract.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF FLORIDA USURY STATUTE

65.     Plaintiff incorporates the above-stated allegations by reference as if fully alleged herein.

66.     The loan violates the Florida usury statute.  Under Fl. Stat. § 687.02, the loan was a "usurious contract." The Florida Attorney General has expressly stated that consumer loans violate the law.

67.     Under Fl. Stat. § 687.02, "[a]ll contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatever, at a higher rate of interest than the equivalent of 18 percent per annum simple interest are hereby declared usurious."

68.     As is evident from Mr. Inetianbor's loan agreement, the interest rate Western Sky charged was over 139%.  Compared to the 18% interest rate limit under Florida law, this interest rate was over seven times greater than what the law allowed.

69.     Under Fl. Stat. § 687.04, CashCall must "forfeit the entire interest so charged, or contracted to be charged."  Further, Plaintiff is entitled to recover double the amount of interest that he paid.

70.     CashCall also violated Fl. Stat. § 687.071, which governs "criminal usury" and "loan sharking."  Under that statute, "any person making an extension of credit to any person, who shall willfully and knowingly charge, take, or receive interest thereon at a rate exceeding 45 percent per annum or the equivalent rate for a longer or shorter period of time, whether directly or indirectly or conspire so to do, commits a felony of the third degree."  Here, CashCall engaged in a criminal act.  Under the statute, "[n]o extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."  Plaintiff requests a declaration that the loan is void and unenforceable, as it exceeded even this high 45% amount.

71.     The facts reflect that Plaintiff received $2,525.00 through direct deposit in this loan. Plaintiff made period payments of approximately $298/month. By December 2011, Plaintiff has made a total payment of approximately $3,252.65 on the loan.

72.     Accordingly, the Plaintiff paid an interest rate of approximately 30%, which is far more than the general usury limit of 18% maximum interest allowed on a consumer loan. CashCall has demanded repayment at an approximate 139% interest rate on the loan by asking Plaintiff to make additional payments.  Here, 18% interest on a loan amount of $2,525 comes to $454.50.  However, the amount that Mr. Inetianbor paid was more than this, in fact totaling $727.

73.     When Plaintiff refused to make any further payments, CashCall in a letter to the Florida Office of Financial Regulations, wrote: "due to Abraham Inetianbor's good payment

17

history Cash Call would accept a onetime cash payment of $2,000.00" in addition to the payments Plaintiff already made to consider the loan account paid in full.  But because the loan is criminal and void, CashCall is entitled to nothing. Plaintiff is clearly a victim of usury by CashCall who is required to abide by the usury laws of Florida when conducting business in the state of Florida.

74.     Under Fl. Stat. § 687.03-.04, any company that willfully violates the statute must "forfeit the entire interest so charged, or contracted to be charged or reserved, and only the actual principal sum of such usurious contract can be enforced in any court in this state, either at law or in equity."  Further, when usurious interest has been paid, the consumer who paid it can recover double the amount of interest that he paid.

75.     As a direct and proximate result of Defendant's violation of the usury statute, Plaintiff has been injured, and the Plaintiff is entitled to an award of monetary damages and declaratory and injunctive relief.

## SECOND CLAIM FOR RELIEF:
## VIOLATION OF THE FLORIDA CONSUMER FINANCE STATUTE

76.     Plaintiff incorporates the above-stated allegations by reference as if fully alleged herein.

77.     Defendant violated the Florida Consumer Finance Act.  *See* Fl. Stat. § 516.001 through 516.36.  Under that law, Plaintiff received a "consumer finance loan," defined to mean a loan for less than $25,000 with an interest rate greater than 18%.  *See* Fl. Stat. § 516.01(2).

78.     Under Fl. Stat. § 516.02, "[a] person must not engage in the business of making consumer finance loans unless she or he is authorized to do so under this chapter or other statutes and unless the person first obtains a license from the office."  Here, no loans were issued in compliance with the law and in accordance with the required licensing.

18

79.     Under Fl. Stat. § 516.02(2)(a), "[a] person who is engaged in the business of making loans of money, except as authorized by this chapter or other statutes of this state, may not directly or indirectly charge, contract for, or receive any interest or consideration greater than 18 percent per annum upon the loan, use, or forbearance of money, goods, or choses in action, or upon the loan or use of credit, of the amount or value of $25,000 or less."  Here, CashCall violated this law by trying to charge more than 18% interest.  The loan also included a "finance charge" of $75.  This charge was illegal under Fl. Stat. § 516.031 which sets limits on finance charges.

80.     By violating this statute, Western Sky engaged in criminal acts under Florida law. *See* Fl. Stat. 516.19, providing that a violation of the Consumer Finance Act is a first degree misdemeanor.

81.     The loan also included a "finance charge" of $75.  This charge was illegal under Fl. Stat. § 516.031 which sets conditions and limits on finance charges.

82.     As a direct and proximate result of Defendant's violation of the consumer finance statute, Plaintiff has been injured, and the Plaintiff is entitled to an award of monetary damages and declaratory and injunctive relief.

**THIRD CLAIM FOR RELIEF:**
**VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE STATUTE**

83.     Plaintiff incorporates the above-stated allegations by reference as if fully alleged herein.

84.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is found at Fl. Stat. § 501.201 to 501.213.  The purpose of FDUTPA is stated at Fl. Stat. § 501.202: "To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the

conduct of any trade or commerce," and "[t]o make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."

85.     Under the FDUTPA, Fl. Stat. § 501.204(1), "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  In this matter, CashCall engaged in unfair and deceptive trade practices.

86.     The FDUTPA was drafted in broad terms to encompass a wide range of unfair or deceptive practices by individuals and companies.  The Florida Supreme Court has defined unfair practices to include conduct that offends public policy and that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. The Court has defined deceptive conduct as representations, omissions, or practices that are likely to mislead the consumer.

87.     Under Fl. Stat. § 501.213, the remedies allowed by FDUTPA are in addition to any other remedies that are available.

88.     Florida case law is replete with examples of businesses that have been held to account for deceptive or unfair trade practices.  Here, some of the unfair and deceptive acts of CashCall include:

- Setting up an arrangement for Western Sky to serve as a "front" to hide the fact that CashCall was the real lender and that no Tribal law actually applies.

- Continuing to do business in states with consumer laws similar to those of the numerous States that have barred CashCall from doing business, waiting until either a consumer lawsuit or a State agency action forces them to shut down.

- Using CashCall personnel in California and other locations outside of South Dakota and outside of the Tribal Reservation to perform servicing, collection and other work on the subject loans, and taking the overwhelming share of the revenues and profits made off the loans, while meanwhile falsely claiming that the loans are governed by Tribal law.

- Including purported tribal arbitration, jurisdiction and class action ban provisions in the form loan agreement and seeking to impose a sham system of arbitration when the Plaintiff sought to arbitrate his claim.

- Seeking to ban court claims and class action claims while knowing that the alternative dispute resolution procedure meant to take the place of those in the contract, i.e. tribal arbitration, was fraudulent and a sham.

89.     As a direct and proximate result of Defendant's violation of the FDUTPA statute, Plaintiff has been injured, and is entitled to an award of monetary damages and declaratory and injunctive relief.   Under Fl. Stat. § 501.211, Mr. Inetianbor is entitled to obtain a declaratory judgment that the unfair and deceptive acts of CashCall violated the Act.   Further, he is entitled to recover damages, attorney's fees and court costs.  *See* Fl. Stat. § 501.2105.

### FOURTH CLAIM FOR RELIEF:
### VIOLATION OF FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT

90.     Plaintiff incorporates the above-stated allegations by reference as if fully alleged herein.

91.     The Florida Civil Remedies for Criminal Practices Act is found at Fl. Stat. § 772.101 to 772.19.   Under Fl. Stat. § 772.102(1), the definition of "criminal activity" under the statute includes any crime that is chargeable under other Florida statutes, including "Chapter 687, relating to interest and usurious practices."   Here, CashCall (and Western Sky) violated the Florida laws relating to interest and usurious practices.

92.     Also, "criminal activity" includes violations of "Chapter 817, relating to fraudulent practices, false pretenses [and] fraud generally…."  Here, CashCall violated Fl. Stat. § 817.06, via misleading advertisements and practices involving illegal loans.

93.     CashCall violated Fl. Stat. § 817.54, which states that no one can with an intent to defraud, obtain a promissory note evidencing a debt from any person by aid of false representation or pretense.

21

94.     Under Fl. Stat. § 772.102(2), CashCall is liable for obtaining monies on an "unlawful debt," meaning, any money constituting principal or interest of a debt that is unenforceable in Florida because the debt was incurred in violation of Fl. Stat. § 687.071, relating to criminal usury and loan sharking.

95.     CashCall engaged in an "Enterprise," meaning, an association between their businesses and controlling individuals to engage in the usury loan activities.  It engaged in a "pattern of criminal activity" because it engaged in multiple incidents of the criminal activity, specifically making the loans to multiple individuals in Florida.  Under Fl. Stat. § 772.103, CashCall engaged in "prohibited activities," including receiving unlawful monies and proceeds from the illegal loans, and investing them back into the unlawful enterprise.

96.     Under Fl. Stat. § 772.18, "[t]he application of one civil remedy under this chapter does not preclude the application of any other remedy, civil or criminal, under this chapter or any other provision of law. Civil remedies under this act are supplemental, and not mutually exclusive."

97.     Under Fl. Stat. § 772.104(1), "[a]ny person who proves by clear and convincing evidence that he or she has been injured by reason of any violation of the provisions of s. 772.103 shall have a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts."  Plaintiff is entitled to all of these remedies under the Act.

98.     As a direct and proximate result of Defendant's violation of the Florida Civil Remedies for Criminal Practices Act, Plaintiff has been injured, and the Plaintiff is entitled to an award of monetary damages and declaratory and injunctive relief.

## FIFTH CLAIM FOR RELIEF:
## FRAUD

99.    Plaintiff incorporates the above-stated allegations by reference as if fully alleged herein.

100.    CashCall is liable for fraud.  CashCall had a duty to be truthful and honest in its representations regarding the loans.  CashCall made false representations including that Western Sky was making the loans when in reality Western Sky was just a front for CashCall.  CashCall also fraudulently represented or caused to be represented that these loans were lawful and valid when that was not true.

101.    Plaintiff relied to his detriment on the misrepresentations because if CashCall had truthfully disclosed or caused to be disclosed that the loans were harmful and illegal, the Plaintiff never would have applied for one.  As a result of CashCall's fraud, the Plaintiff has been harmed.

102.    CashCall made false representations including that Western Sky was making the loans when in reality Western Sky was just a "front" for CashCall.  CashCall also fraudulently represented in the Western Sky advertisements and loan agreement that these loans were lawful and valid when that was not true.  Plaintiff relied on CashCall's misrepresentations because if CashCall had truthfully disclosed that the loan was illegal, the Plaintiff never would have applied.  As a result of CashCall's fraud, the Plaintiff has been harmed.

103.    CashCall also fraudulently included purported tribal arbitration and jurisdiction and class action ban provisions in the form loan agreement while knowing there were no tribal arbitration rules or procedures and then sought to construct and impose a sham system of arbitration when the Plaintiff, as one of the victimized borrowers, sought to arbitrate his claim.

104.     CashCall also fraudulently sought to ban court claims and class action claims while knowing that the alternative dispute resolution procedure meant to take the place of those in the contract, i.e. tribal arbitration, was fraudulent and a sham.

105.     As a direct and proximate result of Defendant's fraud, Plaintiff has been injured, and the Plaintiff is entitled to an award of monetary damages and declaratory and injunctive relief.

## SIXTH CLAIM FOR RELIEF:
## CLAIM UNDER FLORIDA PUNITIVE DAMAGES LAW

106.     Plaintiff incorporates the above-stated allegations by reference as if fully alleged herein.

107.     Plaintiff is entitled to an award of punitive damages against CashCall.   The evidence reflects by clear and convincing evidence that CashCall engaged in intentional misconduct including that it knew the subject loan scheme was a scam and was illegal under Florida law, but pursued it anyway.   CashCall knowingly participated in the unlawful misconduct.  The Plaintiff is entitled to punitive damages.

108.     Plaintiff is further entitled to punitive damages because CashCall fraudulently included purported tribal arbitration and jurisdiction and class action ban provisions in the form loan agreement while knowing there were no tribal arbitration rules or procedures and then sought to construct and impose a sham system of arbitration when the Plaintiff, as one of the victimized borrowers, sought to arbitrate his claim.  CashCall also fraudulently sought to ban court claims and class action claims while knowing that the alternative dispute resolution procedure meant to take the place of those in the contract, i.e. tribal arbitration, was fraudulent and a sham.

109.    Mr. Inetianbor himself spoke to various Tribal members and representatives regarding the present matter.  He was advised that the Western Sky and CashCall lending scheme was not authorized by the Tribe and was in fact a predatory lending scheme.  He was further advised that even under Tribal law, these kinds of high-interest loans were not allowed.   In fact, even under Tribal law, the instant loans are unlawful and criminal.

<b>SEVENTH CLAIM FOR RELIEF:<br>VIOLATION OF FAIR CREDIT REPORTING ACT</b>

110.    Plaintiff incorporates the above-stated allegations by reference as if fully alleged herein.

111.    Under the FCRA, 15 U.S.C. § 1681 *et seq*., furnishings of credit information to Credit Reporting Agencies ("CRAs") must not provide information that they know or have reasonable cause to believe is inaccurate.

112.    If a furnisher of information to one or more CRAs determines that the information provided is not complete or accurate, the furnisher must promptly provide complete and accurate information to the CRA.

113.    If a consumer notifies a furnisher that specific information is inaccurate, and the information is, in fact, inaccurate, the furnisher must thereafter report the correct information to CRAs.

114.    Here, Plaintiff during the pertinent times adequately disputed the negative information on his credit reports, to CashCall as a furnisher of information to the CRAs, and informed CashCall that no negative information should be reported to the CRAs since the loan was invalid and void and no payments are owing.

115.    However, despite Plaintiff's requests to CashCall, Cashcall during some or all of the pertinent times willfully refused to provide accurate information, failed to properly

reinvestigate the matter and meet its duties under the FCRA, and failed to report to the CRAs that the consumer disputed the negative information.

116.    Accordingly, to the extent the evidence may show, the Plaintiff claims a right to all civil remedies provided under the FCRA including recovery of actual damages, attorney fees, and statutory and punitive damages. *See* 15 U.S.C. § 1681n and 1681o.  In addition, Plaintiff pleads all violations of the FCRA as further evidence of his claim against CashCall under the FDUTPA.

117.    As a direct and proximate result of Defendant's violation of the FCRA, Plaintiff has been injured, and the Plaintiff is entitled to an award of monetary damages and declaratory and injunctive relief.

## EIGHTH CLAIM FOR RELIEF: DEFAMATION

118.    Plaintiff incorporates the above-stated allegations by reference as if fully alleged herein.

119.    The elements of a claim for defamation are as follows: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008).

120.    Here, upon information and belief and to the extent the evidence may show: CashCall published defamatory information regarding the Plaintiff specifically by reporting to credit reporting agencies that the Plaintiff owed money on a debt when in fact he did not because the underlying loan is void, unconscionable, and unlawful.

121.    The statements made by CashCall were false; CashCall knew or should have known that the underlying loan was usurious, criminal and void.

122.    Mr. Inetianbor has suffered actual damages; and the statements were defamatory under the circumstances.

123.    As a direct and proximate result of Defendant's defamatory conduct, Plaintiff has been injured, and the Plaintiff is entitled to an award of monetary damages and declaratory and injunctive relief.

**NINTH CLAIM FOR RELIEF:**
**DECLARATORY JUDGMENT THAT TRIBAL LAW AND FORUM DOES NOT**
**APPLY, THAT ARBITRATION CLAUSE IS VOID, AND THAT ANY PURPORTED**
**CLASS ACTION BAR IS VOID**

124.    Plaintiff incorporates the above-stated allegations by reference as if fully alleged herein.

125.    CashCall contends that the Tribal Law of the Tribe governs this loan and this arbitration.  This is false for multiple reasons.

126.    First, the Western Sky company is not a Tribal corporation and not organized under Tribal law.  Rather, it is organized under South Dakota State law.  In other words, in the very formation of the Western Sky company (Western Sky Financial, LLC), its owner, Martin Webb admitted that it was not governed by Tribal corporation law but rather South Dakota corporation law.

127.    It is even more baseless for CashCall to claim that Tribal law applies.  CashCall has no relation to the Tribe.  It is a for-profit California corporation owned by John Paul Reddam who is not a tribal member.  Profits from this business do not go to the Tribe but manly to Reddam and his out-of-state California company.  CashCall has no basis to assert that Tribal law governs its conduct.

128.     Second, Tribal law only applies to a limited range of matters.  Typically, these are disputes on the reservation among Tribal members.  Western Sky admits that it did not even market or make its loans to Tribal members or anyone dwelling on the reservation, or even in South Dakota.  Presumably this was because these loans were so unlawful that the Tribal Courts would not allow them to be made to Tribal members.

129.     Third, States such as Florida have their own small loan laws that govern loans that affect state residents.  Many different states have rejected Western Sky and CashCall's claims that Tribal law could apply.

130.     When a customer called Western Sky to apply for a loan, they did this from where the customer was in Florida or the other state – not on the reservation.  If the loan was approved, the money was sent to the borrower's bank in Florida or another state – not on the reservation. When CashCall took loan payments out of peoples' bank accounts using "electronic debits" or "automatic debits" this was done from these banks off the reservation in states like Florida.

131.     Thus, the tribal law does not apply to these loans as multiple states that have looked at the matter have found, including the States of California, Colorado, Georgia, Illinois, Maryland, Massachusetts, Missouri, New Hampshire, Oregon, Washington State and West Virginia.

132.     Plaintiff's "Agreement to Arbitrate" states as follows: "Agreement to Arbitrate. You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement."  Plaintiff cannot locate any "consumer dispute rules." Therefore, the arbitration agreement is misleading and

unenforceable because there are no such rules.  This is another reason why the Tribal law does not apply – it doesn't even exist, when it comes to these purported "rules."

133.    The loan agreement states that Western Sky is a lender authorized by the laws of the Tribe and "the Indian Commerce Clause."  (Agreement, first page).   The truth is that Western Sky is not chartered under Tribal law but under South Dakota state law.  Further, the Indian Commerce Clause is a part of the U.S. Constitution that allows Congress to regulate Indian tribes and does not "authorize" Western Sky.

134.    The agreement states that the borrower must pay an interest rate of 139.31%. (Agreement, first page).  This is false because Florida law limits interest to 18% for loans under $500,000.00.

135.    The agreement states that the borrower must pay a "finance charge" of $75. (Agreement, second page).  This is false because Florida law does not allow such a charge in such an amount.

136.    The agreement states that the borrower must pay the interest and charges and that whoever holds the note can enforce it.  (Agreement, second page).  This is false because Florida law does not allow such a loan.

137.    The agreement represents that any dispute must be resolved by "Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." (Agreement, page 3, and the representation about the "consumer dispute rules" is made again at page 4).   First, there are no "consumer dispute rules." Second, the Tribe does not have any rules or laws that authorize such an arbitration and third, the "terms of this Agreement" incorporated

29

into the clause are riddled with falsehoods as noted.  Therefore, the arbitration part of the loan agreement is fraudulent and void along with the rest of it.

138.    The agreement states that Western Sky will pay the "filing fee" for the arbitration, making it again sound as if the Tribe has an established procedure and rules.  (Agreement, p. 4).  In fact, because the Tribe does not have any rules or procedures for them there is upon information and belief no such "filing fee."

139.    The agreement defines "disputes" very broadly and says they all must be arbitrated, but then states that any disputes regarding the purported class action ban must be litigated before the Tribal Court.  (Agreement, pp. 3-5).  The agreement states that matters regarding the class ban must be litigated before the Tribal Court when the Tribal Court lacks subject matter jurisdiction over these loans which are never issued to Indians, tribal members, reservation dwellers or even South Dakotans, but instead only via the internet to consumers up to thousands of miles away who never enter the reservation and who are protected by their states' consumer protection laws.

140.    The agreement purports to force Tribal venue, law and arbitration on the consumer when in fact the real lender is a California non-tribal corporation, i.e. CashCall, which has no right to shield itself from suit by virtue of any of the provisions in this unlawful contract.  In fact, CashCall makes almost all the revenues and profits on these loans and they are largely administered by CashCall employees who are in California and other states.  Thus, these illegal loans do not benefit the Tribe.

141.    CashCall fraudulently sought to ban court claims and class action claims while knowing that the alternative dispute resolution procedure meant to take the place of those in the contract, i.e. tribal arbitration, was fraudulent and a sham.  Because the loan agreement and its

pertinent terms are riddled with false, fraudulent and unfair and deceptive provisions and because the loan agreement is an unconscionable contract as well as one that is impossible to perform and the product of mistake, none of its dispute resolution provisions, including the class action ban, should be enforced.

## VI.  CLASS ACTION ALLEGATIONS.

142.   Plaintiff in addition to bringing his individual claims, hereby also brings a class action claim on behalf of himself and all others similarly situated under the provisions of Rule 23 of the Federal Rules of Civil Procedure and request certification of the following class:  All persons who borrowed money in a Western Sky loan in Florida.

143.   The requirements for maintaining this action as a class action are satisfied in that there are too many class members for joinder of all of them to be practicable.  Upon information and belief, there are thousands of members of the proposed class.

144.   There are issues of fact or law that are common to all members of the class, including but not limited to:

- whether Defendant unlawfully collected sums from class members and took money from class members' bank accounts;

- whether CashCall improperly used Western Sky as a "front" for its internet lending business in order to engage in a subterfuge that the enterprise was protected by Tribal law, venue, arbitration and purported class action bans from State regulation or consumer claims;

- whether the Western Sky loan contracts including their Tribal law, venue, arbitration and class action ban provisions are unfair, deceptive, unreasonable, unenforceable and void;

- whether the loans to class members in Florida violate Florida lending and consumer protection law;

- whether Defendant's uniform business methods pertaining to the loans to class members in Florida constitute unfair and deceptive trade practices in violation of the Florida UDAP;

31

- whether the loans are void contracts illegal ab initio and entitling class members to refunds;

- whether class members are entitled to relief under one or more of the Plaintiff's substantive claims for relief;

- whether class members can recover damages and/or injunctive and declaratory relief; and

- whether the class is entitled to an award of attorneys' fees and costs.

145.    Plaintiff's claims are typical of the claims of class members.  Plaintiff is a member of the class, will adequately represent it and does not have any interest adverse to that of class members.  Plaintiff has retained counsel experienced in lending law and who have litigated class action cases against consumer and subterfuge lenders, and who have litigated class actions in other jurisdictions as well.

146.    Pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, the class meets all requirements for class certification.

147.    The class meets the requirements of Rule 23(b)(1) because adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of other members of the class not parties to the adjudications or would substantially impair or impede their ability to protect their interests.  The proposed class may be properly certified under Rule 23(b)(1) because an adverse decision by the Court against an individual Plaintiff might contain precedent that could be used against other Plaintiffs.

148.    The class is also properly maintainable under Rule 23(b)(2) because Defendant acted or refused to act on grounds generally applicable to the class.  Defendant facilitated loans on materially similar terms to all class members.  Plaintiff seeks a declaration as to all class members that the loans were void and illegal and class members do not owe any money pursuant

32

to these loans and that negative and derogatory information should not be reported to credit reporting agencies and that Defendant should take steps to correct any such information on class members' credit reports.  Accordingly, injunctive or declaratory relief would be appropriate.

149.    In addition, the class meets the requirements of Rule 23(b)(3) because the questions of law or fact common to members of the class predominate over any questions affecting only individual class members.  The determinative common questions all apply to all class members.  Additionally, a class action is superior to any other available methods to obtain a fair and efficient adjudication.  Concentrating the litigation in this forum would not present undue burdens for absent members.  Finally, Plaintiff does not foresee any difficulties in managing the case as a class action.

## VII.  PRAYER FOR RELIEF.

WHEREFORE, Plaintiff prays, on behalf of himself and all other similarly situated individuals, for entry of a judgment finding and ordering as follows:

A.    certifying the class under Rule 23;

B.    finding that the arbitration, forum selection, Tribal law and class action ban provisions in the loan agreement are void and unenforceable;

C.    finding that the subject loans violated the law as alleged herein;

D.    declaring that no money may be collected by Defendant from the class members on the subject loans;

E.    ordering Defendant to pay to class members all amounts collected pursuant to the subject loans;

F.    awarding class members actual and treble damages;

G.      ordering injunctive and equitable relief including to correct the credit reports and

credit histories of the Plaintiff and class members;

H.      awarding reasonable attorneys' fees and expenses;

I.      awarding pre-judgment interest as allowable by law; and

J.      awarding such other and further relief as this Court may deem just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.


Respectfully submitted, this the 11th day of February, 2015.


s/Cathy Williams
Mona L. Wallace (N.C. Bar No. 09021)
John S. Hughes (N.C. Bar No. 22126)
Cathy Williams (Fl. Bar No. 0088862)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
agoss@wallacegraham.com
mwallace@wallacegraham.com
jhughes@wallacegraham.com
cwilliams@wallacegraham.com

Janet Varnell, Esq.
Florida Bar No. 0071072
Varnell and Warwick, P.A.
20 La Grande Boulevard
The Villages, FL 32159
Telephone: 352-753-8600
Fax: 352-753-8606525
jvarnell@varnellandwarwick.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2015, I served the foregoing document on all counsel of record, by email and via the Courts' CM-ECF system.


This the 11th day of February, 2015.

s/Cathy Williams
Mona L. Wallace (N.C. Bar No. 09021)
John S. Hughes (N.C. Bar No. 22126)
Cathy Williams (Fl. Bar No. 0088862)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com
cwilliams@wallacegraham.com