## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 13-60066-CIV-COHN-SELTZER

ABRAHAM INETIANBOR          )
     Plaintiff,          )
                  )
vs.          )
                  )
CASHCALL, INC.,          )
     Defendant.          )
_____)

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT CASHCALL, INC.'S
## MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

     Plaintiff pursuant to LR 7.1(c) hereby responds to the motion to dismiss and incorporated brief filed by Defendant at Doc. 122 ("Def. Br.") and shows as follows:

## INTRODUCTION

     After setting up a deliberate scheme to solicit Florida consumers for usurious payday loans over the internet under the fallacious guise of Tribal lending, CashCall now tries to use that very same scheme to force the case to be litigated thousands of miles away from where either Plaintiff or Defendant resides, in Tribal Court under Tribal Law.[1]  After more than two years of litigation the Plaintiff has had no opportunity to engage in any discovery until now.  Plaintiff has just begun discovery into the issues including those relevant to the very motion Defendant has filed, such as – Does the Tribe really have any relation at all to the CashCall scheme?  To what extent was any Tribal entity really involved in the scheme so as to justify in any way applying Tribal law, forum or jurisdiction?  The motion to dismiss should be denied outright, or in the alternative, denied without prejudice as it is vastly premature since Plaintiff is entitled to discovery into the very issues raised by Defendant, as discussed further below.

## ARGUMENT

### 1.  Defendant is Not Entitled to Dismissal under the Choice of Law Clause.

     First, Defendant argues that the loan contract's choice of law provision is enforceable because according to Defendant and without the benefit of any discovery, the transaction

---

[1] Eagle Butte, South Dakota, the largest city near where the Cheyenne River Sioux Tribe Reservation is located, is over 1,430 miles from Orange, California where CashCall's headquarters are presently located, and over 2,100 miles from Oakland Park, Florida where Mr. Inetianbor resides.

purportedly bears a "reasonable relation" to the Cheyenne River Sioux Tribe (the "CRST" or "Tribe") whose laws the provision would apply.  (Def. Br. pp. 3-8).  However, this is a fact-specific issue.  It cannot be decided on a motion to dismiss but rather must await summary judgment.  Alternatively, the motion should be denied outright as the Third Amended Complaint alleges numerous specific facts showing no reasonable relationship between the Tribe and the loans.  While Defendant cites purported facts that it says support its argument that there is a reasonable relation between the loans and the Tribe, the Plaintiff alleges numerous facts supporting the opposite, which Defendant simply ignores.

In fact the Plaintiff outlines and alleges a profoundly unusual and deceptive loan program whereby a company located in California that had nothing to do with the Tribe (CashCall), used the Western Sky entity as a "front" to solicit usurious loans over the internet.  According to Plaintiff (and based on evidence gleaned from regulators who have investigated the scheme), CashCall organized the operation, funded it, used a call center in California, used its computer servers, and was the real lender.  If these facts are borne out in discovery, then clearly they support a finding that there was not a "reasonable relation" between the loans and the Tribe whose laws and forum CashCall wants to apply.

The Plaintiff's claim that the Western Sky setup was a front and an utter sham derives from actual findings already made by regulators and courts in other states.  *E.g., Jackson v. Payday Financial, LLC,* 764 F.3d 765, 779 (7th Cir. 2014) (Western Sky loans "a sham from stem to stern"); *In re CashCall, Inc.*, No. 12-308, 2013 WL 3465250, *2 (N.H. Banking Dept. June 4, 2013) ("After detailed review of the respondents' business scheme, it appears that Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators.").  Furher, when the Eleventh Circuit affirmed this Court's prior order refusing to enforce the arbitration provision, Judge Restani in concurring noted in strong language the sham nature of the very agreement Defendant seeks to enforce.  *See Inetianbor v. CashCall, Inc.,* 768 F.3d 1346, 1356 (11th Cir. 2014) (Restani, J., concurring) (describing how "there simply was no prospect of a meaningful and fairly conducted arbitration" given as "the forum selection provision was **a sham and an illusion**" (quoting *Jackson, supra*; emphasis added)).  CashCall now asks this Court to overlook this sham and endorse the illusion

of Tribal involvement – this should not occur, and the Court is entitled to be informed by discovery before it decides these issues, as well.

Courts have not hesitated to deny motions to dismiss based on choice of law clauses where there is a fact issue or when there has not been a chance to develop evidence that may inform the issue.[2]  Here, Plaintiff is entitled to engage in discovery on the relevant issues and the motion should be denied as premature, if not denied outright.  The reality of CashCall and Western Sky's business relationship and the real status of Tribal involvement and the legitimacy of the enterprise are issues subject to discovery.  Plaintiff has established *prima facie* grounds for that discovery since other authorities have already found the Tribal arrangement a "front" and a "sham."  As one court found, choice of law provisions

> will not be honored where the jurisdiction whose law is to be applied has no reasonable relation to the agreement or where the enforcement of the provision would violate a fundamental public policy …. Since the precise status of the defendant as a business entity and the legitimacy of its business practices have not yet been determined, enforcement of the choice of law provision at this juncture would be inappropriate.

*Culbert, supra,* 184 A.D.2d at 613.  Likewise under Florida law, a choice of law clause will not be enforced if it bears no reasonable relation,[3] and if as Plaintiff alleges the purported Tribal connection of the enterprise was illusory, there is no reasonable relation.

Numerous courts have refused to enforce choice of law clauses where the facts failed to reveal a reasonable relationship between the sought forum (here, the Tribal Court) and the actual facts (here, a California company, CashCall, that tried to use a sham program to make illegal

---

[2] *See Meade v. Florida Infusion Servs.,* No. 00-CV-0821, E.D. Pa. Order dated Nov. 14, 2000, at p. 3 ("Since the record in this action contains no evidence as to whether or not the plaintiff has any contacts whatsoever with Florida and as to whether or not this transaction bears a reasonable relationship to Florida, we find that genuine issues of material fact exist which preclude a definitive determination from being made at this time as to which state's law should apply.") (unreported cases are attached at Exhibit 1); *Culbert v. Rols Capital Co.,* 184 A.D.2d 612, 585 N.Y.S.2d 67 (N.Y. App. Div. 1992) (fact question existed as to whether company was only nominally operating in state for usury scheme and so there was an issue as to whether state bore reasonable relation).

[3] *E.g., Morgan Walton Properties, Inc. v. International City Bank & Trust Co.,* 404 So.2d 1059, 1063 (Fla. 1981) (choice of law clause will be honored where facts show a "normal and reasonable relation" to the choice of law state).

usury loans to Florida residents like Mr. Inetianbor).[4]  Both CashCall and Mr. Inetianbor are domiciled far away from the Tribe's location in South Dakota.  Ties between the parties and the Tribe are insubstantial since the only reason why the Tribe was drawn in at all is due to a sham scheme promulgated by CashCall.  *Compare Carefree Vacations, Inc.*, 615 F.Supp. at 214-15 (refusing to enforce Texas choice of law provision -- the transaction bore no substantial relationship to Texas since the contract was executed elsewhere and the parties were domiciled elsewhere).  As that court found:

> Upon review of the testimony, the record, and consideration of the oral arguments, the Court finds that **the matter at bar bears no "substantial relation" to Texas.** The contract was executed in Tennessee and Illinois. The bill of sale transferring the aircraft to defendant Brunner was signed in Illinois. **The payments by Carefree actually came to rest in defendant's bank in Granite City, Illinois** …. [A]ny nexus with Texas, is extremely remote and insubstantial. [¶] Accordingly, **the Court finds the choice-of-law provision unenforceable.**

615 F.Supp. at 215 (emphasis added).  Likewise here, all the payments were made to CashCall in California (Third Amended Complaint ¶¶ 24, 34) and neither CashCall nor Plaintiff was located on the Reservation.  CashCall tries to hold up Western Sky Financial, LLC and Martin Webb as the basis for Tribal connection, but The Tribe did not even have any affiliation to Western Sky, Western Sky was merely a front for CashCall and not the real lender, and CashCall is located in California.  CashCall neglected to involve the Tribe (Third Amended Complaint ¶ 32), Western Sky was a South Dakota LLC not a Tribal entity, and it was such a sham that CashCall did not even allow Western Sky to take payments from borrowers – they all had to go straight to CashCall.  (Third Amended Complaint ¶¶ 32, 34).

Courts in other jurisdictions do not hesitate to disregard a choice of law clause where there is no "reasonable relationship."[5]  Here, there are many facts supporting the conclusion that

---

[4] *See Carefree Vacations, Inc. v. Brunner*, 615 F.Supp. 211, 215 (W.D. Tenn. 1985) (refusing to enforce Texas choice of law provision where connection was "remote and insubstantial"); *S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F.Supp. 1014, 1025 (S.D.N.Y. 1984), *aff'd*, 762 F.2d 990 (2nd Cir. 1985) (contacts too remote to justify enforcing choice of law clause – "Illinois has no substantial relationship to the parties … the rights and duties of the parties to the contract are to be governed by the law of New York, despite the 'agreement' of the parties to the contrary.").

[5]*See Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.*, 743 So.2d 954, 959 (Miss. 1999) (refusing to enforce Texas choice of law clause in contract providing for relocation of an Exxon ammonia plant from Mississippi to Pakistan – "Texas law bears no reasonable relationship to or significant contacts with the parties or the subject matter of the litigation."); *Curtis 1000, Inc. v. Suess*, 24

4

the entire purported relation between CashCall'a loan program and the Tribe was nonexistent and a sham. Therefore, there can be no reasonable relation between the loan program and the Tribe so as to justify applying Tribal law. Among other things:

- CashCall's agreements with Western Sky reflect how CashCall organized, funded, administered and dominated the internet loan program. *See* Third Amended Complaint ¶¶ 32-34, 47.

- Western Sky itself was not affiliated with the Tribe or endorsed by the Tribe. To the contrary Western Sky was organized as an LLC under South Dakota law, not under Tribal law. *Id.* ¶¶ 16, 33.

---

F.3d 941, 948 (7th Cir. 1994) (Illinois law applied, despite choice of Delaware law in agreement, because "there is insufficient connection between the contract and the State of Delaware"); *Curtis 1000 Inc. v. Youngblade*, 878 F.Supp. 1224, 1254-55 (N.D. Iowa 1995) (choice of law clause invalid --  "this court finds that there is no substantial relationship between Delaware, which is only the place of incorporation of Curtis 1000, to the parties or the transactions involved here and there is no other reasonable basis for the parties' choice of Delaware law."); *Mitsubishi Caterpillar Forklift America Inc. v. Superior Serv. Assocs. Inc*., 81 F.Supp.2d 101, 118 (D. Maine 1999) (noting "record is devoid of evidence demonstrating that Ohio has any relationship, substantial or otherwise, to either of the parties or the transaction at issue, or any other reasonable basis for the choice of Ohio law in the 1994 Agreement"); *Contour Design Inc. v. Chance Mold Steel Co*., No. 09-cv-451-JL  (D.N.H. Dec. 16, 2011), Order at pp. 45-46 ("The NDA is a contract between Contour (which the NDA identifies as a Delaware corporation, and which has its principal place of business in New Hampshire) and Chance (a Taiwanese corporation), and was necessitated by Contour's soliciting Chance, in Taiwan, to manufacture products there for sale worldwide. So the NDA bears no "significant relationship" to Colorado, which means that this court cannot give effect to its choice-of-law clause. *See CCR Data Sys., Inc. v. Panasonic Commc'ns & Sys. Co*., No. 94-456, 1995 WL 54380, at *4-*5 (D.N.H. Jan. 31, 1995) (McAuliffe, J.) (refusing to apply New York law to a contract dispute, even where the contract provided for it, because there was "no nexus between the State of New York, these parties, and this particular contract")); *United Countries Trust Co. v. Mac Lum, Inc.*, 643 F.2d 1140, 1143 (5th Cir. 1981) (refusing to enforce New York choice of law clause in contract between Kentucky and New Jersey corporations concerning equipment in Georgia); *Triad Fin. Establishment v. Tumpane Co.*, 611 F.Supp. 157, 163-64 (N.D.N.Y. 1985) ("Plaintiff Triad is a Liechtenstein entity. Defendant Tumco is incorporated in New York with its main office in Vancouver, Washington…. Tumco had only two employees in New York compared with 3750 in Saudi Arabia, 500 in Montana, 250 in California, 200 in Spain, and 100 in Washington…. It appears that New York's only significant contact with this litigation is via the forum selection clause contained in the Marketing Agreement…. In view of the significant connection to Saudi Arabia, the fundamental Saudi policy against agent's fees in military contracts, and the negligible relation between this case and New York, the court finds that Saudi Arabian law should apply."); *LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc*., 92 F.Supp.2d 119, 127-28 (E.D.N.Y. 2000) ("The parties have failed to identify a sufficient 'reasonable relationship' between the franchise and Tennessee to warrant application of the Agreements' Tennessee choice of law clauses…. The Tennessee choice of law provision in the Agreements are thus unenforceable under New York choice of law rules."); *Coleman v. Robinson*, 778 So.2d 1105, 1115-16 (La. 2001) (one spouse's brief residence in North Carolina was an insufficient connection for a choice-of-law clause for NC in a contract regarding division of marital property – "North Carolina's contacts with these parties and their community property settlement are tenuous, at best.").

- The loans were immediately "assigned" to CashCall which sent a notice to the borrower and all phone calls and emails were with CashCall as the customer made loan payments and was subjected to collection efforts. *Id.* ¶¶ 39, 46.

- Borrowers only made payments to CashCall; CashCall did not allow the purported Western Sky entity to receive payments. *Id.* ¶ 34.

- After the New Hampshire Banking Department was provided access in discovery to documents regarding the CashCall and Western Sky arrangements, it concluded that Western Sky was a sham and nothing but a "front" for CashCall and that CashCall had taken steps to try to conceal the actual facts regarding its enterprise. *Id.* ¶¶ 29-30.

- When Mr. Inetianbor called the Tribal government to find ask about Western Sky, he was told that "Mr. Webb operates his business outside the Tribe – it is not a Tribal business," that the Tribe refused to support Western Sky's claim of Tribal Immunity, and that "from a legal standpoint, Western Sky and CashCall are criminals." Inetianbor affidavit dated Aug. 14, 2013, filed at Doc. 86-1, ¶¶ 10, 14.

Plaintiff has not been allowed discovery to date. Contemporaneous with this brief, he is serving written discovery requests and a Rule 30(b)(6) deposition notice which go precisely to these and other relevant issues. The Court should deny Defendant's motion as being premature and inappropriate where Plaintiff has expressly alleged that the purported Tribal connection (necessary to find a "reasonable relation" for a choice of law clause) was a sham. The choice of law issues should be addressed, if at all, after discovery. Indeed, other courts have found it appropriate to resolve the choice of law issue at the summary judgment stage, after discovery.[6]

In addition, a choice of law clause will not be enforced if doing so will violate an important Florida public policy. While Defendant points to loan cases where courts allowed a foreign state's usury and interest rate laws to apply, the facts here reflect a one-of-a-kind, quasi-criminal outlaw enterprise setting up a deliberate "front." It is difficult to imagine that Florida public policy would allow for a company to set up a sham, illusionary Tribal connection as a basis to avoid Florida consumer lending law. It is appropriate to conclude, either now or after discovery, that enforcing the clause violates State public policy.[7]

---

[6] *See Mitsubishi Caterpillar Forklift America Inc. v. Superior Serv. Assocs. Inc.*, 81 F. Supp. 2d 101, 118 (D. Maine 1999) (denying application of choice of law clause after reviewing evidence in "[t]he summary judgment record").

[7] *See Dept. of Motor Vehicles v. Mercedes-Benz of N. Am., Inc.*, 408 So.2d 627, 630 (Fla. 2d DCA 1981) ("It has been held that the principle of comity does not require the courts of this state to enforce a contract according to the law where it is made if its enforcement would be in conflict with our laws and

A close examination of cases in which Florida courts upheld choice of law clauses shows that there was a finding of a reasonable, normal relationship between the facts and the forum.[8] Here, on the very unusual facts in this case, the Tribe has no connection to the loan scheme and the lender, CashCall, is out in California and not under Tribal jurisdiction at all.

2. **Defendant is Not Entitled to Dismissal under its Forum Selection Clause.**

Defendant' second argument is that the case must be dismissed under the forum selection clause. (Def. Br. pp. 9-12). This argument is premature as well for many of the same reasons as the choice of law argument. Courts addressing choice of law and choice of forum provisions have noted how the analysis is similar. *See Carefree Vacations, Inc.*, *supra*, 615 F.Supp. at 214-15 (refusing to enforce choice of law and choice of forum provisions where the chosen forum of Texas lacked any reasonable relation to the facts and parties).

Under *Atlantic Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S.Ct. 568, 580 (2013), any presumptive enforceability of the clause can be **overcome if the plaintiff makes a strong showing that enforcement would be improper.** *See id.; see also Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009). Defendant baldly claims that "Inetianbor fails to meet this heavy burden" (Def. Br. 8) while ignoring the fact that Mr. Inetianbor so far has failed to have opportunity to engage in discovery on the matter.

The forum selection clause is unenforceable because parties cannot by agreement confer subject matter jurisdiction on a court that does not have it. Defendant seeks to have the parties confer subject matter jurisdiction on the Tribal Court by contract, but the law is clear that parties cannot create subject matter jurisdiction by consent. Further where the contract includes obvious falsehoods such as its assertion that Plaintiff was on the Reservation (he has never been there),

---

would work against our own citizens and give that nonresident an advantage which a resident has not."); *Temporarily Yours, et al., v. Manpower, Inc.*, 377 So.2d 825 (Fla. 1st DCA 1979) (declining to apply the law of a foreign jurisdiction even though that was the law agreed to by the parties).

[8] *E.g., Morgan Walton Properties, Inc. v. International City Bank & Trust Co.,* 404 So.2d 1059 (Fla. 1981). In that case the Court noted that the facts had a "normal and reasonable relation" to the choice of law state: "Since the agreements had a normal and reasonable relation to Louisiana, the stipulation of Louisiana law as controlling should be honored, even if the parties' purpose in making it was to avoid the restrictive effects of Florida's usury law." 404 So.2d at 1063. Here, such a normal and reasonable relation does not exist. *See also Continental Mortgage Investors v. Sailboat Key, Inc*., 395 So.2d 507, 508 (Fla. 1981) ("We conclude that in an interstate commercial loan transaction with which several states have contacts and in which usury is implicated, Florida courts will recognize a choice of law provision provided by the parties **so long as the jurisdiction chosen in the contract has a normal relationship with the transaction**." Emphasis added).

such statements cannot create jurisdiction if it does not exist. This is especially true in the case of Tribal Courts, since they have limited jurisdiction.[9]

Discovery will shed light on the fact that the Tribal court does not have jurisdiction over this dispute between Florida borrowers and a California lender, and thus any forum clause is a nullity. Unlike other controversies, here the matter involves purported Tribal law and forum issues but Defendant fails to point out that the general rule is that tribal courts may **not** exercise jurisdiction over non-tribal members. Mr. Inetianbor is not a Tribal member.[10]

---

[9] *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("For example, no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant…."); *Sosna v. Iowa*, 419 U.S. 393, 398 (1975) (parties may not by stipulation invoke power of the courts); *Wolf v. Cash 4 Titles*, 351 F.3d 1348, 1357 (11th Cir. 2003) ("Parties cannot, by agreement or otherwise, confer jurisdiction on a court."); *Akins v. State*, 691 So.2d 587 (Fla. Ct. App. 1997) ("jurisdiction cannot be conferred on the court by agreement of the parties"); *Evans v. State*, 647 So.2d 180 (Fla. Ct. App. 1994) ("The parties cannot, even by stipulation, confer jurisdiction upon a court…."); *Sterling v. State*, 682 So.2d 694 (Fla. Ct. App. 1996) ("a party cannot stipulate to jurisdiction when a court lacks it") *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (en banc) ("Subject-matter jurisdiction cannot be conferred by the parties, nor can a defect in subject-matter jurisdiction be waived by the parties."); *Radcliffe v. Purdue Pharma L.P.,* 737 F.3d 908 (4th Cir. 2013) (quoting *Brickwood*); *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.),* 372 F.3d 154, 161 (3rd Cir. 2004) (same); *Shapo v. Engle*, 463 F.3d 641, 645 (7th Cir. 2006) ("Parties cannot confer federal jurisdiction by agreement."); *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501 (7th Cir. 1991) (jurisdiction cannot be created by contract); *United States v. Burch*, 169 F.3d 666, 668 (10th Cir. 1999) (same); *People v. Lopez*, 60 Cal.Rptr.2d 511, 52 Cal.App.4th 233, 245 (1997) (same); *People v. Chadd*, 28 Cal. 3d 739, 757, 170 Cal.Rptr. 798, 621 P.2d 837 (1981) (same); *State v. Trevino*, 556 N.W.2d 638 (Neb. 1998) ("subject matter jurisdiction may not be created by consent or conduct of parties"); *Weeks Constr. v. Oglala Sioux Hous. Auth.*, 797 F.2d 668, 671 (8th Cir. 1986) ("Mere consent to be sued, even consent to be sued in a particular court, does not alone confer jurisdiction upon that court to hear a case if that court would not otherwise have jurisdiction over the suit."); *Nelson v. Dubois*, 232 N.W.2d 54, 57 (N.D. 1975) (accord)*; Clinic Masters, Inc. v. District Court*, 509 P.2d 473, 475 (Colo. 1976) ("subject matter jurisdiction cannot be conferred by the parties."); *Ruggieri v. Gen. Well Serv., Inc.*, 535 F.Supp. 525, 528 n.2 (D. Colo. 1982) ("subject-matter jurisdiction cannot be consented to by the parties because it relates to the court's inherent power to hear and decide the case"); *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1228-29 (9th Cir. 1989) (finding that "a party cannot waive by consent or contract a court's lack of subject matter jurisdiction…. Thus, even if the consent of Stock West was adequate to confer personal jurisdiction onto the tribal court, the question of whether the tribal court has subject matter jurisdiction over the case would still not be resolved."); *Progressive Specialty Ins. Co. v. Burnette*, 489 F. Supp. 2d 955, 957 (D.S.D. 2007) ("Despite claims to the contrary, the parties may not waive or even stipulate to subject matter jurisdiction. That is the rule in any court. The fact that the Tribe has a long-arm statute has nothing to do with questions of subject matter jurisdiction.").

[10] See *Montana v. United States*, 450 U.S. 544, 565 (1981) ("[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."). Here, both Plaintiff and Defendant are nonmembers of the tribe. The inherent sovereign powers of the tribe do not extend to them. Plaintiff was never on the Reservation land. The courts are clear that "efforts by a tribe to regulate

The courts are clear that it is appropriate to allow discovery before deciding whether to enforce a forum selection clause.  This is especially so here where when the Eleventh Circuit affirmed this Court's prior order on the arbitration provision, Judge Restani in concurring noted the sham nature of the very forum selection provision Defendant seeks to enforce.  *Inetianbor,* 768 F.3d at 1356 (Restani, J., concurring) (quoting *Jackson* order on how **"the forum selection provision was a sham and an illusion"**).  Given Judge Restani's directive, it would be unjust for this Court now to enforce that very clause without even any discovery.  In *Jackson,* the Seventh Circuit threw out the Western Sky contract as being a sham, based in large part on this Court's very own findings.  See *Jackson*, 764 F.3d at 770-79 (Western Sky loan terms "a sham from stem to stern" – citing this Court's opinion at 962 F.Supp.2d 1303 (S.D.Fla. 2013)).

As the Supreme Court noted in the *Atlantic Marine* decision, there are a variety of factors to be considered in evaluating a forum clause.  *See* 134 S.Ct. at 581-82.  These include:

- "the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 581 n.6.  Here, obviously if the court ultimately concludes that Florida law controls, then it is more appropriate to have the trial here.  Thus this factor supports allowing appropriate discovery on the choice of law issue, and resolving that issue, before deciding the forum clause issue.

- "the local interest in having localized controversies decided at home." *Id.*  Here, Plaintiff alleges and believes that discovery will show that there is no legitimate "locality" of this loan program on the Tribal reservation in South Dakota.  Rather, the internet loan system was really run out of CashCall's offices in California and was simply an extension of CashCall's prior payday loan programs that had been declared illegal.  Rather than moving away from payday loans, CashCall tried to revamp their program by setting up Western Sky as a front.  Now that this scam has been exposed, CashCall has shut down the program and has had to face sanctions and fines in various states.  Just as other jurisdictions have found that the intrusion of this usury loan program into their states by CashCall's TV advertising and collection efforts made it into a local issue for local consumers, this Court should find the same.  However before that occurs, the Plaintiff should be allowed to engage in discovery, which has now commenced.

- "the administrative difficulties" posed by each forum. *Id.* at 581 n.6.  Here, the purported Tribal forum has already posed burdensome and unprecedented administrative difficulties since there was no Tribal arbitration procedure though the loan agreement promised there was.  This case has been effectively delayed for two years, and this Court has had to expend judicial resources and issue multiple orders, all to address the fact that CashCall's promises were false, there was no Tribal arbitration, no Tribal consumer rules, and the

---

nonmembers, especially on non-Indian fee land, are **'presumptively invalid.'**" *Plains Commerce Bank v. Long Family Land & Cattle Co.,* 554 U.S. 316, 330 (2008) (emphasis added).

—

contract was a sham.  Clearly, to avoid further administrative difficulties, the case should proceed here.  Once again though, this should be a matter for discovery.

While Defendant asserts that application of these factors will rarely defeat a forum-selection clause in the normal case, this case is anything but normal.  In fact courts have struck down forum clauses in numerous decisions, and the *Jackson* court did so on almost identical facts.[11]

Defendant argues that the Tribe has a "local interest" in having this case heard (Def. Br. 9), but Plaintiff alleges that CashCall set up the Western Sky scheme as a sham without any affiliation with or endorsement by the Tribe.  Discovery will elucidate the Tribe's official position on these matters.  Mr. Inetianbor spoke with various representatives of the Tribe while he was resisting CashCall's aggressive efforts to crush his *pro se* claim, and what he was told was that Western Sky was not authorized by the Tribe, that the Tribe had never heard of the purported arbitration scheme, and that the Tribe viewed the business as a criminal enterprise.[12]

Defendant claims Western Sky was a "business authorized by CRST law," (Def. Br. 9), when in fact the business violated the Tribe's usury statute as well as its unfair and deceptive trade practices statute.  (*See* Doc. 73-2, ¶¶ 77-79, citing statutes, and Doc. 73-21, attaching statutes).   In fact CashCall obviously did **not** obtain Tribal authorization for its scheme since the Tribe told Mr. Inetianbor it did not approve of the scheme.  In fact, other lenders who actually are properly affiliated with a Tribe have condemned the Western Sky scheme.[13]

---

[11] Defendant oddly asserts that "Inetianbor never even addresses the public-interest factors," Def. Br. 9, when in fact Plaintiff has not had an opportunity to respond to Defendant's motion until now.

[12] *See* Inetianbor affidavit dated Aug. 14, 2013, filed at Doc. 86-1, ¶¶ 10-14.  Plaintiff believes that the Tribe's local interest is precisely to have nothing to do with this fraudulent lending scheme, and to allow afflicted victims to recover in the states where they reside.  Troublingly, by its own business plan, CashCall designed the Western Sky program so that it would never make loans to Tribal members or anyone in South Dakota – further reflecting its fraud and sham nature.

[13] *See* Third Amended Complaint, Doc. 116, ¶ 32.  The Native American Financial Services Association, which represents tribal lenders, condemned Western Sky's actions. *See* Todd Epp, Lending Group Says Western Sky Tars Tribally Owned Lenders, KSOO.com (Sep. 24, 2013), available at http://ksoo.com/lending-group-says-western-sky-tars-tribally-owned-lenders/. According to the Association, Western Sky did "not abide by [recommended] consumer-friendly practices, **[wa]s not an enterprise wholly owned by a federally-recognized tribe, [wa]s not regulated by a tribal regulatory lending authority, d[id] not operate according to tribal law,** and br[oke] the covenants meant to benefit tribal governments and their members." Jessica M. Karmasek, Head of Native American Association Applauds N.Y. AG's Lawsuit Against Western Sky, Legal Newsline (Aug. 13, 2013) (emphasis added), available at http://legalnewsline.com/news/243531-head-of-native-american-association-applauds-n-y-ags-lawsuit-against-western-sky.

Defendant claims that Mr. Inetianbor's case somehow "threatens" Western Sky's ongoing business (Def. Br. 9), yet fails to advise this Court that CashCall already shut down the enterprise over a year ago after an onslaught of investigations, cease and desist orders, claims and penalties from a variety of state and federal agencies as well as private litigants.[14]   While Defendant claims its now-shuttered business was somehow beneficial to the Tribal economy, in fact it was blatant exploitation of the community by out-of-state CashCall, which derived the lion's share of the profits.  Defendant directs the Court to Tawny Lawrence and her affidavit (Doc. 122-4), yet Ms. Lawrence fails in her affidavit to address how she was directly involved in the deceptive letter ghostwritten for the arbitrator, Mr. Chasing Hawk.[15]

The court in *Jackson*, *supra*, affirming that the forum clause should be stricken, noted that the presumptive validity of a forum clause can be overcome if it is unreasonable.  The court found that as to the Western Sky loans, "we believe enforcement of the forum selection clause contained in the loan agreements is unreasonable… We have no hesitation concluding that an illusory forum is unreasonable…." 764 F.3d at 776.

In addition, a forum-selection clause obtained by fraud is voidable.[16]   Here, the same facts that made Western Sky a sham and an illusion as a purported Tribal lender also invalidate the attempt to enforce the Tribal forum selection clause.  If Mr. Inetianbor had known that

---

[14] *See* Andrew Scurria, "Online Lender Deal Brings $20M Consumer Payday: NY AG," May 20, 2014, available at http://www.law360.com/articles/539651/online-lender-deal-brings-20m-consumer-payday-ny-ag  ("Western Sky had ceased lending and laid off most of its 75 employees in September [2013] under the weight of more than a dozen state and federal regulatory probes.").  A dozen or more states have brought actions against the Western Sky program.  *See* Doc. 73-5 (list of proceedings); *see also* D. Douglas, Payday Lender Western Sky Financial to Stop Funding Loans on Sept. 3, Wash. Post (Aug. 26, 2013), http://www.washingtonpost.com/business/economy/payday-lender-western-sky-financial-to-stop-funding-loans-on-sept-3/2013/08/26/d683c298-0e7f-11e3-85b6-d27422650fd5_story.html.

[15] *See* brief filed at Doc. 72-1, p. 15 describing how "Mr. Chasing Hawk has admitted he did not write the letter. He has said it was **written for him by Tawny Lawrence**, who is employed by Martin Webb. In fact Ms. Lawrence is a Human Resources manager for Webb's payday loan business. Thus, Mr. Chasing Hawk falsely stated that he did not have a relationship with any of the parties.   The Plaintiff is entitled to depose Ms. Lawrence and others and to develop evidence reflecting the full scope of the fraud." (emphasis added).  Defendant wants the Court to rely on this self-serving affidavit before Plaintiff has a chance to engage in discovery or depose Ms. Lawrence or others.

[16] *E.g., Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, n.7 (1988) (court may elect not to enforce forum-selection clause upon facts showing that to enforce it would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching); *Tucker v. Cochran Firm-Criminal Def. Birmingham L.L.C.*, 2014 OK 112, ¶ 34 (Okla. Dec. 16, 2014) (same).

Western Sky was really not a Tribal lender, that in fact the Tribe itself viewed Western Sky as criminal, and that it was just a front for notorious California payday lender CashCall, he never would have agreed to the Tribal forum selection or any other part of the contract.   Third Amended Complaint ¶¶ 99-105.  Once again, he is entitled to discovery on this issue.

### 3.   The Case Should Not Be Dismissed to Exhaust Tribal Remedies.

Defendant further argues that this Court should dismiss the matter under the discretionary doctrine of exhaustion of Tribal remedies.  (Def. Br. 13-16).  However the court in *Jackson, supra,* expressly rejected that assertion:  "The Loan Entities have not established a colorable claim of tribal jurisdiction, and, therefore, exhaustion in tribal courts is not required." *Id.* at 768. In *Jackson,* the lower court cited how "[t]he intrusion of the Cheyenne River Sioux Tribal Nation into the contractual arbitration provision appear[ed] to be merely an attempt to escape otherwise applicable limits on interest charges. As such, the promise of a meaningful and fairly conducted arbitration [wa]s a sham and an illusion." *Id.* at 770.  The court further found:

> The arbitration provision contained in the loan agreements is unreasonable and substantively and procedurally unconscionable under federal, state, and tribal law…. Additionally, the courts of the Cheyenne River Sioux Tribe do not have subject matter jurisdiction over the Plaintiffs' claims. **Nor have the Defendants raised a colorable claim of tribal jurisdiction necessary to invoke the rule of tribal exhaustion.**

*Id*. at 786 (emphasis added).  Likewise, here there is no need for Tribal exhaustion. Where all parties to a dispute are non-tribal members, tribal jurisdiction is presumptively invalid.  No parties to this case are the Tribe or Tribal members. Defendant must overcome a presumption against Tribal jurisdiction and cannot do so.[17]

Here, the Tribe did not own Western Sky; Western Sky was a South Dakota LLC not a Tribal entity; neither Western Sky nor any Tribal member is a party; CashCall is a California corporation with nothing to do with the Tribe; and Plaintiff is not a Tribal member and never

---

[17]*See Progressive Specialty Ins. Co. v. Burnette,* 489 F.Supp.2d 955, 958 (D.S.D. 2007) ("The agent and the Insurer are non-tribal members. We know that tribal jurisdiction over non-members is 'presumptively invalid.'") (citing *Atkinson Trading Co. v. Shirley,* 532 U.S. 645, 659 (2001)). *See also Nevada v. Hicks,* 533 U.S. 353, 358 n.2 (2001) ("we have never held that a tribal court had jurisdiction over a nonmember defendant"); *FTC v. Payday Financial, LLC,* 935 F.Supp.2d 926 (D.S.D. 2013) ("Indian tribes generally lack legal authority over people who are not tribal members.") (citing *Plains Commerce Bank, supra,* 554 U.S. 316, 328 (2008)).

went on the Reservation.  There is no Tribal jurisdiction. Because there is no Tribal jurisdiction, there is no need to exhaust Tribal remedies.[18]

Further, Defendant fraudulently structured Western Sky to make it appear that Tribal jurisdiction existed when it does not.  In *Tamiami Partners v. Miccosukee Tribe of Indians,* 898 F.Supp. 1549, 1562 (S.D. Fla., 1994), this Court rejected the need for tribal exhaustion based on complaint allegations of bad faith, which allegations the Court took as true at that threshold stage.  Here, likewise, Plaintiff has expressly alleged that CashCall misused the purported Tribal affiliation and allege there is no Tribal jurisdiction and taking these allegations as true, there is no need to exhaust.  Third Amended Complaint ¶¶ 103 (CashCall fraudulently included Tribal jurisdiction provisions), 108 (same), 139 (no Tribal jurisdiction). Exhaustion is "a matter of comity, not as a jurisdictional prerequisite." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 n.8 (1987); *Tamiami Partners v. Miccosukee Tribe of Indians,* 788 F.Supp. 566, 570 (S.D. Fla. 1992) (same). Exhaustion must be interpreted narrowly in light of the "virtually unflagging obligation of federal courts to exercise the jurisdiction given them." *Garcia v. Akwesasne Housing Authority*, 268 F.3d 76, 80 (2nd Cir. 2001).  Here, no Tribal exhaustion should be required.

### 4.  Plaintiff Properly States Claims for Relief.

Plaintiff responds to Defendant's motion to dismiss certain discrete claims in the Third Amended Complaint as follows.  (See Def. Br. 16-21).

### A.  Claim One: Usury.

Inetianbor has asked for a declaration that the loan is void because it violated the usury statutes including Fla. Stat. §§ 687.02, .04 and .071.  The claim is appropriate since a civil

---

[18] *See also Nevada v. Hicks*, 533 U.S. 353, 369 (2001) (rejecting exhaustion; doctrine should not apply where tribal court did not have jurisdiction); *Strate v. A-1 Contractors*, 520 U.S. 438, 459-60 & n.14 (exhaustion not applicable to non-member parties); *Hornell Brewing Co. v. Rosebud Sioux Tribal Court*, 133 F.3d 1087, 1091 (8th Cir. 1998) (exhaustion not appropriate – law does not "allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring outside their reservations"); *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 483-84 (1999) (exhaustion inapplicable; a prudential doctrine only); *Christian Children's Fund, Inc. v. Crow Creek Sioux Tribal Court,* 103 F.Supp. 2d 1161 (D.S.D. 2000) ("there is no exhaustion requirement because the tribal court simply lacks authority to adjudicate disputes arising from such conduct."); *BNSF Ry. Co. v. Ray*, 138 Fed. Appx. 970 (9th Cir. 2005) (exhaustion not required; tribal court did not have jurisdiction); *Burlington N. R.R. Co. v. Red Wolf*, 196 F.3d 1059 (9th Cir. 1999) (same); *Weter v. Archambault*, 232 F.3d 899 (table), No. 99-35638, 2000 WL 1028973, at *1 (9th Cir. July 26, 2000) (accord); *Ford Motor Co. v. Todecheene*, 221 F. Supp. 2d 1070, 1087-88 (D. Ariz. 2002) (accord), *aff'd,* 394 F.3d 1170 (9th Cir. 2005), *withdrawn on other grounds*, 488 F.3d 1215.

litigant can ask the court for a declaratory judgment of the parties' rights under a contract, and a contract is void where it violates the usury laws.[19]

"Whether or not a transaction is subject to the usury laws of Florida is a question of fact." *Beausejour Corporation Nv, supra,* 802 F.2d at 1320; *Kellerman v. Siegel,* 319 So.2d 581, 581 (Fla. Ct. App. 1975). Thus, the issue regarding whether plaintiff is entitled to declaratory relief that the loan violated the usury statute is a factual question not properly subject to a motion to dismiss. Defendant fails to cite any cases directly on point for its argument against the allegation of the criminal usury violation, and fails to acknowledge the above-listed authority.[20]

**B.  *Claim Two: Consumer Finance Act ("CFA").***

Under the Florida CFA, Fl. Stat. § 516.001 - 516.36, loans for under $25,000 at an interest rate over 18% are unlawful unless the lender is licensed. The fact that Defendant violated this statute supports obtaining declaratory relief in the form of an order that the loan is void. It also supports a finding of unfair and deceptive trade practices. Accordingly, the

---

[19] *See Beausejour Corporation Nv v. Offshore Dev. Co.,* 802 F.2d 1319 (11th Cir. 1986) (affirming the judgment of the bankruptcy court, that the transaction between the parties was usurious loan and, therefore, the debt was unenforceable; citing Fla. Stat. § 687.071). Likewise in *Burket v. Johnson*, 61 So.2d 197, 198 (Fla. 1952), the court found that because the loan violated the usury statute, the lender had to forfeit the entire sum. This remedy of rescission and restitution on a void loan is well-grounded in the law. The court discussed how "defendant should forfeit the entire sum" and how "[t]his holding was predicated on the provisions of Section 687.07, F.S.A." *Id. See also Title & Trust Co. of Florida v. Parker*, 468 So.2d 520, 524 (Fla. Ct. App. 1985) (civil litigant can raise the issue of the defendant's violation of a criminal usury statute and "it was not error for the trial court to consider the fact that the underlying loan transaction here involved criminal usurious activity as defined by Section 687.071(3), Florida Statutes (1981)"); *Dupont Plaza, Inc. v. Samuel Kipnis Family Foundation,* 132 So.2d 352, 356-57 & n.4 (Fla. Ct. App. 1961) (noting that "usury may be the basis of an independent action to obtain affirmative relief" and citing § 687.07); *Schwartz v. Lincoln Construction & Development Corp*., 455 So.2d 612, 612 (Fla. Ct. App. 1984) ("The trial judge's extensive findings which concluded that a contract for the purchase of several condominium units was a disguised usurious mortgage loan will not be disturbed by this court because they are supported by clear and convincing evidence in the record."); *Lee Construction Corp. v. Newman*, 143 So.2d 222, 225 (Fla. Ct. App. 1962) (citing usury statutes and finding as to charging excessive interest, "[i]f the lender intentionally does that, then regardless of what device is used to make it appear other than a loan and interest thereon, he is guilty of usury.").

[20] The case of *Glen v. Club Mediterranee S.A.,* 365 F.Supp.2d 1263 (S.D. Fla. 2005) cited by Defendant, is completely off-point as it addresses whether one may sue civilly under the Trading with the Enemy Act, 50 U.S.C.App. § 1 *et seq*.

Plaintiff requests that the court allow the claim under the CFA proceed either on its own or viewed as a predicate allegation supporting declaratory relief and unfair trade practice claims.[21]

### C. *Claim Three: FDUTPA*

CashCall violated the FDUTPA, Fl. Stat. § 501.201 *et seq*., by facilitating a scheme to make usurious loans.  Plaintiff has alleged a proper *prima facie* claim for unfair and deceptive trade practices.  Defendant contends there is no causation.  (Def. Br. 17)  Yet but for Defendant CashCall's efforts to organize, arrange for, direct and market this usury loan scheme, the Plaintiff never would have seen the television ad, never would have made the call, would never have received the Western Sky loan, and would never have been subjected to CashCall's abusive collection practices as it knowingly south to collect on this criminal loan.

"Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Fla. Stat. § 501.204(1); *Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc*., 693 So. 2d 602, 605 (Fla. Ct. App. 1997).  The stated purpose of this act is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). The statute does not define "unfair and deceptive act or practice" but the provisions of the act are to be "construed liberally." Fla. Stat. § 501.202. A practice is unfair if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So.2d 773, 777 (Fla. 2003). Here, if the evidence does substantiate Plaintiff's allegations of an outrageous scheme to use a front organization to make usurious loans, then it warrants submitting the FDUTPA claim to the jury.  CashCall previously sought to make usurious payday loans by working with unscrupulous banks in a "rent-a-bank" scheme.  When the courts declared this illegal, CashCall switched to new scheme where it set up Western Sky as a "front" to make it

---

[21] *Compare State Dept. of Agriculture and Consumer Services v. Quick Cash of Clearwater*, 605 So. 2d 898 (Fla. Ct. App. 1992), which involved a suit by the Division of Consumer Services to enjoin several pawnbrokers' alleged violations of the Florida Deceptive and Unfair Trade Practices Act.  The lower court had quashed the complaint because it ruled the division did not have the authority to bring the action. Reversing, the appellate court concluded that if the division could prove the defendants were engaging in a business method which involved criminal usury under Fl. Stat. § 687.071, this "could constitute either an unfair method of competition or an unfair or deceptive act for purposes" of FDUTPA. Likewise here, if Plaintiff is able to prove usury, this provides support for his FDUTPA claim.

appear that its usurious loans were protected by Tribal Immunity.  This scheme was so improper that legitimate Tribal lenders condemned it.  CashCall marketed the loans by television and other media and managed to ensnare Mr. Inetianbor.  After he had paid back the loan principle and more, paying all the interest Florida law allows, Mr. Inetianbor asked that CashCall cease harassing him with collection efforts, but it would not and made a point of blemishing his credit record with the purported delinquency.  Clearly under this set of facts the jury may properly find an FDUTPA violation.  Many other courts have found that allegations of usurious loans support an unfair and deceptive trade practices claim, and the claim here should be allowed to proceed.[22]

The court must accept the facts alleged in a complaint as true when reviewing an order that determines the sufficiency of the complaint. *Higgs v. Florida Dept. of Corrections*, 647 So.2d 962 (Fla. Ct. App. 1995); *McKinney-Green Inc. v. Davis*, 606 So.2d 393 (Fla. Ct. App. 1992).  Here, the Complaint includes very detailed allegations which provide a proper basis for the claim.  To support a FDUTPA claim, there must be a representation, omission or practice that is likely to mislead the consumer, but actual deception not required. *Rollins, Inc. v. Butland*, 951 So. 2d 860 (Fla. Ct. App. 2006).  This loan program was designed by CashCall to deceive the consumers into believing it was a legitimate program sponsored by an Indian Tribe.  In fact, nothing was further from the truth.  A contract can give rise to a claim under the statute where it is unconscionable. *See Dep't of Legal Affairs v. Commerce Commercial Leasing, LLC*, 946 So. 2d 1253, 1259 (Fla. Ct. App. 2007) (complaint that contract was unconscionable stated cause of action under FDUTPA).  Here, the loan scheme and contract was unconscionable. *See State ex rel. King v. B&B Investment Group, Inc.,* 2014 WL 2893304 (N.M. June 26, 2014) (high interest

---

[22] *See CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300, W. Va. Sup. Ct. May 30, 2014 (CashCall's prior "rent-a-bank" usury lending scheme that it employed prior to switching to the rent-a-tribe scheme, was found after a trial to violate the West Virginia Consumer Credit Protection Act among other laws and verdict for over $13 million was upheld – claim was that CashCall worked with a bank partner, FB&T, but that "CashCall's agreement with FB&T was essentially a sham" – likewise here, CashCall's partnership with Western Sky was a sham); *Hartke v. Illinois Payday Loans,* 1999 U.S. Dist. LEXIS 14937 (C.D. Ill. Sept. 13, 1999) (plaintiffs alleged unfair and deceptive claim against payday lender); *Johnson v. Cash Store,* 68 P.3d 1099 (Wash. Ct. App. 2003) (UDAP claim against payday lender upheld); *Quick Cash of Clearwater, Inc. v. State Dep't of Agric. & Cons. Servs.,* 605 So.2d 898, 902 (Fla. Dist. Ct. App. 1992) ("If the Division can plead and prove that Quick Cash is unlawfully conducting business as a consumer finance company, or that it is engaging in a business method which involves criminal usury under section 687.071, Florida Statutes (1991), we conclude that this would involve a "disposition of . . . a consumer service" that could constitute either an unfair method of competition or an unfair or deceptive act for purposes of the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Florida Statutes (1991).").

payday loans were unconscionable). Finally, in improperly trying to limit the scope of Plaintiff's FDUTPA claim, the Defendant merely focuses on Third Amended Complaint ¶ 88 while ignoring the fact that Plaintiff also incorporated by reference all prior allegations.  *See id*. ¶ 83. Taken together, the allegations support the claim under the FDUTPA.

      **D.  *Claim Four: Civil Remedies for Criminal Practices Act ("Florida RICO").***

      The Florida RICO statute makes it unlawful for any person "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt." Fla. Stat. § 772.103(3). Defendant contends that Plaintiff's Florida RICO claim fails because he has not adequately alleged that there was an "enterprise." (Def. Br. 17).  Plaintiff agrees that the "enterprise" cannot simply be a company and its very own employees.  However, an "enterprise" can exist when there are two companies.  Here, there was not only CashCall, but also, the Western Sky Financial, LLC entity that CashCall adamantly asserts is a real and separate entity.  Because the Complaint adequately asserts that CashCall engaged in a criminal usury enterprise by setting up the "front" company namely Western Sky, the claim should be allowed.  *See* Third Amended Complaint ¶¶ 4 (Western Sky enterprise was a front for CashCall), 15-16 (alleging how CashCall supported another company -- nonparty Western Sky Financial, LLC), 21-25 (Western Sky was acting as a front for CashCall). Defendant argues:  "By alleging only that CashCall engaged in an 'enterprise' with itself and with its own employees, Inetianbor has 'failed to allege RICO Claims involving a distinct enterprise,' and thus Claim Four must be dismissed." (Def. Br. 18).  Yet, clearly the Third Amended Complaint alleges that CashCall set up another company, namely Western Sky, in order to set it up as a front for the loan business and to make it appear that the business was protected by Tribal Immunity.  These facts support a Florida RICO claim.

      **E.  *Claim Five: Fraud.***

      If as Plaintiff believes, discovery will support his allegations that the Western Sky program was a fraud, a sham and an illusory attempt to set up a Tribal lender, this may support the claim of fraud.  As alleged in the Complaint, the facts reflect that Western Sky a sham and an illusion as a purported Tribal lender.  A contract may be invalidated by fraud.  If Mr. Inetianbor had known that Western Sky was really not a Tribal lender, that in fact the Tribe itself viewed Western Sky as criminal, and that it was just a front for notorious California payday lender

CashCall, he never would have agreed to the contract.  The claim meets the Rule 12(b)(6) standard. Third Amended Complaint ¶¶ 99-105.

### F.  *Claim Six: Punitive Damages.*

Defendant contends that "there can be no such thing as a free-standing 'claim' for punitive damages." Def. Br. 18, citing *Neill v. Gulf Stream Coach, Inc.,* 966 F.Supp. 1149, 1153 n.8 (M.D. Fla. 1997).   However, the punitive damages statute itself makes clear that a plaintiff may assert "a claim for punitive damages."  *See* Fl. Stat. § 768.72(1) (describing procedure to allege "a claim for punitive damages."  The *Neill* case states:  "Fla. Stat. § 768.72 bars the … pleading, of a claim for punitive damages until the relevant threshold showing has been made." 966 F.Supp. at 1154.  Plaintiff respectfully contends that he has made a sufficient showing to justify his claim for punitive damages.  He has cited detailed facts supporting his claim that CashCall set up a sham Tribal lender as a front for its usurious loans; these factual allegations "constitute a proffer creating a reasonable basis for recovery of punitive damages."  *Id.* at 1156. Plaintiff should be allowed to continue with the punitive damages claim whether it is viewed as a damages contention appended to the merits claims, or as a free-standing claim.

### G.  *Claim Seven: Fair Credit Reporting Act ("FCRA").*

The FCRA exists "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 52 (2007). To that end, § 1681s-2 is designed to prevent "furnishers of information" from spreading inaccurate consumer-credit information.  Where a furnisher "willfully fails to comply with any requirement imposed … with respect to any consumer," that consumer may seek damages, punitive damages and attorney's fees. 15 U.S.C. § 1681n; *Beaudry v. Telecheck Servs., Inc.*, 579 F.3d 702, 705-06 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 2379 (2010).  Here, Plaintiff contends that CashCall as a furnisher willfully provided inaccurate information to the credit reporting agencies.  Further Mr. Inetianbor avers that CashCall abusively threatened to harm his credit standing.  *See* Doc. 86-1, ¶ 2.  Clearly this claim is adequately alleged, given as the Plaintiff claims that CashCall knew its lending scheme was illegal and usurious, and yet continued to engage in it and to report negative credit information anyway.  *See* 15 U.S.C. § 1681n(a) (allowing liability of furnisher where willful conduct shown);  *Frost v. Experian and TRW, Inc.*, 1998 WL 765178 (S.D.N.Y. 1998) (same); *Boggio v. USAA Federal Savings Bank*, 696 F.3d 611, 2012 WL 4478797 (6th Cir. 2012) (same).

FCRA § 1681s-2(b) requires furnishers to investigate and promptly respond to consumer disputes once they receive notice of a dispute from a credit reporting agency. *Liste v. Cedar Fin.*, No.8:13-cv-3001, 2015 WL 439442, at *3 (M.D. Fla. Feb. 3, 2015). Plaintiff alleges that Defendant continued to report negative credit information after knowing that the Plaintiff disputed the same and failed to reinvestigate the matter and meet its FCRA duties, despite knowing that its loan scheme was illegal. Third Amended Complaint ¶¶ 114-15. Clearly this is enough to state a claim.

**H.    *Claim Eight: Defamation.***

Defendant contends the common law defamation claim must be dismissed because Plaintiff cannot show that CashCall acted with malice or with a willful intent. Plaintiff agrees that the FCRA preempts common law claims for defamation unless malice or willfulness is shown. *See* 15 U.S.C. § 1681h(e) (stating that "no consumer may bring any action or proceeding in the nature of defamation … with respect to the reporting of information against … any person who furnishes information to a consumer reporting agency," unless the "false information [was] furnished with malice or willful intent to injure such consumer"). However, Plaintiff in the defamation claim expressly incorporated by reference all prior allegations. Third Amended Complaint ¶ 118. And, the allegations as a whole clearly outline a claim that CashCall deliberately and maliciously pressed its purported loan entitlement to try to threaten and intimate Plaintiff and damage his credit score all the while knowing that the loan scheme was unlawful and fraudulent. *See id.* ¶¶ 4 (CashCall used Western Sky as a front for the loan scheme), 5 (CashCall sought to conceal its own involvement), 26 (CashCall refused to remove negative credit information), 27 (acted with cruelty and arrogance), 121 (statements made by CashCall were false; CashCall knew or should have known that the underlying loan was usurious, criminal and void). These facts adequately allege defamation.

**I.    *Claim Nine: Declaratory Relief.***

Defendant finally contends that Claim Nine "must also be dismissed to the extent its requests for declaratory relief depend upon claims that have been dismissed for any of the reasons above." Because the antecedent claims are proper as shown above, so too is the declaratory relief claim.

## <u>CONCLUSION</u>

Plaintiff respectfully requests that Defendant's motion to dismiss be denied.  A proposed order is attached hereto.

Respectfully submitted, this the 30th day of March, 2015.

<u>s/Cathy Williams</u>
Mona L. Wallace (N.C. Bar No. 09021)
John S. Hughes (N.C. Bar No. 22126)
Cathy Williams (Fl. Bar No. 0088862)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
agoss@wallacegraham.com
mwallace@wallacegraham.com
jhughes@wallacegraham.com
cwilliams@wallacegraham.com

Janet Varnell, Esq.
Florida Bar No. 0071072
Varnell and Warwick, P.A.
20 La Grande Boulevard
The Villages, FL 32159
Telephone: 352-753-8600
Fax: 352-753-8606525
jvarnell@varnellandwarwick.com
Attorneys for Plaintiff

EXHIBITS:

1. Unreported cases.
2. Proposed order.

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2015, I served the foregoing document on all counsel of record, by email and via the Courts' CM-ECF system.

This the 30th day of March, 2015.

<u>s/Cathy Williams</u>
Mona L. Wallace (N.C. Bar No. 09021)
John S. Hughes (N.C. Bar No. 22126)
Cathy Williams (Fl. Bar No. 0088862)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com
cwilliams@wallacegraham.com