UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-60066-CIV-COHN-SELTZER

ABRAHAM INETIANBOR, JOHNNY
FRETWELL, LAUREN BROWN, THOMAS
PETERSON, VIRGINIA FRY, and NELS
PATE, JR., on behalf of themselves and a class
of persons similarly situated,

        Plaintiffs,

    v.

CASHCALL, INC. and JOHN PAUL
REDDAM,

        Defendants.

**CLASS ACTION**

## FIFTH AMENDED COMPLAINT

Plaintiffs, Abraham Inetianbor, Johnny Fretwell, Lauren Brown, Thomas Peterson, Virginia Fry and Nels Pate, through counsel, hereby submit this Fifth Amended Complaint against the Defendants CashCall, Inc. ("CashCall"), and John Paul Reddam ("Reddam") and allege as follows.

## I. NATURE OF THE ACTION.

1.    Plaintiffs bring this lawsuit on behalf of themselves, and on behalf of all other Floridians who have borrowed money from Western Sky lending enterprise under "consumer loan" arrangements at usurious interest rates. Consumer loans are loans of relatively small amounts of money carrying high interest rates. Under Florida law, these loans are unlawful.

2.    Prior to terminating the "Western Sky" loan enterprise in Florida, Defendants CashCall and Reddam controlled an enterprise to make and collect on unlawful loans and to avoid liability for doing so.

3.     Plaintiffs brings this claim on their own behalf, and also, on behalf of a class of all persons who obtained "Western Sky" loans in Florida, to recover all amounts collected by the Defendants and for damages, attorneys' fees, and such other relief as allowed by law.  Plaintiffs also seek declaratory and injunctive relief including a declaration that the loans are void, for refunds, and for correction of all affected credit reports of class members.

4.     Aware of the law in Florida, Defendants sought to insulate themselves from liability, by declaring that their loan business was protected from the application of any State or Federal law under tribal immunity afforded to the Cheyenne River Sioux Tribe of South Dakota (the "Tribe").  However, the Tribe did not own or operate the lending enterprise, and Western Sky did not make loans to tribal members because the loans were illegal under tribal law and violated the tribal usury statutes. Accordingly, the enterprise is not protected by tribal immunity. Furthermore, the entire Western Sky enterprise was actually just a "front" for the Defendants, CashCall, a private California corporation with no Tribal connection, and Reddam as its president, CEO and sole shareholder.  The vast majority of the revenues from the enterprise did not go to benefit any Tribal members but rather to line the pockets of Defendant Reddam, the owner and president of CashCall.

5.     Defendants also sought to avoid liability by including a purported arbitration agreement and class action ban that would require individual arbitration under arbitration rules of the Tribe which actually did not exist. The loan agreement and its relevant provisions are unfair, deceptive, false, fraudulent and unenforceable and CashCall should not be able to benefit from the terms in a loan contract that CashCall did not sign.  In fact, CashCall tried to conceal its involvement in the business.

6.      Unlike any other known matter involving a consumer challenge to a consumer lending scheme, the original Plaintiff in this case, Mr. Inetianbor, sought to proceed with the individual arbitration process required by his contract, when that was ordered by the Court.  In this effort Mr. Inetianbor uncovered compelling evidence of a false and fraudulent scheme to include arbitration and class action ban provisions in a contract when in fact the Defendants knew these provisions were an illusion, there was no arbitration process in place, and the Defendants sought to create such an arbitration process out of whole cloth once Mr. Inetianbor called its bluff.

7.      But for Mr. Inetianbor's painstaking efforts to pursue his claim and uncover the true nature of the Western Sky lending scheme and illusory arbitration process, the Defendants would have succeeded with its scheme.  In fact, Mr. Inetianbor discovered that Defendants unilaterally had the purported arbitrator selected; this arbitrator, Robert Chasing Hawk, had a daughter who herself worked for the lending enterprise; the arbitrator admitted that there were no consumer rules as promised by the contract to govern the purported process; and to this day CashCall refuses to disclose the terms of the arbitrator's retention or what he was to be paid.

8.      In light of these facts, other Court have found the entire Western Sky loan agreement "promise of a meaningful and fairly conducted arbitration is a sham and an illusion." *Jackson v. Payday Financial, LLC,* No. 12-2617, 2014 WL 4116804, at *8 (7th Cir. Aug. 22, 2014) (reviewing facts recited by the District Court herein).

9.      Likewise the New Hampshire Banking Department, in issuing a Cease and Desist order, found that Western Sky was nothing more than a front for Cashcall to evade licensure by state agencies and exploit Tribal immunity to try to shield its deceptive practices.  *In re CashCall, Inc.*, No. 12-308, 2013 WL 3465250 (N.H. Banking Dept. June 4, 2013).  There, the New Hampshire Banking Department found that CashCall's scheme to employ Western Sky in this

manner constituted unfair and deceptive trade practices.   The agency found that CashCall controlled and funded Western Sky's loan origination operation. Western Sky solicited borrowers on a website managed by CashCall and assigned loans shortly after origination to CashCall. Thus CashCall was the actual or *de facto* lender, not Western Sky. *Id.* at *2.  "After detailed review of the respondents' business scheme, it appears that Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators." *Id.*

10.     Under these unusual and extraordinary facts, it is equitable and proper to find that the pertinent provisions of the Western Sky loan agreement are unconscionable and unenforceable. The alternative dispute resolution provisions in the contract reflect a deliberate sham to intimidate borrowers and impair the enforcement of consumer protection laws.   Accordingly, this Court should strike the offensive language in its entirety and allow Mr. Inetianbor to receive relief both for himself and for the larger class of Florida borrowers.

11.     After the time of the form of loan contract used for Mr. Inetianbor, the company revised the form contract several times.   While Mr. Inetianbor should be able to represent borrowers under all versions of the loan agreement, out of an abundance of caution, he seeks to amend so as to join as additional Plaintiffs and class representatives, Johnny Fretwell, Lauren Brown, Thomas Peterson and Virginia Fry, who also received the loans.   The loan agreement, regardless of form, has been held unlawful and void by multiple courts.

## II.  JURISDICTION AND VENUE.

12.     This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) as the matter in controversy exceeds the sum of

$5,000,000, exclusive of interest and costs, and is a class action in which Plaintiffs and class members include one or more citizens of a State different from that of Defendants.  The Court also has jurisdiction due to a federal question in light of the Plaintiff Inetianbor's claim under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*.

13.     This Court has personal jurisdiction over Defendants because it marketed, offered, made, serviced and/or collected on loans in Florida.

14.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

### III. <u>PARTIES.</u>

15.     Plaintiff Abraham Inetianbor is a citizen and resident of Oakland Park, Florida.

16.     Plaintiff John Fretwell is a citizen and resident of Zephyr Hills, Florida.

17.     Plaintiff Lauren Brown is a citizen and resident of Miami, Florida.

18.     Plaintiff Thomas Peterson is a citizen and resident of Clearwater, Florida.

19.     Plaintiffs Virginia Fry is a citizen and resident of Gulfport, Florida.

20.     Plaintiffs Nels Pate is a citizen and resident of Ocoee, Florida.

21.     Upon information and belief, Defendant CashCall is a California corporation with a principal place of business at 1600 S. Douglass Road, Anaheim, CA 92806 and/or 1 City Boulevard West #1000, Orange, CA 92868, and may be served with process at that address.  Upon information and belief, CashCall was assigned numerous of the loans made herein and was the real and *de facto* lender.

22.     Upon information and belief, during the pertinent times Defendants materially controlled and supported a company known as Western Sky Financial, LLC ("Western Sky"), which is or was a limited liability company chartered under the law of and with a principal place

of business in South Dakota and with an office address at 612 East St., Timber Lake, South Dakota. Upon information and belief, during the pertinent times, Martin A. Webb ("Webb"), a citizen and resident of South Dakota, was the president of Western Sky.

23.     Upon information and belief, Defendant CashCall during the pertinent times was owned by and had as its president, Defendant John Paul Reddam, a citizen and resident of California. During the pertinent times in material respects he directed and controlled the CashCall enterprise. Reddam was President and CEO of CashCall and owned 100% of its corporate stock and controlled operations at its principal place of business. Reddam may be served with process c/o CashCall, at its business address of business at 1600 S. Douglass Road, Anaheim, CA 92806 and/or 1 City Boulevard West #1000, Orange, CA 92868.

24.     Upon information and belief, WS Funding, LLC ("WS Funding") is or was a wholly-owned subsidiary of CashCall. Reddam is or was the president of WS Funding. WS Funding is or was a limited liability company organized under Delaware law. CashCall has at times asserted that WS Funding bought notes executed between Western Sky and borrowers and assigned the note servicing to CashCall.

25.     Upon information and belief, Delbert Services Corporation ("Delbert") is or was a corporation which has sought from time to time to collect purported debts loans consumers owed to CashCall. Delbert was incorporated under Nevada law with an office address at 7125 Pollock Drive, Las Vegas, NV 89119, and with Mr. Reddam as its sole director and owner.

## IV.  FACTUAL ALLEGATIONS.

### A.     Facts Regarding the Inetianbor Family and the Loan.

26.     Mr. Inetianbor resides with his wife in Oakland Park, Florida. They have been married since 2007 and have a young daughter.

27.     In the December 2010/January 2011 time period, the Inetianbors were in financial hardship.  During this time period, Mr. Inetianbor saw an ad for "Western Sky" on the television. The TV ad deceptively represented that these were valid and proper loans and because he was in a state of financial hardship, Mr. Inetianbor called the telephone number.  During the telephone call, a Western Sky representative induced him to apply for a loan from Western Sky.

28.     Mr. Inetianbor's Western Sky loan agreement is dated January 5, 2011.  Under that agreement, Western Sky loaned him a net amount of $2,525.

29.     After receiving the loan for $2,525, Mr. Inetianbor diligently paid back approximately $3,252 on this loan – substantially more than he received.

30.     Mr. Inetianbor was informed at or about the time of the loan or shortly after he received it, that the loan was now with CashCall.  Mr. Inetianbor made all his loan payments to CashCall.  He never made a payment to Western Sky.  In fact, Western Sky was simply operating as a "front" for CashCall, all along.

31.     Eventually Mr. Inetianbor through his own research learned that his loan was unlawful under Florida law and the interest rate was far above the limit allowed by law.  However, when he complained to CashCall, they continued trying to collect on the loan, even though he had already paid back more than he had borrowed.

32.     Further, CashCall refused to remove negative information about the loan and the purported debt from Mr. Inetianbor's credit report.  This continuing conduct by CashCall has caused ongoing harm to the Inetianbor family by harming Mr. Inetianbor's credit score.

33.     During this time, CashCall acted with utter cruelty and arrogance, threatening and intimidating Mr. Inetianbor, who was shocked and outraged by this conduct.

34.     CashCall caused Mr. Inetianbor and his family to suffer great stress and suffering as well as monetary loss.

35.     As State Regulators have found, "Western Sky is nothing more than a front to allow CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators." *In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc., and WS Funding LLC*, Case No. 12-308, Cease and Desist Order by the State of New Hampshire Banking Department, 2013 WL 3465250 (N.H. Banking Dept. June 4, 2013).

36.     In the lending scheme, Defendants "have taken substantial steps to conceal this business scheme from consumers and state and federal regulators." N.H. Order, p. 5.

37.     CashCall set up the Western Sky lending scheme after its previous efforts to profit from high-interest usurious loans failed.  Prior to entering into its "rent-a-tribe" arrangement with Western Sky in 2009, CashCall previously entered into an analogous "rent-a-bank" arrangement with one or more state-chartered banks. The State of West Virginia filed suit against CashCall for making illegal loans to West Virginia consumers using that scheme. Following a trial, the West Virginia court found that "the purpose of the lending program was to allow Cash Call to hide behind the Bank's charter and its right to export interest rates under federal banking law, as a means for CashCall to deliver its loan product to states like West Virginia with usury laws." *West Virginia v. CashCall,* No. 08-C-1964, Kanawha County Circuit Court, Final Order on Phase II of the Trial, at 25. The Court found that CashCall was the *de facto* lender and enjoined it from making loans in West Virginia without a license and from making or collecting on usurious loans, imposed a civil penalty of $730,000, awarded a judgment of $10,045,687, and declared all loans made by CashCall in West Virginia null and void.

38.     After that setback, CashCall began the purported "rent-a-tribe" tribal lending scheme that used Western Sky as its "front."  However, that scheme was no more legal than was the prior "rent-a-bank" scheme.  Most obviously, in setting up its scheme with Western Sky, CashCall neglected to involve a real Indian Tribe.  Western Sky was merely a private South Dakota LLC.  Accordingly, even other payday lenders and tribal lenders have distanced themselves from the CashCall/Western Sky scheme and have denounced it as improper.

39.     During the pertinent times, CashCall provided the website hosting services for Western Sky, reimbursed Western Sky for costs associated with the server, reimbursed Western Sky for office, personnel and postage, provided Western Sky with a toll-free number and fax number and an array of marketing services including TV and radio and internet ads, reviewed loan applications to the "Western Sky" website and CashCall funded a reserve account for Western Sky to fund the loans.

40.     In the case brought by the New Hampshire Banking Commissioner, the following factual findings were reported, all of which reflect the fraudulent and sham nature of the enterprise and of the Western Sky loan agreement, and which facts are expressly alleged herein:

- CashCall created all advertising and marketing materials for Western Sky;

- CashCall provided website hosting and support services for Western Sky;

- CashCall reimbursed Western Sky for all costs of maintenance, repair and/or update costs associated with Western Sky's server;

- CashCall reimbursed Western Sky for its office, personnel, and postage, and provided Western Sky with a toll free telephone and fax number;

- Once a consumer applied for a loan, CashCall reviewed the application for underwriting requirements;

- Once a loan application was approved, Western Sky executed a promissory note and debited a so-called "Reserve Account" to fund the promissory note;

- CashCall was required to set up, fund, and maintain the balance in this Reserve Account;

- After a loan was funded, CashCall was obligated to purchase the promissory note from Western Sky;

- CashCall bore all risk of loss on the loans;

- CashCall generally made contact with the consumer within one business day of the consumer filing an application for the loan and once the loan was made;

- Western Sky accepted no payments from consumers on the loans;

- CashCall serviced the loans;

- CashCall was responsible for tracking all consumer complaints regarding the loans;

- CashCall agreed to indemnify Western Sky for all costs arising or resulting from any and all civil, criminal or administrative claims or actions relating to the loans, including but not limited to fines, costs, assessments, and/or penalties which could arise in any jurisdiction;

- As compensation for services provided, Western Sky paid CashCall 2.02% of the face value of each approved and executed loan transaction plus any additional charges, with a net minimum payment of $100,000 per month;

- CashCall paid Western Sky 5.145% of the face value of each approved and executed loan credit extension and/or renewal, as well as a minimum monthly administration fee of $10,000;

- CashCall took "substantial steps to conceal this business scheme from consumers and state and federal regulators," and the scheme "prevents consumers from understanding which entity is making the loans";

- Western Sky did not identify its relationship with CashCall or WS Funding on its website or in any marketing materials;

- The promissory notes identified the lender as Western Sky with an address of Timber Lake, South Dakota; and

- The promissory notes stated that the loan agreement was "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.

41.     Defendants organized and instituted a sophisticated business enterprise in an effort to evade the fact that payday loans are illegal under Florida law.

42.     Defendants ensured that television advertisements were placed to be seen by Florida residents and controlled or approved various websites that offered loans to Florida consumers.

43.     Defendant CashCall made loans to borrowers outside of South Dakota.  Defendant marketed loans over the Internet and through television advertising designed to reach potential borrowers who resided off the reservation and outside of South Dakota.  The borrowers were not members of the Tribe. During the entirety of a loan transaction and the relationships between borrowers and these companies, the borrowers were located off the reservation and outside of South Dakota.  All communications between Defendant CashCall and borrowers occurred via mail or over the telephone or the internet.

44.     In a typical loan transaction, a potential borrower contacted Western Sky and/or CashCall over the telephone or the internet to apply.  A potential borrower sent his or her application and background information to the company, which then considered the application to determine whether to approve it.  Loan decisions were made off the reservation.  The approval or denial of a loan application was communicated to a potential borrower over the telephone or the internet.  If a potential borrower's application was approved and the borrower accepted the loan, the funds were transferred to the borrower's bank located off the reservation.

45.     Upon information and belief, all Western Sky loans were immediately assigned to CashCall and all borrower payments were made to CashCall and collection efforts and electronic withdrawals from borrower bank accounts were made by CashCall.  When CashCall made withdrawals from borrowers' bank accounts for repayment of loans, those were taken from the

accounts at banks located off the reservation.  If borrowers missed payments or failed to repay their loans, CashCall and/or related entities such as Delbert made collection efforts off the reservation and outside of South Dakota. CashCall and/or Delbert engaged in numerous communications with Florida residents regarding the loans and took electronic debits from Florida bank accounts.

46.     Prior to ending Western Sky operations in Florida, Defendant CashCall regularly engaged in and was involved in soliciting, making and collecting loans to and from consumers, in amounts varying from approximately $300 to $3,000.   The loans were payable in monthly installments and ranged from approximately 12 to 84 months. The loans had annual percentage rates ("APRs") of approximately 90% to over 300%.  CashCall and Delbert employees engaged in numerous contacts and communications with putative class members seeking to collect on their loans in Florida.

47.     Defendant CashCall participated in maintaining a website, www.westernsky.com, which offered loans to consumers.   The website showed the following table of loans:

| Loan Product | Borrower Proceeds | Loan Fee | APR | Number of Payments | Payment Amount |
|---|---|---|---|---|---|
| $10,000 | $9,925 | $75 | 89.68% | 84 | $743.49 |
| $5,075 | $5,000 | $75 | 116.73% | 84 | $486.58 |
| $2,600 | $2,525 | $75 | 139.22% | 47 | $294.46 |
| $1,500 | $1,000 | $500 | 234.25% | 24 | $198.19 |
| $850 | $500 | $350 | 342.86% | 12 | $150.72 |

48.     Consumers applied for loans directly through the website.  As part of obtaining a loan, consumers entered into a purported form loan agreement with Western Sky electronically via the website. This loan agreement was called the "Western Sky Consumer Loan Agreement."  The Agreement was not signed by the customer by hand, nor was it provided to the customer in a printed, paper copy.

49.     Western Sky disbursed the loan's proceeds by electronically depositing the proceeds directly into the consumer's checking or other bank account.

50.     The Agreement recited that the consumer authorized Western Sky (or an assignee such as CashCall) to debit and withdraw electronically funds from the consumer's bank account for the scheduled monthly installments due. By this authorization, the consumer also purportedly authorized withdrawal electronically of other funds from the consumer's account for payment of additional fees or charges.

51.     Upon information and belief, during the loan application process when some consumers obtained loans, the consumers' computers were communicating with a server located in California (not on any Indian reservation) owned or operated by CashCall; this was the case even when loans were purportedly issued by Western Sky.

52.     Western Sky routinely assigned loans to CashCall.  Upon information and belief, after Plaintiff herein entered into his loan, Western Sky assigned it to CashCall.

53.     On or about December 28, 2009, CashCall through a subsidiary and Western Sky entered into an "Agreement for the Assignment and Purchase of Promissory Notes."  The terms reflected that Western Sky assigned all of its loans "on a daily basis" to the CashCall subsidiary (Agreement, p. 1) which paid Western Sky a monthly "administration fee" of $10,000 and also paid it $100,000 a month (p. 2) and was to "reimburse Western Sky for all costs of maintenance,

repair and/or update costs associated with Western Sky Financial's server." (Id.). CashCall funded a "Reserve Account" initially funded at $100,000 and to be funded thereafter based on the value of purchased notes (Id., p. 3), was responsible for "all collection efforts" (Id., p. 4) and CashCall indemnified Western Sky for any civil or criminal claims. (Id.). Also on or about December 28, 2009, a subsidiary of CashCall and Western Sky entered into a "Promissory Note," and an "Agreement for Service."

### B.   History of Plaintiff Inetianbor's Claim in Arbitration.

54.   The history of the Plaintiff's claim in arbitration further reflects how the loan agreement and all of its provisions are false and fraudulent.

55.   After the Court initially ordered arbitration, Defendants acting on their own arranged for Mr. Robert Chasing Hawk to be the arbitrator.

56.   Plaintiff never agreed with CashCall for Mr. Chasing Hawk to be the arbitrator in my dispute. CashCall picked him on its own.

57.   Mr. Chasing Hawk had never before arbitrated a consumer dispute, and he was not licensed or qualified as an arbitrator by any known authority.

58.   Plaintiff asked CashCall how much they were paying Mr. Chasing Hawk to be the arbitrator. CashCall said it was none of Plaintiff's business. CashCall would not send Plaintiff a copy of any contract with Mr. Chasing Hawk or records of what they were paying him. To this day, such information has not been produced.

59.   Plaintiff found out through his own research that Mr. Chasing Hawk's daughter worked for the lending enterprise. Mr. Chasing Hawk had previously said in a May 1, 2013 letter that he had no prior connection to any of the parties. This statement was inaccurate for several

reasons – first, because his daughter worked for the lender, second, because the company actually wrote the letter he sent, and third, because he had long been in contact with Mr. Webb.

60.     The May 1 letter was "ghostwritten" for the arbitrator to pretend was his own.  Mr. Chasing Hawk emailed Plaintiff the letter on Friday May 3, 2013.  But when the Plaintiff clicked to open the letter, it was not signed.  It was simply a Microsoft Word document.  The Plaintiff noticed that in the email, Mr. Chasing Hawk was actually forwarding him another email that someone at a Lakota Cash email address had sent to Mr. Chasing Hawk.

61.     The email to Mr. Chasing Hawk was sent from a Lakota Cash "HR" (human resources) email address. Making matters worse, the email was copied on the Bogue law firm, which had filed corporation papers for Webb's companies and responded to consumer complaints for him in the past, and to Dan Baren who was the in-house counsel for CashCall.

62.     Thus when Mr. Chasing Hawk said he had "no preexisting relationship with either party," this was palpably false as he was signing a letter written for him by Defendants' enterprise.

63.     The Plaintiff's loan agreement says the tribe's "consumer dispute rules" apply to the purported alternative dispute resolution process.  Yet neither Defendants nor Mr. Chasing Hawk ever provided the Plaintiff with the "consumer dispute rules" that were supposedly governing.

64.     This entire dispute started with the Plaintiff's lawsuit against CashCall merely alleging false information on his credit report.  However, the demand CashCall sent to the arbitrator claimed that the Plaintiff still owed CashCall more money. Incredibly, CashCall was still trying to collect the "remaining balance" that the law says the Plaintiff does not owe.  The amount of money the company loaned came to $2,525.00 (loan amount of $2,600 minus "fee" of $75). By December 2011, the Plaintiff had paid back $3,252.65 on the loan.  Thus the Plaintiff had paid

back significantly more than he borrowed yet CashCall sought to pervert the arbitration process to claim a right to even more money.

65.     During the arbitration process, Mr. Chasing Hawk admitted that his adult daughter worked for Martin Webb as a loan officer at the loan organization.

66.     The "preliminary hearing" in the arbitration occurred by telephone on Friday, June 21, 2013.  The Plaintiff called in and tape-recorded the hearing and Mr. Chasing Hawk said that he tape-recorded it as well.

67.     In the hearing, Mr. Chasing Hawk admitted that his daughter worked "giving out the loans." He also admitted that the owner (Martin Webb) came to him a few months before, unilaterally and without Plaintiff's involvement, asking Mr. Chasing Hawk to be the arbitrator.

68.     In the hearing, the Plaintiff expressed his concern that the parties should not be making rules as they go along, and asked for clarification as to what the rules were.  Mr. Chasing Hawk finally said "I think both parties would compromise you don't have to really follow rules and regulations that's why I mentioned it's going to be informal and we'll agree we don't have to follow this and that because if we follow all the rules and regulations we're going to be jammed up here."  Plaintiff did not agree to this arrangement.  Mr. Chasing Hawk also said "there's no set rules." In other words, the language in the loan agreement saying arbitration would be under the Tribe's "consumer dispute rules" was false.

69.     Due to Defendants' egregious and willful misconduct and unfair and deceptive business practices, the Plaintiff was put in the middle of a completely unfair arbitration proceeding, at great stress to himself as he was then proceeding *pro se*.

70.     In light of these facts, the entire dispute resolution provisions of the Western Sky loan agreement should be stricken and declared void, including all of the arbitration terms, tribal jurisdiction terms, and class action ban terms of the contract.

C.     **Facts Regarding Mr. Fretwell.**

71.     Mr. Fretwell resides in Zephyr Hills and previously in Brandon, Florida.

72.     In early 2013, Mr. Fretwell was in financial hardship.  He saw a TV ad for Western Sky and called the number.

73.     On February 7, 2013, Mr. Fretwell obtained a Western Sky loan of $2,525 with the loan agreement stating he would have to pay back $14,054.12.

74.     Shortly after the loan date, Mr. Fretwell was informed that the loan was now assigned to CashCall or a CashCall subsidiary.  It later was said to be transferred to CashCall's debt collection arm, Delbert Services.

75.     Over time, Mr. Fretwell received confusing and inconsistent information from CashCall or its related entity Delbert regarding the status of his loan and the amounts that he had paid and that he purportedly still owed.

76.     There has also been misleading and damaging information placed on his credit report.  Over time, Mr. Fretwell believes that he has paid back over $2000 on this void loan.  He made payments through on or about August 26, 2014.

77.     The burden of this loan has caused hardship to Mr. Fretwell.  As a direct and proximate result of the unlawful conduct of Defendants, Mr. Fretwell has been injured and is entitled to monetary damages and other relief.

D.     **Facts Regarding Ms. Brown.**

78.     Plaintiff Lauren Brown resides in Miami, Florida.

17

79.     Ms. Brown obtained a Western Sky loan dated March 11, 2013.

80.     The loan amount she received was $2,525.

81.     Over time, she paid back approximately $3,438.69 on the loan (10 payments of $294.46, and payments of $204.75, and $289.34, according to a payment history received from CashCall's collection arm, Delbert Services).  These payments were made between April 2013 and March 2014.

82.     The burden of this loan has caused hardship to Ms. Brown.  Among other things, she changed her car due to not having money in or about September 2013 due to lack of funds and damage to her credit.  She also had to take out another loan to help with normal bills due to the CashCall debt.

83.     Ms. Brown has paid much more than the legal interest amount under Florida law.  Because this was an illegal void loan, for excessive interest, she is entitled to receive damages and other relief.  As a direct and proximate result of the unlawful conduct of Defendants, Ms. Brown has been injured and is entitled to monetary damages and other relief.

     **E.**    **Facts Regarding Mr. Peterson.**

84.     Plaintiff Thomas S. Peterson resides in Clearwater, Florida.  He previously at the time of his Western Sky loan resided in Sanford, Florida.

85.     In mid-2012, Mr. Peterson saw a television ad about Western Sky loans and remembers there was a Native American appearing actor in the ad.  He was suffering from adverse financial conditions.

86.     He obtained a Western Sky loan dated June 27, 2012.  The loan amount he received was $9,925.

87.     Over time, he paid back over $16,000 on the loan (20 payments of $743.49, and payments of $842.38, $100, $300, and $100, according to a payment history dated April 29, 2014). He paid back more than $6000 more than he borrowed.

88.     He has paid much more than the legal interest amount under Florida law.  Despite all the money he has paid, he has continued to receive collection notices from Delbert Services regarding the loan.   The company also placed false information on his credit report.

89.     The burden of this loan has caused hardship to Mr. Peterson.  As a direct and proximate result of the unlawful conduct of Defendants, Mr. Peterson has been injured and is entitled to monetary damages and other relief.

**F.      Facts Regarding Ms. Fry.**

90.     Virginia Fry resides in Gulfport, Florida.

91.     In July 2011, Ms. Fry was in a state of financial hardship.  Ms. Fry obtained a Western Sky loan dated July 29, 2011.  The loan amount she received was $2,525.

92.     Over time, she paid back over $11,000 on the loan (over 30 payments of $294.46, over many months from in or about September 2011 through November 2014).

93.     She has paid much more than the legal interest amount under Florida law.  She paid back more than $8000 on this loan – more than four times what she borrowed.

94.     The burden of this loan has caused hardship to Ms. Fry.  The burden of having to make the monthly payments to the payday lender, constricted her budget for daily necessities and made it harder for her to pay her bills, or engage in other activities.  As a direct and proximate result of the unlawful conduct of Defendants, Ms. Fry has been injured and is entitled to monetary damages and other relief.

G.    **Facts Regarding Mr. Pate.**

95.    Plaintiff, Nels Pate, resides in Ocoee, Florida.

96.    In July 2012, Mr. Pate was in a state of financial hardship.  He saw the TV ad for Western Sky, called the number, went to the website, and eventually obtained a Western Sky loan dated July 23, 2012.

97.    The loan amount he received was $2,525.

98.    Over time, he paid back over $5,900 on the loan through many monthly payments. The company was automatically debiting his bank account.

99.    He has paid much more than the legal interest amount under Florida law.

100.    In fact, he paid back more than twice the amount that he borrowed.  Eventually, he paid the loan off and received a document from Delbert Services stating "paid in full on 4/30/14."

101.    The burden of this loan has caused hardship to Mr. Pate.  As a direct and proximate result of the unlawful conduct of Defendants, Mr. Pate has been injured and is entitled to monetary damages and other relief.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:  VIOLATION OF FLORIDA USURY STATUTE (INDIVIDUAL AND CLASS CLAIM)

102.    Plaintiffs incorporate the above-stated allegations by reference as if fully alleged herein.

103.    The loan violates the Florida usury statute.  Under Fl. Stat. § 687.02, the loan was a "usurious contract." The Florida Attorney General has expressly stated that consumer loans violate the law.   Fla. Stat. § 687.147(1) creates a civil right of action.  Plaintiffs allege this claim in accordance with Fla. Stat. § 687.147(1).

104.    Under Fl. Stat. § 687.02, "[a]ll contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatever, at a higher rate of interest than the equivalent of 18 percent per annum simple interest are hereby declared usurious."

105.    As is evident from the loan agreements, the interest rate Western Sky charged was far over the 18% interest rate limit under Florida law.

106.    Under Fl. Stat. § 687.04, CashCall must "forfeit the entire interest so charged, or contracted to be charged."  Further, Plaintiffs are entitled to recover double the amount of interest that they paid.

107.    CashCall also violated Fl. Stat. § 687.071, which governs "criminal usury" and "loan sharking."  Under that statute, "any person making an extension of credit to any person, who shall willfully and knowingly charge, take, or receive interest thereon at a rate exceeding 45 percent per annum or the equivalent rate for a longer or shorter period of time, whether directly or indirectly or conspire so to do, commits a felony of the third degree."  Here, CashCall engaged in a criminal act.  Under the statute, "[n]o extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."  Plaintiffs request a declaration that the loans are void and unenforceable, as they exceeded even this high 45% amount.

108.    The facts reflect that Plaintiff Inetianbor, for example, received $2,525.00 through direct deposit in this loan. Plaintiff made period payments of approximately $298/month. By December 2011, Plaintiff has made a total payment of approximately $3,252.65 on the loan.

109.    Accordingly, the Plaintiff paid an interest rate of approximately 30%, which is far more than the general usury limit of 18% maximum interest allowed on a consumer loan.  CashCall

has demanded repayment at an approximate 139% interest rate on the loan by asking Plaintiff to make additional payments. Here, 18% interest on a loan amount of $2,525 comes to $454.50. However, the amount that Mr. Inetianbor paid was more than this, in fact totaling $727.

110.   When Plaintiff refused to make any further payments, CashCall in a letter to the Florida Office of Financial Regulations, wrote: "due to Abraham Inetianbor's good payment history Cash Call would accept a onetime cash payment of $2,000.00" in addition to the payments Plaintiff already made to consider the loan account paid in full. But because the loan is criminal and void, CashCall is entitled to nothing. Plaintiff is clearly a victim of usury by CashCall who is required to abide by the usury laws of Florida when conducting business in the state of Florida. The other Plaintiffs are also usury victims.

111.   Under Fl. Stat. § 687.03-.04, any company that willfully violates the statute must "forfeit the entire interest so charged, or contracted to be charged or reserved, and only the actual principal sum of such usurious contract can be enforced in any court in this state, either at law or in equity." Further, when usurious interest has been paid, the consumer who paid it can recover double the amount of interest that he paid.

112.   As a direct and proximate result of Defendant's violation of the usury statute, Plaintiffs have been injured, and the Plaintiffs are entitled to an award of monetary damages and declaratory and injunctive relief.

<u>**SECOND CLAIM FOR RELIEF:**</u>
<u>**VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE STATUTE**</u>
<u>**(INDIVIDUAL AND CLASS CLAIM)**</u>

113.   Plaintiffs incorporate the above-stated allegations by reference as if fully alleged herein.

114.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is found at Fl. Stat. § 501.201 to 501.213.  The purpose of FDUTPA is stated at Fl. Stat. § 501.202: "To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce," and "[t]o make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."

115.    Under the FDUTPA, Fl. Stat. § 501.204(1), "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  In this matter, CashCall engaged in unfair and deceptive trade practices.

116.    The FDUTPA was drafted in broad terms to encompass a wide range of unfair or deceptive practices by individuals and companies.  The Florida Supreme Court has defined unfair practices to include conduct that offends public policy and that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. The Court has defined deceptive conduct as representations, omissions, or practices that are likely to mislead the consumer.

117.    Under Fl. Stat. § 501.213, the remedies allowed by FDUTPA are in addition to any other remedies that are available.

118.    Florida case law is replete with examples of businesses that have been held to account for deceptive or unfair trade practices.  Here, some of the unfair and deceptive acts of CashCall include:

- Setting up an arrangement for Western Sky to serve as a "front" to hide the fact that CashCall was the real lender and that no Tribal law actually applies.

- Continuing to do business in states with consumer laws similar to those of the numerous States that have barred CashCall from doing business, waiting until either a consumer lawsuit or a State agency action forces them to shut down.

- Using CashCall personnel in California and other locations outside of South Dakota and outside of the Tribal Reservation to perform servicing, collection and other work on the subject loans, and taking the overwhelming share of the revenues and profits made off the loans, while meanwhile falsely claiming that the loans are governed by Tribal law.

- Including purported tribal arbitration, jurisdiction and class action ban provisions in the form loan agreement and seeking to impose a sham system of arbitration when the Plaintiff Mr. Inetianbor sought to arbitrate his claim.

- Seeking to ban court claims and class action claims while knowing that the alternative dispute resolution procedure meant to take the place of those in the contract, i.e. tribal arbitration, was fraudulent and a sham.

119.    Plaintiffs also allege as a basis for the FDUTPA claim, that the Defendant violated the Florida Consumer Finance Act.  *See* Fl. Stat. § 516.001 through 516.36.  Under that law, each Plaintiff received a "consumer finance loan," defined to mean a loan for less than $25,000 with an interest rate greater than 18%.  *See* Fl. Stat. § 516.01(2).

120.    Under Fl. Stat. § 516.02, "[a] person must not engage in the business of making consumer finance loans unless she or he is authorized to do so under this chapter or other statutes and unless the person first obtains a license from the office."  Here, no loans were issued in compliance with the law and in accordance with the required licensing.

121.    Under Fl. Stat. § 516.02(2)(a), "[a] person who is engaged in the business of making loans of money, except as authorized by this chapter or other statutes of this state, may not directly or indirectly charge, contract for, or receive any interest or consideration greater than 18 percent per annum upon the loan, use, or forbearance of money, goods, or choses in action, or upon the loan or use of credit, of the amount or value of $25,000 or less."  Here, CashCall violated this law by trying to charge more than 18% interest.  The loan also included a "finance charge" of $75. This charge was illegal under Fl. Stat. § 516.031 which sets limits on finance charges.

122.     By violating this statute, Western Sky in fact engaged in criminal acts under Florida law. *See* Fl. Stat. 516.19, providing that a violation of the Consumer Finance Act is a first degree misdemeanor.

123.     The loan also included a "finance charge" of $75.  This charge was illegal under Fl. Stat. § 516.031 which sets conditions and limits on finance charges.

124.     As a direct and proximate result of Defendant's violation of the FDUTPA statute, Plaintiffs have been injured, and are entitled to an award of monetary damages and declaratory and injunctive relief.   Under Fl. Stat. § 501.211, Plaintiffs are entitled to obtain a declaratory judgment that the unfair and deceptive acts of CashCall violated the Act.   Further, they are entitled to recover damages, attorney's fees and court costs.  *See* Fl. Stat. § 501.2105.

## THIRD CLAIM FOR RELIEF:  FRAUD
## (INDIVIDUAL CLAIM)

125.     Plaintiffs incorporate the above-stated allegations by reference as if fully alleged herein.

126.     CashCall is liable for fraud.  CashCall had a duty to be truthful and honest in its representations regarding the loans.  CashCall made false representations including that Western Sky was making the loans when in reality Western Sky was just a front for CashCall. CashCall also fraudulently represented or caused to be represented that these loans were lawful and valid when that was not true.

127.     Each Plaintiff relied to his detriment on the misrepresentations because if CashCall had truthfully disclosed or caused to be disclosed that the loans were harmful and illegal, each Plaintiff never would have applied for one.  As a result of CashCall's fraud, each Plaintiff has been harmed.

128.     CashCall made false representations including that Western Sky was making the loans when in reality Western Sky was just a "front" for CashCall.  CashCall also fraudulently represented in the Western Sky advertisements and loan agreement that these loans were lawful and valid when that was not true.  Each Plaintiff relied on CashCall's misrepresentations because if CashCall had truthfully disclosed that the loan was illegal, each Plaintiff never would have applied.  As a result of CashCall's fraud, each Plaintiff has been harmed.

129.     CashCall also fraudulently included purported tribal arbitration and jurisdiction and class action ban provisions in the form loan agreement while knowing there were no tribal arbitration rules or procedures and then sought to construct and impose a sham system of arbitration when Plaintiff Inetianbor, as one of the victimized borrowers, sought to arbitrate his claim.

130.     CashCall also fraudulently sought to ban court claims and class action claims while knowing that the alternative dispute resolution procedure meant to take the place of those in the contract, i.e. tribal arbitration, was fraudulent and a sham.

131.     As a direct and proximate result of Defendant's fraud, each Plaintiff has been injured, and each Plaintiff is entitled to an award of monetary damages and declaratory and injunctive relief.

132.     Each Plaintiff is further entitled to an award of punitive damages against CashCall for its fraud.  The evidence reflects by clear and convincing evidence that CashCall engaged in intentional misconduct including that it knew the subject loan scheme was a scam and was illegal under Florida law, but pursued it anyway.  CashCall knowingly participated in the unlawful misconduct.  Each Plaintiff is entitled to punitive damages.

133.    Each Plaintiff is further entitled to punitive damages because CashCall fraudulently included purported tribal arbitration and jurisdiction and class action ban provisions in the form loan agreement while knowing there were no tribal arbitration rules or procedures and then sought to construct and impose a sham system of arbitration when the Plaintiff, Mr. Inetianbor, as one of the victimized borrowers, sought to arbitrate his claim.  CashCall also fraudulently sought to ban court claims and class action claims while knowing that the alternative dispute resolution procedure meant to take the place of those in the contract, i.e. tribal arbitration, was fraudulent and a sham.

134.    Mr. Inetianbor himself spoke to various Tribal members and representatives regarding the present matter.  He was advised that the Western Sky and CashCall lending scheme was not authorized by the Tribe and was in fact a predatory lending scheme.  He was further advised that even under Tribal law, these kinds of high-interest loans were not allowed.   In fact, even under Tribal law, the instant loans are unlawful and criminal.

**FOURTH CLAIM FOR RELIEF:**
**VIOLATION OF FAIR CREDIT REPORTING ACT**
**(INDIVIDUAL CLAIM, PLAINTIFF INETIANBOR)**

135.    Plaintiffs incorporate the above-stated allegations by reference as if fully alleged herein.

136.    Plaintiff Inetianbor hereby asserts a claim against CashCall as a furnisher for damages for violation of its Section 1681s-2(b) duties under the FCRA to properly investigate and reinvestigate consumer credit report disputes forwarded to the furnisher by the credit reporting agency or CRA.

137.    Plaintiff during the pertinent times adequately disputed the negative information on his credit reports, to the CRAs who in turn notified CashCall as a furnisher of information.

However, despite Plaintiff's requests to the CRAs and the CRA's notifications of disputes sent by the CRA to CashCall, Cashcall negligently and willfully refused to provide accurate information, failed to properly investigate and reinvestigate the matter and meet its duties under the FCRA, and otherwise violated the FCRA.

138.    Defendant, CashCall, as the furnisher, received notices of the consumer disputes from a CRA with regard to Plaintiff.  A CashCall account summary prepared by Elissa Chavez, a CashCall employee, dated October 2012, reflects that on December 29, 2011, Plaintiff filed an online credit dispute with Equifax, a Credit Reporting Agency.  The summary quotes from the dispute he sent to the CRA, reflecting that the CRA forwarded it to CashCall.  It says "CashCall responded to this dispute on 1/18/2012" reflecting that CashCall received notice from the CRA.

139.    The internal CashCall memo describes that Plaintiff filed another credit dispute on January 15, 2012 with Experian, quotes from his dispute letter which Experian forwarded to CashCall, and states that CashCall responded.

140.    The summary describes how Plaintiff separately sent faxes directly to CashCall about the incorrect credit reporting, for example on May 29, 2012.  CashCall was both receiving notices of the dispute from the CRA, and from Plaintiff.

141.    The CashCall internal summary describes how Plaintiff filed yet another online credit dispute on June 15, 2012 with Experian, summarizes from his dispute letter which Experian forwarded, and states that CashCall responded.

142.    On June 24, 2012, Plaintiff filed another online credit dispute with Experian, which was sent to CashCall by the CRA.  The summary adds that CashCall updated his account to show it was "charged off."

143.    Meanwhile, credit report information that Plaintiff printed for himself, having signed up on services to allow him to periodically check on his credit reports, reflected that as of June 2012, CashCall was reporting the account as having a balance of $0, a past due amount of $0, and as being charged off.  The credit report showed his last payment as having been in December 2011.  December 2011 was in fact when he made his last payment.

144.    On July 12, 2012, Mr. Inetianbor filed his original Florida state court lawsuit.  On information and belief, CashCall retaliated against Mr. Inetianbor by manipulating his credit report.  On July 31, 2012, CashCall reported a balance of $2,491 (in June, before he had sued, it was $0), a past due amount of $1,282 (in June, it had been $0).  Now, the status of the loan reported by CashCall was "120+ days past due."  Back in June, it had been "Charge-off."

145.    Mr. Inetianbor sent another credit dispute to Experian on August 28, 2012 according to CashCall's internal summary memo.  The dispute was forwarded by the CRA to CashCall as the furnisher, as reflected by the fact that CashCall in its own memo quotes from the letter: "3500 dollars already paid…."  CashCall adds that on September 19, 2012 it responded to the credit dispute.

146.    Plaintiff filed another credit dispute with the CRA, Experian, on August 31, 2012. CashCall received the complaint which was forwarded to it by the CRA; CashCall reflected its receipt of the complaint by the fact that CashCall quotes from it in the internal memo; and CashCall said that it responded to the CRA regarding the credit complaint.

147.    Throughout this time, Plaintiff was both electronically filling out complaint forms, and mailing complaints as well, such as to Experian and Equifax in August 2012.  He was complaining both to the CRAs and to CashCall.

148.    According to the CashCall memo, Plaintiff complained again to Experian on September 4, 2012 and Equifax on September 21, 2012.  The CRAs forwarded the disputes to CashCall as furnisher.

149.    Credit reports Mr. Inetianbor obtained and letters he received from the CRAs confirmed how he had made a consumer credit complaint to the CRA, how the CRA had forwarded it to the furnisher CashCall, and how CashCall had responded.  See, for example, an Equifax letter to him dated September 14, 2012, confirmation number 2241043476, and the one dated September 19, 2014, with similar information.

150.    He complained again to Experian on September 24, 2012.  Experian as CRA forwarded the dispute to CashCall.  CashCall quoted how in the dispute form, Plaintiff complained about how even though he made his last payment in December 2011, the account was showing as not charged off.  Normally, an account gets charged off after 6 months.  CashCall had reported his account as charged off back in June 2012, but after he sued, on information and belief, Defendant "re-aged" his account and showed a balance still owing and supposedly not charged off.

151.    CashCall's internal memo states that Plaintiff complained again to the CRA, Equifax, on October 5, 2012.  On October 10, 2012, CashCall responded to the credit dispute and claimed to Equifax that "we are reporting the account information accurately," despite knowing it was an illegal loan that should not be reported at all.

152.    CashCall's internal memo reflects how Plaintiff complained again to Equifax on October 11, 2012, stating "Paid in full not charged off."  CashCall received the complaint from the CRA and responded on October 12.

153.   CashCall's internal memo reflects how Plaintiff complained again to Equifax on October 16, 2012, stating "Paid in full not charged off."  CashCall received the complaint from the CRA and responded on October 17.

154.   Plaintiff continued to receive letters from Equifax confirming how he had complained, the CRA sent the complaint and made inquiries with the furnisher CashCall, and CashCall responded, including Equifax letters dated October 4, 26, 30, 31 and November 7, 2012.

155.   On November 8, 2012, on information and belief, credit record information obtained by Mr. Inetianbor reflected that CashCall had sent false information again to the CRA; CashCall on November 8, 2012 reported that he had made payments in May, June, July, August, September and October 2012; and each purported payment was indicated by an asterisk found at the bottom of the page where it says, "81-Month Payment History."  On information and belief, by reporting payments that never existed, CashCall could "re-age" the account, make it appear that the customer was admitting the debt by making more payments, could prevent the six-month charge-off period from expiring, and could aggravate Mr. Inetianbor.  The document now shows both continued payments being made in 2012, and at the same time, says "Charge-Off."  In fact, the last payment he really made was back in December 2011.

156.   Mr. Inetianbor received information from Experian dated February 27, 2013.  It showed that the CashCall account was now both "charged off" and "never late."  On information and belief, because the account had been "re-aged" by CashCall, it showed the account as one that would continue to be listed until April 2019.  Under the normal seven-year period for information to stay on a credit report, the account should have been listed to be dropped from the report earlier.

157.    Mr. Inetianbor made other complaints to the credit reporting agencies.  These, too, were forwarded to the Defendant by the CRA, and the Defendant then responded in a negligent and willfully improper fashion.

158.    The Fair Credit Reporting Act imposed duties upon CashCall in its capacity as a furnisher of credit information.  CashCall received notice of a dispute with regard to the completeness or accuracy of information it provided to a CRA.  Notice to CashCall as a furnisher of credit information, was provided when the CRAs, Experian, and Equifax, reported that a customer, Plaintiff, had disputed an item of credit that the Defendant provided to the CRA.  *See* 15 U.S.C. § 1681i(a)(2), § 1681s-2(b)(1).

159.    After receiving such notice, Defendant was required to conduct an investigation with respect to the disputed information and review all relevant information provided to it by the CRA. 15 U.S.C. § 1681s-2(b)(1).  Defendant was obligated to report back to any CRA that notified it of the dispute.  15 U.S.C. § 1681s-2(b)(1)(C).  If the investigation resulted in a finding that Defendant provided incomplete or inaccurate information to the CRA, then Defendant had to report the results of its investigation to all other CRAs that received such incomplete or inaccurate information. 15 U.S.C. § 1681s-2(b)(1)(D).  If the investigation was either inconclusive or resulted in a finding that the Defendant provided incomplete or inaccurate information to the CRA, then Defendant had to promptly modify that item of information, delete that item of information, or permanently block the reporting of that item of information.  15 U.S.C. § 1681s-2(b)(1)(E).

160.    Defendant was obligated to complete its investigations, reviews and reports within the 30-day period after the consumer, Mr. Inetianbor, notified the CRA of the dispute. 15 U.S.C. § 1681s-2(b)(2).

161.     During the pertinent times, Defendant received multiple notices of disputes with regard to the completeness or accuracy of information provided to a consumer reporting agency. Plaintiff multiple times contacted CRAs including Experian and Equifax to dispute the reported information regarding the illegal Western Sky loan found in his credit report.  Each time, the CRAs sent an Automated Consumer Dispute Verification to Defendant notifying it of Plaintiff's dispute. After receiving notice of the dispute from Equifax and Experian, CashCall's duty under Section 1681s-2(b) was triggered and it breached its duty.

162.     Defendant failed, with regard to multiple notices of consumer disputes it received from CRAs, to conduct a reasonable investigation with respect to the disputed information, to review all relevant information provided, to report the results of its investigation properly back to the CRA, to properly address and correct incomplete or inaccurate information, and to modify, delete or permanently block the reporting of information known to be inaccurate and incomplete.

163.     Defendant's duty as a furnisher under  15 U.S.C. § 1681s-2(b) was triggered after it received notice of the dispute from the consumer reporting agencies as it did multiple times.  At least two different CRAs had notified the furnisher of the consumer's disputes.  Experian and Equifax both sent CashCall multiple notices informing Defendant of disputes.

164.     Defendant's investigation was unreasonable in that the consumer had alerted the CRA and the Defendant furnisher that the initial information was unreliable and the Defendant knew or should have known that it was unreliable.  Also, the consumer had repeatedly insisted in both telephone calls and written correspondence that the information was erroneous.

165.     On information and belief, CashCall: (1) failed to conduct an adequate investigation regarding the disputed information; (2) failed to properly and accurately report to the CRA Plaintiff's status and that of the account; (3) continued to report inaccurate information; (4)

33

continued to insert inaccurate and misleading information in Plaintiff's credit report; (5) failed to follow reasonable procedures to assure the accuracy of its investigation; (6) failed to conduct an adequate and reasonable investigation despite being notified of problems by two different CRAs; and (7) deliberately manipulated the false information placed on the credit report in order to threaten, punish and intimidate the Plaintiff, to "re-age" the account, to show the account as charged-off, active, or both, indiscriminately, and otherwise to harass the Plaintiff.

166.    Defendant sent inconsistent messages to the CRAs, at one point showing monthly payments that never occurred; at another time saying the account was paid and charged off; at other times saying it was not charged off; and so forth.

167.    Defendant negligently and willfully failed to comply with Section 1681s-2's investigation requirement.  During the pertinent times, Defendant knowingly and intentionally committed an act in conscious disregard for the rights of others, and acted with malice or evil motive.  During the pertinent times, Defendant knowingly and intentionally engaged in willful concealments or misrepresentations.

168.    As a result of Defendant's failure to comply with the FCRA, Plaintiff suffered a lower credit score and a denial of credit when Defendant inaccurately reported back to the CRAs his status.  He injured in other ways as well.  As a direct and proximate result of Defendant's violation of the FCRA, Plaintiff has been injured, and the Plaintiff is entitled to an award of monetary damages and declaratory and injunctive relief.

169.    Accordingly, to the extent the evidence may show, the Plaintiff alleges all civil remedies provided under the FCRA including recovery of actual damages, attorney fees, statutory and punitive damages.  15 U.S.C. § 1681n and 1681o.  In addition, Plaintiff pleads all violations of the FCRA as further evidence of his claim against CashCall under the FDUTPA.

**FIFTH CLAIM FOR RELIEF: DEFAMATION**
**(INDIVIDUAL CLAIM, PLAINTIFF INETIANBOR)**

170.    Plaintiffs incorporate the above-stated allegations by reference as if fully alleged herein.

171.    The elements of a claim for defamation are as follows: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008).

172.    Here, upon information and belief and to the extent the evidence may show: CashCall published defamatory information regarding the Plaintiff Mr. Inetianbor specifically by reporting to CRAs that the Plaintiff owed money on a debt when in fact he did not because the underlying loan is void, unconscionable and unlawful.

173.    The statements made by CashCall were false; CashCall knew or should have known that the underlying loan was usurious, criminal and void.

174.    Mr. Inetianbor has suffered actual damages; and the statements were defamatory under the circumstances.

175.    As a direct and proximate result of Defendant's defamatory conduct, Plaintiff has been injured, and the Plaintiff is entitled to an award of monetary damages, compensatory and punitive damages and declaratory and injunctive relief.

**SIXTH CLAIM FOR RELIEF: DECLARATORY JUDGMENT**
**(INDIVIDUAL AND CLASS CLAIM)**

176.    Plaintiffs incorporate the above-stated allegations by reference as if fully alleged herein.

177.     Each Plaintiff pleads a request for declaratory and injunctive relief both as a remedy for their FDUTPA claim, and as an independent claim for declaratory judgment regarding the enforceability of Loan Agreement provisions.

178.     Plaintiffs request that the Court enter declaratory and injunctive relief finding the loan agreement, and all provisions therein, to be void and unenforceable, and to provide rescission and restitution, and to declare the respective right and duties of the parties herein.

179.     Plaintiffs further request that the Court order the loan agreement void and each of its component provisions void for reasons including that CashCall contends that the Tribal Law of the Tribe governs this loan and this arbitration.  This is false for multiple reasons.

180.     First, the Western Sky company is not a Tribal corporation and not organized under Tribal law.  Rather, it is organized under South Dakota State law.  In other words, in the very formation of the Western Sky company (Western Sky Financial, LLC), its owner, Martin Webb admitted that it was not governed by Tribal corporation law but rather South Dakota corporation law.

181.     It is even more baseless for CashCall to claim that Tribal law applies.  CashCall has no relation to the Tribe.  It is a for-profit California corporation owned by John Paul Reddam who is not a tribal member.  Profits from this business do not go to the Tribe but manly to Reddam and his out-of-state California company.  CashCall has no basis to assert that Tribal law governs its conduct.

182.     Second, Tribal law only applies to a limited range of matters.  Typically, these are disputes on the reservation among Tribal members.  Western Sky admits that it did not even market or make its loans to Tribal members or anyone dwelling on the reservation, or even in South

Dakota.  Presumably this was because these loans were so unlawful that the Tribal Courts would not allow them to be made to Tribal members.

183.    Third, States such as Florida have their own small loan laws that govern loans that affect State residents.  Many different states have rejected Western Sky and CashCall claims that somehow, Tribal law could apply.

184.    When a customer called Western Sky to apply for a loan, they did this from where the customer was in Florida or the other state – not on the reservation.  If the loan was approved, the money was sent to the borrower's bank in Florida or another state – not on the reservation. When CashCall took loan payments out of peoples' bank accounts using "electronic debits" or "automatic debits" this was done from these banks off the reservation in states like Florida.

185.    Thus, the tribal law does not apply to these loans as multiple States that have looked at the matter have found, including the States of California, Colorado, Georgia, Illinois, Maryland, Massachusetts, Missouri, New Hampshire, Oregon, Washington State and West Virginia.

186.    Plaintiff Inetianbor's "Agreement to Arbitrate" states as follows: "Agreement to Arbitrate. You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." Plaintiff cannot locate any "consumer dispute rules." Therefore, the arbitration agreement is misleading and unenforceable because there are no such rules.  This is another reason why the Tribal law does not apply – it doesn't even exist, when it comes to these purported "rules."

187.    The loan agreement states that Western Sky is a lender authorized by the laws of the Tribe and "the Indian Commerce Clause."  (Agreement, first page).   The truth is that Western Sky is not chartered under Tribal law but under South Dakota state law.  Further, the Indian

Commerce Clause is a part of the U.S. Constitution that allows Congress to regulate Indian tribes and does not "authorize" Western Sky.

188.    The agreement states that the borrower must pay an interest rate of 139.31%. (Agreement, first page).  This is false because Florida law limits interest to 18% for loans under $500,000.00.

189.    The agreement states that the borrower must pay a "finance charge" of $75. (Agreement, second page).  This is false because Florida law does not allow such a charge in such an amount.

190.    The agreement states that the borrower must pay the interest and charges and that whoever holds the note can enforce it.  (Agreement, second page).  This is false because Florida law does not allow such a loan.

191.    The agreement represents that any dispute must be resolved by "Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement."  (Agreement, page 3, and the representation about the "consumer dispute rules" is made again at page 4).  First, there are no "consumer dispute rules." Second, the Tribe does not have any rules or laws that authorize such an arbitration and third, the "terms of this Agreement" incorporated into the clause are riddled with falsehoods as noted.  Therefore, the arbitration part of the loan agreement is fraudulent and void along with the rest of it.

192.    The agreement states that Western Sky will pay the "filing fee" for the arbitration, making it again sound as if the Tribe has an established procedure and rules.  (Agreement, p. 4). In fact, because the Tribe does not have any rules or procedures for them there is upon information and belief no such "filing fee."

193.    The agreement defines "disputes" very broadly and says they all must be arbitrated, but then states that any disputes regarding the purported class action ban must be litigated before the Tribal Court.  (Agreement, pp. 3-5).  The agreement states that matters regarding the class ban must be litigated before the Tribal Court when the Tribal Court lacks subject matter jurisdiction over these loans which are never issued to Indians, tribal members, reservation dwellers or even South Dakotans, but instead only via the internet to consumers up to thousands of miles away who never enter the reservation and who are protected by their States' consumer protection laws.

194.    The other Plaintiffs' loan agreements are likewise unenforceable, and its purported arbitration provisions are specifically unenforceable.

195.    The agreement purports to force Tribal venue, law and arbitration on the consumer when in fact the real lender is a California non-tribal corporation, i.e. CashCall, which has no right to shield itself from suit by virtue of any of the provisions in this unlawful contract.  In fact, CashCall makes almost all the revenues and profits on these loans and they are largely administered by CashCall employees who are in California and other states.  Thus, these illegal loans do not bring the benefit to the Tribe.

196.    CashCall fraudulently sought to ban court claims and class action claims while knowing that the alternative dispute resolution procedure meant to take the place of those in the contract, i.e. tribal arbitration, was fraudulent and a sham.  Because the loan agreement and its pertinent terms are riddled with false, fraudulent and unfair and deceptive provisions and because the loan agreement is an unconscionable contract as well as one that is impossible to perform and the product of mistake, none of its dispute resolution provisions, including the class action ban, should be enforced.

**SEVENTH CLAIM FOR RELIEF:**
**DIRECT PERSONAL LIABILITY OF REDDAM**

## (INDIVIDUAL AND CLASS CLAIM)

197.   Plaintiffs incorporate the above-stated allegations by reference as if fully alleged herein.

198.   During the pertinent times, Reddam was the founder, sole shareholder, sole director, president and CEO of CashCall.

199.   Reddam approved and signed the key documents facilitating the Western Sky "front" organization.

200.   Reddam was actively, directly and personally involved in the CashCall and Western Sky loan enterprise during the pertinent times.  He has actively managed the activities of CashCall and devised major company policies.   On information and belief, Reddam engaged in communications by telephone and email on behalf of CashCall and Delbert with financial institutions and other companies and individuals in Florida in connection with the enterprise.

201.   On information and belief, in late 2009, in support of license applications for Delbert, the collecting arm of CashCall, in one or more states, Reddam represented that he "r[an] the day-to-day operations of CashCall," that "[a]ll of the company's department heads report[ed] directly to [him]," that he was "responsible for devising and implementing all major company policies," and that "[h]e coordinate[d] all marketing and advertising, and determine[d] where advertising should be directed."

202.   On information and belief, in an affidavit filed in Colorado in 2010, and dated only months before he signed the contracts initiating the Western Sky enterprise, Reddam averred:

> Mr. Reddam runs the day-to-day operations of CashCall which currently originates and services unsecured loans.  All of the company's department heads report directly to Mr. Reddam.  He is responsible for devising and implementing all major company policies – including its various loan programs and interest rates.

203.    Reddam has been the director and sole owner of Delbert, and involved in its business and operations. On information and belief, in late 2009, Reddam personally signed Delbert's application for a debt-collection license in Massachusetts, in which he agreed on behalf of Delbert to comply with laws pertaining to the debt-collection business. He represented that he, along with one other person, had "principal responsibility for the fulfillment of [Delbert]'s mission and the legal accountability for its operations." Likewise, on information and belief, in support of Delbert's license to engage in debt collection in Massachusetts, in 2009 and in 2012, Reddam submitted a Biographical Statement & Consent Uniform Debt Collector (DU2) Form in his capacity as a control person for Delbert. As part of these submissions, Reddam provided and attested to information about his personal finances, his employment history, his business affiliations, his criminal background, and regulatory actions taken against him personally. On information and belief, Reddam has from time to time made similar representations with regard to one or more of his companies in other states.

204.    Reddam played a central role in developing and setting into motion the nationwide scheme through which loans that his companies marketed, financed, purchased, serviced, and collected purportedly did not have to comply with state licensing and usury laws because they were made in the name of Western Sky.

205.    In late 2009, Reddam negotiated, and in early 2010 signed, the agreements between his companies and Western Sky that structured and governed the scheme. Moreover, he is the president, manager, sole member, and sole owner of WS Funding, an entity created to purchase WS Loans from Western Sky.

206.    Reddam participated in, or had the authority to control and knew or should have known about, the actions of CashCall, WS Funding, and Delbert, including their acts in Florida.

207.     On information and belief, Reddam chose or approved the choice of Florida as a State where the loans would be advertised.

208.     As a direct and proximate result of Reddam's decisions and conduct in setting up and implementing the Western Sky loan program, these fraudulent loans were issued to residents of Florida including the Plaintiffs, applying usurious and unlawful interest rates, causing damage to their credit standing and otherwise injuring and harming the Plaintiffs and the putative class.

209.     Reddam during the pertinent times was directly and materially involved in the intentional misconduct and knew the subject loan scheme was a scam and was illegal under Florida law, but pursued it anyway via his company, CashCall.  More recently, Reddam had Western Sky shut down its loan issuances in September 2013, and purported to sell off the lucrative home mortgage part of the CashCall enterprise in January 2015.   Reddam's known business enterprises have been shut down and dissolved except for CashCall, Inc., but on information and belief it is now being run on a shoestring.

210.     On information and belief, Reddam directed, approved or ratified the decision of CashCall to fraudulently include the purported tribal arbitration and jurisdiction and class action ban provisions in the form loan agreement while knowing there were no tribal arbitration rules or procedures.

211.     As a direct and proximate result of Reddam's personal involvement in the tortious and unlawful conduct herein, the Plaintiff and class members have been damaged and are entitled to an award of monetary damages and declaratory and injunctive relief.

## VI.  CLASS ACTION ALLEGATIONS.

212.     Plaintiffs in addition to bringing their individual claims, hereby also brings a class action claim on behalf of themselves and all others similarly situated under the provisions of Rule

23 of the Federal Rules of Civil Procedure and request certification of the following class:  All persons who borrowed money in a Western Sky loan in Florida.

213.    The requirements for maintaining this action as a class action are satisfied in that there are too many class members for joinder of all of them to be practicable.  Upon information and belief, there are thousands of members of the proposed class.

214.    There are issues of fact or law that are common to all members of the class, including but not limited to:

- whether Defendant unlawfully collected sums from class members and took money from class members' bank accounts;

- whether CashCall improperly used Western Sky as a "front" for its internet lending business in order to engage in a subterfuge that the enterprise was protected by Tribal law, venue, arbitration and purported class action bans from State regulation or consumer claims;

- whether the Western Sky loan contracts including their Tribal law, venue, arbitration and class action ban provisions are unfair, deceptive, unreasonable, unenforceable and void;

- whether the loans to class members in Florida violate Florida lending and consumer protection law;

- whether Defendant's uniform business methods pertaining to the loans to class members in Florida constitute unfair and deceptive trade practices in violation of the Florida UDAP;

- whether the loans are void contracts illegal ab initio and entitling class members to refunds;

- whether class members are entitled to relief under one or more of the Plaintiff's substantive claims for relief;

- whether class members can recover damages and/or injunctive and declaratory relief;

- whether Reddam is jointly and severally liable with CashCall; and

- whether the class is entitled to an award of attorneys' fees and costs.

215.    Plaintiffs' claims are typical of the claims of class members.  Each Plaintiff is a member of the class, will adequately represent it and does not have any interest adverse to that of class members.  Plaintiffs have retained counsel experienced in lending law and who have litigated class action cases against consumer and subterfuge lenders, and who have litigated class actions in other jurisdictions as well.

216.    Pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, the class meets all requirements for class certification.

217.    The class meets the requirements of Rule 23(b)(1) because adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of other members of the class not parties to the adjudications or would substantially impair or impede their ability to protect their interests.  The proposed class may be properly certified under Rule 23(b)(1) because an adverse decision by the Court against an individual Plaintiff might contain precedent that could be used against other Plaintiffs.

218.    The class is also properly maintainable under Rule 23(b)(2) because Defendants acted or refused to act on grounds generally applicable to the class.  Defendants facilitated loans on materially similar terms to all class members.  Plaintiffs seek a declaration as to all class members that the loans were void and illegal and class members do not owe any money pursuant to these loans and that negative and derogatory information should not be reported to credit reporting agencies and that Defendants should take steps to correct any such information on class members' credit reports.  Accordingly, injunctive or declaratory relief would be appropriate.

219.    In addition, the class meets the requirements of Rule 23(b)(3) because the questions of law or fact common to members of the class predominate over any questions affecting only individual class members.  The determinative common questions all apply to all class members.

Additionally, a class action is superior to any other available methods to obtain a fair and efficient adjudication.  Concentrating the litigation in this forum would not present undue burdens for absent members.  Finally, Plaintiffs do not foresee any difficulties in managing the case as a class action.

## VII.  **PRAYER FOR RELIEF**.

WHEREFORE, Plaintiffs pray, on behalf of themselves and all other similarly situated individuals, for entry of a judgment finding and ordering as follows:

A.      certifying the class under Rule 23;

B.      finding that the arbitration, forum selection, Tribal law and class action ban provisions in the loan agreement are void and unenforceable;

C.      finding that the subject loans violated the law as alleged herein;

D.      declaring that no money may be collected by Defendants from the class members on the subject loans;

E.      ordering Defendants to pay to class members all amounts collected pursuant to the subject loans;

F.      awarding class members actual and treble damages;

G.      ordering injunctive and equitable relief including to correct the credit reports and credit histories of the Plaintiff and class members;

H.      awarding reasonable attorneys' fees and expenses;

I.      awarding pre-judgment interest as allowable by law; and

J.      awarding such other and further relief as this Court may deem just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Respectfully submitted, this the 13th day of June, 2016.

s/Janet Varnell
Janet Varnell, Esq.
Florida Bar No. 0071072
Varnell and Warwick, P.A.
P.O. Box 1870
Lady Lake, FL  32158
Telephone: 352-753-8600
Fax: 352-504-3301
jvarnell@varnellandwarwick.com

Mona L. Wallace (N.C. Bar No. 09021)
John S. Hughes (N.C. Bar No. 22126)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2016, I served the foregoing document on all counsel of record, by email and via the Courts' CM-ECF system.


s/Janet Varnell
Janet Varnell, Esq.
Florida Bar No. 0071072
Varnell and Warwick, P.A.
P.O. Box 1870
Lady Lake, FL  32158
Telephone: 352-753-8600
Fax: 352-504-3301
jvarnell@varnellandwarwick.com

Mona L. Wallace (N.C. Bar No. 09021)
John S. Hughes (N.C. Bar No. 22126)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com
*Attorneys for Plaintiffs*