**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 13-60066-CIV-COHN-SELTZER**

ABRAHAM INETIANBOR, JOHNNY
FRETWELL, LAUREN BROWN, THOMAS
PETERSON, VIRGINIA FRY, AND NELS
PATE, JR., on behalf of himself and a class of
persons similarly situated,

      Plaintiffs,

vs.

CASHCALL, INC. and JOHN PAUL
REDDAM,

      Defendants.

_____/

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR**
**PRELIMINARY APPROVAL OF THE PROPOSED CLASS ACTION SETTLEMENT**
**AND FOR APPROVAL OF A PROPOSED PLAN OF CLASS NOTICE**

      Plaintiffs, Johnny Fretwell, Lauren Brown, Thomas Peterson, Virginia Fry and Nels Pate, Jr. (collectively, "Plaintiffs"), through undersigned counsel, and without opposition from Defendants CashCall, Inc. ("CashCall") and John Paul Reddam ("Mr. Reddam"), hereby respectfully file this Memorandum of Law in support of their unopposed motion for preliminary approval of the proposed class action settlement and for approval of a proposed plan of class notice. In support of the motion, Plaintiffs state as follows:

**I.      INTRODUCTION**

      The Stipulation and Agreement of Settlement (the "Settlement") filed herewith is proposed to the Court after years of diligent and zealous litigation and representation on the part of all parties involved. The Court is well aware of the intensity and the thoroughness with which many key issues, both threshold and merits, were discovered, advanced, briefed, and heard and

ruled on over that time.  The case has led to issuance of multiple Orders by this Court which have been widely cited both by other courts and legal commentators.  It also led to an appeal to the Eleventh Circuit resulting in a reported panel decision and a subsequent petition for certiorari to the United States Supreme Court.  There are two more recent appeal petitions pending.

The case began with a *pro se* complaint filed in the Florida state court.  After being removed to this Court, threshold issues regarding arbitration provisions were repeatedly briefed leading to several decisions.  After a period of time, the original Plaintiff Mr. Inetianbor retained the undersigned Plaintiffs' counsel.  Over the months that followed, the Court received significant briefing and issued Orders on issues including but not limited to arbitration, choice of law or forum, personal jurisdiction, sufficiency of the pleading of federal law and state law claims, and other issues.  The parties engaged in extensive discovery.  Thousands of pages of documents were produced.  Written responses to interrogatories and requests for admission were served.   There was motion practice on motions to compel.  Several depositions were taken including of several corporate representatives of CashCall, the deposition of Mr. Reddam, and depositions both of the original Plaintiff Mr. Inetianbor and of the subsequently joined Plaintiffs, and now proposed settlement class representatives, Johnny Fretwell, Lauren Brown, Thomas Peterson, Virginia Fry, and Nels Pate, Jr.

The extensive discovery and litigation of key issues has allowed all parties to assess the relative strengths and weaknesses of their claims and defenses.   In addition, a series of settlements with state Attorneys General and other state agency representatives regarding issues involving the Western Sky lending program in those states has occurred.  These resolutions, some of which came after significant litigation, provide useful comparables and benchmarks for purposes of assessing the proposed resolution herein.   As discussed below, the relief to be

provided to Florida borrowers under the Western Sky loans, should this settlement be approved, compares favorably with the resolutions obtained in other states.

The standard for preliminary approval of a class action settlement of this type is not onerous and requires only a showing that the proposed resolution falls within the range of reasonableness. The present proposed settlement clearly falls within that range, and accordingly this Court should enter an order of preliminary approval, allow the sending out of the class notice, make provision for the submission of any opt-out requests by settlement class members or objections, and schedule a date for a final fairness hearing.

## II.    FACTUAL BACKGROUND

The facts of the case have been recited in prior submissions including, for example, those at DE 72, 138, 153, 169, 206, and others.   To summarize:

### A.  The *pro se* complaint, removal.

On July 12, 2012, Abraham Inetianbor ("Mr. Inetianbor") then acting *pro se*, filed his original Complaint against CashCall, Inc. on July 12, 2012 in the Broward County Court.  (See Doc. 1-4, p. 4 of 63).   On October 19, 2012, Defendant filed a motion to dismiss or for more definite statement. (*Id.*, p. 13).  On December 3, 2012, the Court denied the motion to dismiss but granted the motion for a more definite statement.  (*Id.* at 46).  Mr. Inetianbor filed his amended complaint on December 17, 2012.  (*Id.* at 47).   It included a new claim for usury and under the Fair Credit Reporting Act.  (*Id.* at 48-49).

Defendant CashCall removed the case on January 11, 2013 to this Court.  On January 14, 2013, Plaintiff filed a motion to remand the case to State Court.  (Doc. 4). On January 24, a scheduling conference was held before Magistrate Judge Seltzer. (Doc. 15).

**B.  CashCall's motion to compel arbitration, first arbitration order.**

On January 24, 2013, Defendant moved the Court to order arbitration under the Federal Arbitration Act and the provisions in the loan agreement.  (Doc. 16). Defendant also moved to stay discovery.  (Doc. 18).  On January 28, 2013, Plaintiff filed an opposition to CashCall's arbitration motion.  (Doc. 19).  Plaintiff also filed an opposition to CashCall's motion to stay discovery.  (Doc. 23).  On February 7, 2013, CashCall filed its reply brief in favor of its motion. (Doc. 26, at p. 3).

On February 15, 2013 (Doc. 33), the Court entered an Order denying Plaintiff's motion to remand, and granting Defendant's motion to compel arbitration and to stay discovery.  On March 12, 2013, Plaintiff filed a notice that he had submitted an arbitration demand.  (Doc. 36).  On March 12, Plaintiff also filed a motion to re-open the case.  (Doc. 37).  On March 13, Plaintiff again filed a motion for leave to file a Second Amended Complaint. (Doc. 38).  On March 14, CashCall filed a notice regarding arbitration.  (Doc. 39).  On March 18, 2013, Plaintiff filed a Reply on the issue. (Doc. 42, p. 2).  On March 29, 2013, CashCall filed an opposition to Plaintiff's motion.  (Doc. 43).

**C.  Order reopening case, renewed motion to arbitrate, second arbitration order.**

On April 1, 2013 (Doc. 45), the Court granted Plaintiff's motion to reopen the case.  The Court found that Plaintiff had made a showing that the arbitration forum specified in the arbitration agreement was not available.  *Id.* at p. 5.  On April 23, 2013, Defendant renewed its motion to compel arbitration.  (Doc. 53).  On April 29, 2013, Plaintiff filed his brief opposing this renewed demand to arbitrate. (Doc. 56).  On May 9, CashCall filed its reply. (Doc. 57).  On May 17, 2013, the Court granted Defendant's new motion to compel arbitration.  (Doc. 59).

On May 21, 2013, Plaintiff filed motions to reconsider and to re-open the case. (Docs. 61, 62). On June 6, 2013, Defendant filed briefs in opposition. (Docs. 65, 66). On June 10, Plaintiff filed reply briefs. (Docs. 67, 69). On June 20, 2013, the Court filed an Order denying the Plaintiff's motion that it reconsider its prior May 17 Order requiring arbitration. (Doc. 70).

**D. Retention of counsel, new motion to reconsider, new order, appeal.**

A preliminary arbitration hearing took place on June 21, 2013. (Docs. 73-22). After the preliminary hearing. Plaintiff retained counsel. Mr. Inetianbor through counsel then filed a renewed motion for reconsideration. (Docs. 72-73). The motion to reconsider was heard in this Court on August 16, 2013. (Doc. 89). After considering the evidence and argument from counsel, on August 19, 2013, the Court reconsidered its earlier rulings and denied the motion to compel arbitration. (Doc. 90). CashCall filed a notice of appeal on August 22, 2013. (Doc. 92).

The appeal was docketed in the Eleventh Circuit under No. 13-13822. Appellate briefs were filed and the Eleventh Circuit heard oral argument on July 31, 2014. The Eleventh Circuit subsequently affirmed the District Court decision in a published opinion dated October 2, 2014. CashCall filed a petition for rehearing *en banc*, which was denied on December 1, 2014. CashCall filed a petition for a writ of certiorari to the United States Supreme Court, which was denied on April 6, 2015.

**E. Proceedings on remand to the District Court.**

On February 11, 2015, Mr. Inetianbor filed his Third Amended Complaint in this Action, asserting class action claims. (Doc. 116). A Scheduling Order was entered. (Doc. 121). On March 13, 2015 Defendant filed a motion to dismiss raising Tribal jurisdiction and other issues. (Doc. 122). This motion was briefed out. (Docs. 128, 130). On June 19, 2015 the Plaintiff moved to file a Fourth Amended Complaint. (Doc. 137). On June 29, 2015 the Court entered

Orders denying the motion to dismiss the Third Amended and allowing the filing of the Fourth Amended.  (Docs. 139-140).   The Fourth Amended was filed joining Mr. Reddam as a Defendant.  (Doc. 141).  In its June 29 Orders, the Court provided that the parties could engage in factual discovery on issues of governing law and venue raised in the Motion to Dismiss the Third Amended Complaint.   The parties engaged in such discovery.   (See Doc. 146).   On October 19, 2015 the parties then filed exhaustive supplemental briefs with extensive exhibits on the issues of jurisdiction which also implicated issues of control and structure and nature of the underlying business enterprise.   (See Docs. 151, 153).   They filed additional materials on October 26.  (Dos. 156-57).

On December 7 the Court entered an Order regarding choice of law and associated issues. (Doc. 158).   On January 11, 2016 the Defendants moved to dismiss the Fourth Amended Complaint on a variety of grounds.  (Doc. 164).  They also filed a motion to dismiss the claims as to Mr. Reddam based on lack of personal jurisdiction and other contentions.   (Doc. 165). These motions were briefed out.  (Docs. 167-68, 184-85).   Meanwhile, on January 29, 2016 the Plaintiffs filed their first motion for class certification, attaching voluminous materials arising out of their discovery and investigation.  (Docs. 169-174).   On February 17, 2016 Plaintiffs moved for discovery on the personal jurisdiction issues raised by Mr. Reddam.  (Doc. 183).

On February 29, 2016 the parties filed a new scheduling report reflecting the status of the case to date and relative positions.  (Doc. 187).  On March 2 Defendants responded to the first class certification motion and on March 7 responded to the jurisdictional discovery motion. (Docs. 188-89).  Plaintiffs filed replies on both matters.  (Docs. 190-91).

On April 5, the Court entered an Order denying the motions to dismiss the Fourth Amended Complaint and Mr. Reddam's motion to dismiss.  (Doc. 193).  The Court entered an

Order om April 19, 2016 denying the first class certification motion, but without prejudice to refiling the motion.  (Doc.  196).

Defendants filed an answer to the Fourth Amended Complaint.  (Doc. 198).  The parties entered into a fact stipulation covering various issues.  (Doc. 204).  On May 27, 2016, the Plaintiffs filed a motion to amend their complaint so as to join new Plaintiffs as prospective class representatives addressing issues identified by the Court's Order that denied the first motion to certify a class, and also filed their renewed motion for class certification.  (Docs. 205-06).  These motions were briefed out.  (See Docs. 208-214, 231).  The Court also provided for time for the depositions and discovery regarding the new prospective class representative Plaintiffs.  (*See id.*).  On June 13, 2016, the Court granted the motion to amend the complaint.  (Doc. 215).

### F.  Fifth Amended Complaint, class certification.

On June 13, 2016, the Fifth Amended Complaint in this Action was filed, asserting class action claims and joining Plaintiffs Fretwell, Brown, Peterson, Fry, and Pate, Jr.  (Doc. 217). This operative complaint asserts claims for relief including: (1) individual and class claims for violation of the Florida usury statute, Fla. Stat. § 687.02, *et seq.*; (2) individual and class claims for violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-.213; (3) individual claims for fraud; (4) individual and class claims for declaratory judgment; and (5) individual and class claims for direct personal liability of Mr. Reddam.

On July 14, 2016, Defendants moved to dismiss the amended complaint, which was fully briefed.  (Doc. 220, 230).  The parties continued to engage in discovery.  Discovery issues themselves were vigorously contested leading to more briefing.  (See Docs. 225, 229, 241, 254).

On August 18, 2016 the Court denied the most recent motion to dismiss and compel arbitration.  (Doc. 246).  Defendants filed a notice of appeal.  (Doc. 259).  On September 9,

2016, the Court held a live hearing on the class certification issues.  The parties through counsel argued the motion to certify and a representative from the Florida Attorney General Office was also present.  (Doc. 271).  Supplemental briefs were then filed addressing issues noted by the Court at the hearing.  (Docs. 276-77).

On September 19, 2016, the Court certified a class as well as three subclasses, and designated Plaintiffs Fretwell, Brown, Peterson, Fry, and Pate, Jr. as class representatives and their attorneys as class counsel.  (Doc. 284).  Defendants moved for a stay pending appeal, which motion the Court denied on September 30, 2016.  (Doc. 291).  The certified class was defined as follows:

> **Class:**  All individuals identified as Florida residents in Western Sky loan agreements dated on or after February 11, 2011.
>
> **FDUTPA Subclass:** All individuals identified as Florida residents in Western Sky loan agreements dated on or after June 30, 2011.
>
> **Usury Subclass 1:** All individuals identified as Florida residents in Western Sky loan agreements who made payments on their loans on or after June 30, 2013.
>
> **Usury Subclass 2:** All individuals identified as Florida residents in Western Sky loan agreements who made payments on their loans on or after February 11, 2013.

The following claims were asserted on behalf of the class: (1) individual and class claims for violation of the Florida usury statute, Fla. Stat. § 687.02, *et seq.*; (2) individual and class claims for violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-.213; (3) individual claims for fraud; (4) individual and class claims for declaratory judgment; and (5) individual and class claims for direct personal liability of Mr. Reddam.

On October 4, 2016 the Defendants answered the most recent and currently operative complaint.  (Doc. 294).  Plaintiffs worked on a plan of class notice for the certified litigation class (see Docs. 292, 295, 297-98) but the parties now were also going back into intensive

negotiations and mediation in an effort to resolve the matter prior to when a litigation class notice would need to be sent.   Meanwhile, the parties reviewed the voluminous discovery and deposition testimony that by now had accumulated and filed opposing motions for partial or total summary judgment as well as on issues regarding the parties' Rule 26 expert witnesses.  (Docs. 299-307).  By this time, the parties had taken depositions of each of the six Plaintiffs, including the five new Plaintiffs whom the Court had certified as litigation class representatives; depositions of CashCall executives, including Mr. Reddam;, and depositions of multiple designated corporate representatives of CashCall.   Also, the parties had obtained extensive written discovery and production of documents both from each other and from third party sources by this juncture.

### G.  Mediation and arrival at proposed resolution.

The parties originally participated in a mediation session with Professor Eric Green of Resolutions, LLC in June 2016.   After receiving further discovery and having further developments occur in the lawsuit, the parties returned to mediation, and now engaged in a mediation session with former U.S. District Judge Layn R. Phillips of Phillips ADR Enterprises in October 2016.  This in turn led to additional arm's-length settlement negotiations.

The mediation process was laborious and proceeded at arm's-length.  The original Plaintiff, Mr. Inetianbor arrived at a resolution of his individual claims.  That settlement is separately entered into and resolves his individual claims, given as he was not appointed to be one of the five litigation class representatives and is not a proposed settlement class representative.  Now, the class representative Plaintiffs and Class Counsel have concluded that it would be in the best interests of the Settlement Class to enter into this Settlement in order to avoid the uncertainties of litigation and to assure benefits to the Settlement Class and that the

settlement contemplated hereby is fair, reasonable, and adequate and in the best interests of all members of the Settlement Class.

## III.    TERMS OF THE PROPOSED SETTLEMENT.

The parties' agreed Stipulation and Agreement of Settlement ("Agreement") is filed herewith.  This Settlement is entered into between the Named Plaintiffs Johnny Fretwell, Lauren Brown, Thomas Peterson, Virginia Fry, and Nels Pate, Jr., on behalf of themselves and as representatives of the Settlement Class, and the Defendants CashCall and Mr. Reddam.  The Settlement would fully and finally resolve the litigation pending between the parties in the pending action.  It has also been carefully coordinated with related resolutions of proceedings initiated by the Attorney General of the State of Florida, and by the Office of Financial Regulation ("OFR") of the State of Florida.

Plaintiffs seek preliminary approval of the Settlement on behalf of the class and subclasses that were certified by the District Court on September 19, 2016.  The Class is defined as:  All individuals identified as Florida residents in Western Sky loan agreements dated on or after February 11, 2011.  (Agreement § 3.2).

Based on a review of its records, Defendants estimate that under this definition, the Settlement Class consists of approximately 29,631 Settlement Class Members.  All Settlement Class Members shall have the right to exclude themselves by way of the opt-out procedure set forth in Section 7.3 of the Settlement and the proposed Preliminary Approval Order.  (Agreement § 3.2).

There is a separate smaller group of Western Sky borrowers whose loans predate the class definition herein.  This fact arises because the Western Sky loan program began some months prior to February 11, 2011 which is when the class period opens.  The vast majority of

the Florida loan borrowers fall into the post-February 11, 2011 group.  However, for the smaller earlier cohort of borrowers, the coordinated resolution with the Attorney General and OFR will ensure that those borrowers receive relief substantially similar to that contemplated by the Agreement herein.

Under the proposed settlement herein, the parties will work together to identify the Settlement Class Members.  (Agreement § 3.3).  The class members will be entitled to both equitable relief including the cessation of collection on the loans, and, for borrowers who paid more than the loan amounts plus statutory interest at the usury cap of 18% in Florida, *pro rata* restitution based upon a plan of allocation from a common fund.

The equitable relief includes that, as of the Effective Date under the Agreement which follows dissemination of class notice, a final fairness hearing, and other steps, the Defendants will permanently cease and desist servicing and collection activities on any Outstanding Loans of the Settlement Class Members.  (Agreement § 3.4).  This relief of loan forgiveness itself represents a massive benefit to the class.  Even borrowers who had obtained a Western Sky loan and only had ever paid back a minimal amount, or paid back less than the principle amount they borrowed, will no longer be subject to enforcement or collection efforts by Defendants.  This is very significant relief obtained for the class.

Further, the parties will work together to identify any loans that may have been sold to third parties for further collection.  The Defendants will provide notice to the third parties to which they sold any Florida Western Sky Loans that such loans should be deemed cancelled and that the amounts allegedly owed by consumers are in dispute.  (Agreement § 3.4).

In addition, the Defendants will contact applicable credit bureaus to request that any credit reporting by Released Parties regarding Florida Western Sky Loans be removed.

11

(Agreement § 3.4). This fact, along with the fact that Defendants will cease collection and enforcement efforts and acknowledge the loans are disputed, will facilitate the improvement of credit reports for numerous loan borrowers. The Agreement also specifies other prospective and equitable relief. (Agreement § 3.4).

In addition to that relief, the Defendants will pay into a common fund from which monetary benefits will be allocated. The total Fund amount will be $14,417,810. (Agreement §§ 2.16, 3.4). The Fund shall be distributed first, to pay the costs of class notice and settlement administration, Class Counsel's attorneys' fees and litigation costs, as well as Named Plaintiffs' service awards, all as approved by the District Court. Second, the Fund will be allocated to pay Cash Awards, apportioned pro rata to Settlement Class Members. These Cash Awards will be calculated based on a plan of allocation based on factors including the amount that the borrower repaid on the loan and intended to ensure that the monetary restitution is distributed fairly among the eligible Settlement Class Members. The Cash Award checks will be mailed by the settlement administrator, Dahl Administration, and the eligible Class Members will not be required to engage in a "claim form" process in order to get their restitution checks. (Agreement §§ 3.4, 5.3).

The Fund will be set up by the payment of two equal installments, the first to be paid within ten days after the Effective Date of the Settlement, with the second payment following within seventy days after the Effective Date. In addition, within five days following the Effective Date, Mr. Reddam will execute a personal guaranty in a form agreed to by the parties with respect to the payments into the Fund. There shall be no reverter of any monies paid into the Fund. Defendants shall be jointly and severally liable for payments into the Fund. If, after the Cash Awards have been distributed to Settlement Class Members, there are leftover residual

amounts in the Fund, those will be sent to a Court-approved nonprofit organization. (Agreement §§ 3.4, 5.3).

The Plaintiffs will ask that the Court award service awards to the five Named Plaintiffs in light of their work on the case, including the fact that they worked with Class Counsel for months, provided information and documents, and appeared at time-consuming and stressful depositions. The service awards requested will be for $10,000 to each of the Named Plaintiffs. The Named Plaintiffs will also be allowed to participate in the relief offered to the Settlement Class Members. In addition, the Plaintiffs will apply to the District Court at least thirty days prior to the deadline for filing objections to this Settlement for an award of Class Counsel attorneys' fees and reimbursement of litigation costs. Such attorneys' fees and litigation costs will be paid from the Fund in an amount approved by the District Court. (Agreement §§ 3.5, 3.6).

In consideration of the benefits provided under the Settlement, the Plaintiffs and Settlement Class Members will release claims against the Defendants herein. The Release will apply to the Named Plaintiffs and all Settlement Class Members as of the Effective Date of the Settlement. Any Settlement Class Members who do not wish to be subject to the Release have the right to exclude themselves by way of the opt-out procedures set forth in the Agreement. Upon entry of the Final Approval Order, the parties shall cooperate to have Judgment entered and for the action to be dismissed. (Agreement §§ 4.1-4.4).

The Administrator of the Settlement will be Dahl Administration. Dahl is a well-respected third party administrator which has already successfully overseen the administration of multiple other state resolutions and reimbursement programs for Western Sky borrowers. The costs of notice and administration shall be paid from the Fund. (Agreement §§ 5.1, 5.2).

13

The Administrator working with the parties will provide notice to the Settlement Class Members regarding the Settlement.   The Administrator will send Direct Mail Notice consistent with the due process requirements of Fed. R. Civ. P. 23 thirty days following entry of the Preliminary Approval Order.   The Direct Mail Notice will be sent in the form attached as Exhibit B to the Agreement.  It will be sent by first class mail and also by electronic mail using email addresses as available for the Settlement Class Members.   A process to update addresses and re-mail notices will be used for notices that are returned as undeliverable.   (Agreement § 5.3).

In addition, Dahl will establish a website, www.FloridaCashCallClassSettlement.com, containing relevant information.  The website will post copies of the Direct Mail Notice as well as a printable long-form notice.  In addition, the website will make accessible copies of key pleadings and orders in the Action, the Settlement Agreement, and related materials.  A copy of the long-form notice is attached to this Settlement as Exhibit C. The website will go live within five days after the District Court's entry of the Preliminary Approval Order.  The parties will cooperate to prepare "FAQ" or "Frequently Asked Questions" content for the website. (Agreement § 5.3).

The Agreement also provides for the ability of Settlement Class Members to opt out of the Settlement by submitting a request for exclusion.  All requests by Settlement Class Members to be excluded must be in writing and mailed to the Administrator, and postmarked no later than ninety days after entry of the Preliminary Approval Order.  Further provisions with regard to submitting a request for exclusion is found in the Agreement at Section 7.3.  The Administrator will update the parties and the Court with regard to identification of opt-outs in advance of the Final Fairness Hearing.   All prospective Settlement Class Members who timely exclude

themselves from the settlement will not be eligible to receive any settlement benefits, and will preserve their ability to independently pursue any individual claims for relief.  (Agreement § 7.3).

In addition, any Settlement Class Member who has not opted out has the right to object to the Settlement in whole or part and to appear and be heard at the Final Fairness Hearing. Any Settlement Class Member who wishes to object must file a written objection with the Court postmarked no later than ninety days after entry of the Preliminary Approval Order.  Copies of objections should also be sent to counsel for the parties and follow the other requirements set forth in the Agreement.   (Agreement § 7.4).

Prior to the date of the Final Fairness Hearing, the Plaintiffs will submit their motion requesting that the District Court enter the Final Approval Order and Judgment in this Action. At that time, the Plaintiffs will request that the Court find that the Direct Mail Notice satisfies the requirements of due process and other applicable laws; that the Settlement should be finally approved because it is fair, reasonable and adequate to the Settlement Class; that the Settlement Class Members and Named Plaintiffs are bound by the Settlement, including the release provisions.  The Plaintiffs will ask that the Court confirm the final list of opt-outs, and address any objections to the Settlement.  The Plaintiffs will also request that the Court approve their request for payment of Class Counsel attorneys' fees and costs, and for approval of Named Plaintiff service awards.  (Agreement § 8.1).

## IV.   THE COURT SHOULD ENTER AN ORDER OF PRELIMINARY APPROVAL.

### A.  Legal Standard for Preliminary Approval.

Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient

use of judicial resources, and achieve the speedy resolution of justice[.]" *Montoya v. PNC Bank, N.A.*, No. 1:14-cv-20474-JG (S.D. Fl. Sept. 30, 2015) (Goodman, J.), slip op. at 3 (quoting *Turner v. Gen. Elec. Co.,* No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006).  For these reasons, "[p]ublic policy strongly favors the pretrial settlement of class action lawsuits." *Montoya, supra* (quoting *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992)).

"Approval of a class action settlement is a two-step process."  *Fresco v. Auto Data Direct, Inc.*, No. 03-cv-61063, 2007 WL 2330895, at *4 (S.D. Fla. May 14, 2007).  Preliminary approval is the first step, requiring the Court to "make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms." *Id.*  In the second step, after notice to the class and time and opportunity for absent class members to object or otherwise be heard, the court considers whether to grant final approval.  *Smith v. Wm. Wrigley Jr. Co.*, 2010 WL 2401149, at *2 (S.D. Fla. June 15, 2010).  *Accord*, Manual for Complex Litigation, Fourth, § 21.632, pp. 320-21 (Federal Judicial Center 2004) (approval of a class action settlement as fair, adequate, and reasonable is a two-step process; first, the Court must determine whether the proposed settlement terms fall within the range of reasonableness such preliminary approval is warranted; second, after notice is given to the class, the Court must evaluate whether final approval is warranted).[1]

At the preliminary approval stage, the Court's task is to evaluate whether the Settlement is within the "range of reasonableness." 4 Newberg on Class Actions § 11.26; *Montoya, supra,* slip op. at 4. "Preliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies and the settlement falls

---

[1] Available at http://www.fjc.gov/public/pdf.nsf/lookup/mcl4.pdf/$file/mcl4.pdf.

within the range of reason." *Smith v. Wm. Wrigley Jr. Co.*, No. 09-60646, 2010 WL 2401149, at *2 (S.D. Fla. Jun. 15, 2010). Settlement negotiations that involve arm's-length, informed bargaining with the aid of experienced counsel support a preliminary finding of fairness. *Montoya, supra,* slip op. at 4 (quoting Manual for Complex Litigation, Third, § 30.42 (West 1995) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") (internal quotation marks omitted)).

### B.  <u>The Proposed Settlement Falls Into the Range of Reasonability</u>.

Here, clearly the proposed settlement falls into the range of reasonability.

- The Settlement Class is consistent with the definition of the overall class originally certified by the District Court in its Order on September 19, 2016.  The Settlement Class is defined as:  All individuals identified as Florida residents in Western Sky loan agreements dated on or after February 11, 2011. (Agreement § 3.2).  This is a logical and sensible definition, already tested by a contested class certification process which included an original class certification motion, a renewed motion, class discovery, a live hearing, supplemental briefing and the Court's Order that certified the litigation class.

- Based on a review of its records, Defendants estimate that under this definition, the Settlement Class consists of approximately 29,631 Settlement Class Members.   All Settlement Class Members shall have the right to exclude themselves by way of the opt-out procedure set forth in the Settlement.  (Agreement § 3.2).

- A smaller group of borrowers have Western Sky loans that pre-date the class period. They will be provided with similar relief via coordinated resolutions between Defendants and the Florida Office of the Attorney General ("AG") and Florida Office of Financial Regulation ("OFR").

- Upon final resolution and approval, it is contemplated that the execution of three separate settlement agreements will result in: (i) a Final Approval Order in this Court; (ii) a Stipulated Final Judgment and Order in the Circuit Court of the 13th Judicial Circuit in Hillsborough County, Florida with regard to the AG/OFR action; and (iii) a Final Order entered by the Florida Office of Financial Regulation with regard to the OFR administrative action.   In addition, a separate settlement agreement to resolve the individual claim of Mr. Inetianbor will allow the filing of a dismissal with prejudice filed in this Court as to his claim.

- The coordinated injunctive and equitable relief in the proceedings will result in Defendants agreeing to cease and desist from servicing or collecting on any outstanding Western Sky loans made to Florida residents. Defendants agree that the amounts owed on all Class Members' loans are disputed. Defendants will provide notice to the third parties to which they sold any Florida Western Sky Loans that such loans should not be enforced, collected, or sold and the amounts owed on the loans are disputed. Defendants shall be permanently enjoined and prohibited within Florida from: offering, soliciting, making, originating, funding, or financing any loan; servicing or collecting on any loan; selling, transferring, or assigning any Florida Western Sky Loans to any third party; and selling, transferring, assigning, or leasing, in any manner, any information or data related to Class Members to any third party.

- Defendants will also contact applicable credit bureaus to request that any credit reporting for Western Sky loans to Florida residents that Defendants be removed.

- Once all of the coordinated proceedings are resolved, it is anticipated that the Defendants will have paid a total of $17 Million in settlement monies for resolution of Western Sky loan litigation in Florida..

- These will include payments to the AG reflecting its penalties and attorney's fees and costs, to the OFR for an administrative fine, and to Mr. Inetianbor resolving his individual claim.

- A fund of $1,032,190 will be set up as an AG Restitution Fund for restitution for Florida Western Sky borrowers who are not members of the Settlement Class pursuant to a plan of allocation overseen by the AG.

- A fund of $14,417,810 will be set up under this Court's supervision as a Rule 23 Class Common Fund to provide *inter alia* restitution on a *pro rata* basis to eligible members of the Settlement Class. This Fund will also be used to cover the cost of settlement administration and provision of notice and processing of restitution amounts. In addition, Plaintiffs will request disbursement of service awards for Johnny Fretwell, Lauren Brown, Thomas Peterson, Virginia Fry, and Nels Pate, Jr. ($10,000 each, total of $50,000, subject to court approval). The Plaintiffs will also request disbursement of Class Counsel attorney fees and reimbursement of litigation costs in an amount approved by the Court.

- All Settlement Class members will be entitled to the equitable relief. In addition, Florida Western Sky borrowers who are Settlement Class Members and who have paid their loan in full, or have made total payments greater than the total payments that would have been due had such loan been originated at an 18% interest rate, will be eligible for restitution. Distribution will be made on *a pro rata* basis, based on a plan of allocation and coordination among the AG, OFR and Class Counsel.

- There shall be no reverter of any residual unclaimed Rule 23 Class Common Fund proceeds, which rather shall be disbursed as determined by Class Counsel and approved by the Court. Defendants shall be jointly and severally liable for payments. In addition, Mr. Reddam will execute a personal guaranty with respect to the Class Settlement.

- It is anticipated that approximately $11,075,000 will be available for restitution for eligible borrowers, comprised of the restitution payment under the AG settlement for borrowers whose loans predate the Settlement Class and approximately $10,042,810 of the Class Common Fund remaining after deductions if the Court approves the requested amounts for the costs of notice and administration, service awards and attorneys' fees and costs for members of the Settlement Class. Eligible borrowers whose Western Sky loan agreement is dated before the February 11, 2011 Class period in this case, may be eligible for a restitution payment under the AG settlement. They will be directed by the class notice to the AG website at www.myfloridalegal.com for more information. See the postcard and long-form class notices attached as Exhibits B and C to the Settlement Agreement.

- Stated differently, the total amount to be paid in settlement of all claims in all of the ongoing proceedings (including this case, the AG and the OFR proceedings) is a grand total of $17,000,000. That total amount is being allocated by a coordinated resolution between the Florida State Attorney General's Office, the Office of Financial Regulation, and Class Counsel and Named Plaintiffs herein to cover all of the claims in all of the actions. A sum of approximately $11,075,000 of the gross amount is anticipated to be paid back to Florida borrowers as restitution. The State Attorney General's Office will oversee the distribution of the restitution amounts for eligible borrowers whose loans were dated prior to February 11, 2011 which is when the class period for the Settlement Class herein opens. The Settlement Class overseen by this Court will distribute the restitution for those eligible borrowers whose loans fall after that date.

- The cash payment to eligible Settlement Class Members will be paid on an equitable basis, after consultation with the Attorney General and a third-party claims administrator and the amount that that a particular eligible Settlement Class Member will receive will be an approximate percentage of the excess interest that was paid on the loan. The Attorney General's Office and Class Counsel are developing a proposed equitable plan of distribution and will submit the plan to the Court for approval in due course. These monetary payments, as noted, are in addition to the injunctive and prospective relief.

- Class Counsel will ask the Court for an award of attorneys' fees and expenses in an amount equal to approximately 29% of the Settlement Fund. This requested amount is in line with typical class action resolutions, and is amply supported both by the amount of work that was required of counsel over the course of the litigation, as well as the risk involved in proceeding with the claims.

Accordingly, the Court should enter an order of preliminary approval of this settlement.

### C.    The Proposed Settlement Compares Favorable to Other Similar Resolutions.

The proposed settlement compares favorably to other settlements that have been announced pertaining to the Western Sky loan enterprise.  In addition, it compares favorably to other consumer lending class action resolutions.

- **Washington State** –  A Western Sky settlement with the Washington State Attorney General was announced in October 2015.  The resolution involved 6,900 loans.  The parties agreed to a $1.9 million fund, along with equitable relief in which principle loan amounts were forgiven.  Respondents agreed to contact credit reporting agencies and request that information about Western Sky loans be removed.  Administrator was AB Data.  The average cash restitution per borrower was approximately $275/borrower.[2]

- **Nebraska** – A settlement with the State Attorney General was announced in May 2016 involved approximately 2,400 Western Sky loans.  The parties agreed to a $950,000 fund for restitution, along with a payment of $150,000 to the State.  According to the settlement administrator website, the pro rata restitution amount was approximately 19% of the loan payments beyond the State usury cap.  The average cash restitution per borrower was approximately $396 per borrower.[3]

- **North Carolina** – A settlement with the State Attorney General was announced in June 2016.  That resolution involved approximately 21,000 loans.  Under the settlement, CashCall agreed to stop collecting on the loans and to ask credit bureaus to remove negative information.  There would be payment of $9,025,000 to allow for refunds to consumers.  Accordingly, the cash awards average approximately $430 per borrower.[4]

- **Iowa** -- CashCall agreed to pay $1.5 million in restitution, after a settlement with the Iowa Division of Banking and State Attorney General.  The resolution involved approximately 3,400 Western Sky loans. Under the settlement, CashCall also agreed to reset the interest rates on outstanding loans to 4 percent.[5]

---

[2] http://www.dfi.wa.gov/news/press/checks-going-out-cashcall-and-western-sky-predatory-lending-victims. http://www.dfi.wa.gov/news/press/washington-dfi-enters-settlement-agreement-cashcall-and-western-sky-financial-over.
[3] https://protectthegoodlife.nebraska.gov/news/attorney-general-and-director-banking-announce-settlement-western-sky.  https://secure.dahladmin.com/NECASH/FrequentlyAskedQuestions#q3.
[4] http://www.ncdoj.gov/News-and-Alerts/News-Releases-and-Advisories/Press-Releases/CashCall,-Western-Sky-to-pay-NC-$9-million-plus-fo.aspx, https://secure.dahladmin.com/NCCASH.
[5] http://www.desmoinesregister.com/story/money/business/2014/10/06/cashcall-western-sky-attorney-general/16804335/.

- **Maryland --** the Maryland Commissioner of Financial Regulation reached a settlement with Western Sky and CashCall valued at approximately $2 million. The number of loans involved was in excess of 1,200 loans.  Eligible borrowers would be eligible to receive restitution of approximately $1.7 million, administered by Dahl Administration under the oversight of Circuit Court for Baltimore City.[6]

- **Massachusetts –** the Commonwealth of Massachusetts Division of Banks and Attorney General agreed to a settlement with Western Sky Financial and CashCall.  Massachusetts residents who received a loan from Western Sky were entitled to relief from the settlement approved by the Court on October 26, 2015. Pursuant to the Court's Order, borrowers would receive either a cash payment or a modification of their loan.   The Settlement Administrator was Dahl Administration.  The borrowers were required to make a claim to receive a cash payment.  For some borrowers, loan terms were reset to a 12% interest rate and CashCall could continue to collect payments on those loans for two years.[7]

- **Michigan –** On May 6, 2015, the Michigan Attorney and Michigan Department of Insurance and Financial Services reached a $2.2 million settlement with Western Sky, CashCall, and others that resolved allegations of unlicensed loans made to approximately 15,700 Michigan consumers.   The settlement would reduce the interest rate on all loans to Michigan's legal rate of 7%.  Additional relief including a *pro rata* refund payment for some borrowers was allowed for borrowers who filed a valid claim.[8]

- **Missouri –** In March 2015, the Attorney General announced an agreement including $270,000 in consumer restitution, and forgiveness of loan balances for Missouri consumers.[9]

- **New York** – Under a settlement the Attorney General reached in January 2014, some New York residents who obtained a loan from Western Sky were eligible for a refund if they submitted a claim form to the settlement fund administrator. Other borrowers received modifications of existing loans. The amount of *pro rata* refunds was based on amounts paid on Western Sky loans above the legal rate of interest of 16%. For example, a borrower issued a loan of $1,500, who repaid CashCall $600 in total, would have the principal balance remaining reduced to $400 and the interest rate will be reduced to 0%.[10]

---

[6] https://www.dllr.state.md.us/whatsnews/frwesternsky2014.shtml.
[7] https://secure.dahladmin.com/MACASH.
[8] https://secure.dahladmin.com/MICASH.
[9]  https://ago.mo.gov/home/ag-koster's-sweep-of-payday-loan-sites-shuts-down-eight-predatory-operations-in-missouri.
[10] http://www.ag.ny.gov/western-sky-settlement-fund .

- **Pennsylvania –** State regulators reached a $1 million settlement regarding loans to more than 18,600 Pennsylvania residents.  The $1 million settlement will be used for restitution to consumers and to repay the Banking Department's costs. The settlement allowed CashCall to modify rates on outstanding loans to 6 percent, the lending cap under state law.[11]

The current settlement compares favorably with these other resolutions.  The average restitution amount expected to be sent to eligible borrowers is greater than that found in most if not all of these settlements, and other equitable relief is included.   Accordingly, the settlement should be approved.

The Court should grant preliminary approval because the proposed settlement is clearly reasonable. The agreement has been negotiated over a long period of time with extensive and difficult bargaining on both sides. The interests of putative class members have been vigorously represented by Plaintiffs' counsel, who have extensive experience in complex class litigation and specifically in consumer financial class actions. The litigation is factually and legally complex. As reflected in the procedural history set out above, the case implicates complicated issues regarding Tribal law, arbitration and other issues.

Absent a settlement, the litigation would likely last well into the future. The case has already been pending for more than four years.  There are appellate proceedings pending and other ongoing proceedings involving CashCall in other jurisdictions.  If the matter was litigated to conclusion and the Plaintiffs prevailed, there would still be potential issues with regard to collection on a monetary judgment.  In addition, the litigation is legally complex.  The lawsuit turns on the interpretation of agreements between Western Sky and CashCall and on the loan agreements with the Florida borrowers.  While this Court has rendered its determinations on the

---

[11] http://triblive.com/business/headlines/6575923-74/loans-cashcall-lending.

issues of class certification, application of tribal law, the enforceability of the arbitration provisions, the forum selection clause and on Defendant Reddam's direct personal liability, these issues have been appealed.  Resolution of these issues involves consideration of complex policy and constitutional issues of tribal sovereignty, banking regulation, state consumer protection interests, and lending law.  Even though the Plaintiffs believe they are likely to prevail on these appeals, the appeals are costly and time consuming.  In trial, Plaintiffs will still have to prove that Western Sky is merely the nominal lender, and that CashCall and Reddam are directly liable for the violations of Florida law. The expense of litigation has already been considerable, and would increase greatly.  Additionally, given the complexity of accounting and lending practices at issue in the case, plaintiffs retained consumer lending and forensic accounting experts. Were the case to proceed to trial, the costs of these experts, and those retained by defendants, would be considerable.  Given the factual and legal complexity of the case, a trial would likely require considerable time, and, given the novelty of the legal issues presented, additional appeals following trial would be filed extending the litigation for likely years more.

Having said that, the lawsuit is already at a relatively advanced stage. Significant discovery has occurred, as described above. In addition, the parties have had the benefit of the litigation of related cases in which many of the issues between them have been the subject of extensive argument and several rulings and regulatory decisions. Given the proceedings in this case and related litigation, the parties are in a good position to evaluate the relative strengths and weaknesses of their respective positions. Each party has significant risks in the litigation, rendering settlement a reasonable resolution of the lawsuit.

In considering the range of Plaintiffs' likely recovery as compared with the Settlement benefits, it is helpful to consider the range of recoveries that were secured in other States.  As

this Court noted in its Order granting class certification, other states settling similar claims against CashCall actually permitted CashCall to keep the loans in place and continue collecting on them at a reduced interest rate. (Doc. 284, p.15). In comparison, the injunctive and declaratory relief under this Settlement provides that CashCall cannot collect on any outstanding loan balances. Also significant is the comparative monetary recovery for those who paid 18% or more in interest. Here, the total monetary fund created for the Florida Class is $14,417,810. This is the one of the largest single state recoveries in the Country. Further, the average expected restitution for eligible borrowers will be very significant and greater than that provided in most prior State settlements. Thus, this compromise is reasonable in light of the relief obtained as compared with recoveries in similar litigation, and the risks and uncertainty of litigation and collection on a judgment.

While full consideration of the opinions of class members must await a final fairness hearing, putative class counsel and class representatives believe that the settlement is a fair and reasonable compromise. The Class Counsel have extensive experience in consumer protection litigation and class action litigation. Class Counsel negotiated this settlement in good faith and in coordination with the Florida State Attorney General and the Florida Office of Financial Regulation.

The named plaintiffs and putative class representatives have been involved with the decision making and prosecution of the case. Counsel has met with the plaintiffs regarding the case and the proposed settlement. Plaintiffs support the settlement and believe that it is in the best interest of the class. At this stage, of course, the Court cannot evaluate the objections, if any, of absent class members but will be able to do so at the time of the Fairness Hearing.

**D.  The Service Awards and Attorney Fee Award are Reasonable.**

Traditionally, class representatives are compensated for the time and effort in bringing the litigation on behalf of others through what is termed an service or incentive award.  Many courts have addressed service awards to class representatives as a means to encourage litigants to bring class litigation, which will further the public policy underlying the statutory scheme.

Service awards are not uncommon in class action litigation where, as here, a common fund has been created for the benefit of the class. Incentive awards compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation. *Allapattah Servs., Inc. v. Exxon Corp.,* 454 F. Supp. 2d 1185, 1218-19 (S.D. Fla. 2006)(citing *In re Southern Ohio Corr. Facility,* 175 F.R.D. 270, 272-76 (S.D. Ohio 1997)). Incentive awards serve an important function, particularly where the named plaintiffs participated actively in the litigation. *Id.* (citing *Denney v. Jenkens & Gilchrist,* 230 F.R.D. 317, 2005 WL 388562, at *31 (S.D.N.Y. Feb. 18, 2005)).

There is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action. *Allapattah Servs.,* 454 F. Supp. 2d at 1218-19.  In fact, "'[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'" *Ingram v. Coca-Cola Co.,* 200 F.R.D. 685, 694 (N.D.Ga.2001) (*quoting In re Southern Ohio Corr. Facility,* 175 F.R.D. 270, 272 (S.D.Ohio 1997); *see also Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir.1998) (affirming award of $25,000 to named plaintiff); *In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 400 (D.D.C. 2002) ("Incentive awards are not uncommon in class action litigation and particularly where ... a common fund has been created for the benefit of the entire class.... In fact, [c]ourts routinely approve incentive

25

awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation") (internal quotations and citation omitted); *Godshall v. Franklin Mint Co.,* 2004 WL 2745890, at *6 (E.D.Pa. Dec. 1, 2004) (granting special award of $20,000 to each named plaintiff for their work as class representatives); *In re Linerboard Antitrust Litig.,* 2004 WL 1221350, at *18-19 (E.D.Pa. June 2, 2004) (awarding $25,000 for each of the five class representatives); *Tenuto v. Transworld Sys.,* 2002 WL 188569, at *4-5 (E.D.Pa. Jan. 31, 2002) (granting award of $2,000); *Dornberger v. Metropolitan Life Ins. Co.,* 203 F.R.D. 118, 124-125 (S.D.N.Y. 2001) (approving an award of $10,000 for Dornberger and $1,500 for the eight sub-class representatives); *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 145 (E.D.Pa. 2000) ("courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."); *In re Residential Doors Antitrust Litig.,* 1998 WL 151804, at *11 (E.D.Pa. Apr. 2, 1998) (awarding an incentive award of $10,000 to each of the four Class representatives).

The proposed Settlement contemplates that Class Counsel will apply for attorney fees and costs on the basis of a percentage of the Class Fund.  Although there was substantial benefit to the Class in terms of prospective relief, Class Counsel will only request a percentage of the actual cash fund created for the benefit of the Class.  Defendants agreed to a coordinated resolution for $17,000,000 in settlement for the three related pending Florida cases including this action, the Florida Attorney General action and the Florida Office of Financial Regulation's administrative action.  Class counsel expended considerable time and effort on this matter and will submit their time records along with the application for approval of fees.  Plaintiffs expect to request an attorney fee of approximately 29% of the common fund, placing it squarely within the range of fees approved by numerous other Courts in class action settlements.

## V.     THE PROPOSED CLASS NOTICE SATISFIES DUE PROCESS

Notice is an integral part of Rule 23(b)(3).  Class actions under this subdivision are only allowed when common questions of fact or law predominate and class-action treatment is thought to be superior to other available means of settling the controversy.  *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S. Ct. 652 (1950).  Without the notice requirement, it would be constitutionally impermissible to give the judgment binding effect against the absent class members.  Notice to the class must be given before entry of judgment in order to allow class members the opportunity to either participate in the proceedings, or to opt out of the proceedings.  *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173-176 (1974) (notice and opportunity to opt out required by due process).  Notice must be sent well before the merits of the case are adjudicated.  *Brown v. Colegio de Abrogados de Puerto Rico,* 613 F.3d 44, 51 (1st Cir. 2010) (The purpose of the rule regarding notice for a class action is to ensure that the plaintiff class receives notice of the action well before the merits of the case are adjudicated). The Eleventh Circuit's position on class notice in Rule 23(b)(3) certified class actions is one of adherence to due process.  *Cohen v. Office Depot, Inc.,* 204 F.3d 1069, 1078 (11th Cir. 2000).

For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion;

and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).  Fed. R. Civ. P. 23(b)(3).

Attached hereto is a proposed short-form and long-form notice which satisfies the requirements of Rule 23(b)(3), and which will provide Settlement Class Members with all the information necessary to file claims, opt out, or file objections to this Settlement.  Accordingly, Plaintiffs request that this Court approve the Notice, and Court order notice be issued to the class upon preliminary approval by the due dates set forth in the Settlement Agreement.

## VI.   SETTLEMENT TIMELINE

The Settlement Notice requirements of the Class Action Fairness Act ("CAFA") dictate that Notice be provided to the appropriate officials.  A court cannot enter an order giving final approval to the settlement until 90 days after the CAFA Notice is given. 28 U.S.C. § 1715.

Accordingly, the parties propose the following schedule:

1.  Preliminary Approval Order signed by this Court: by December 31, 2016.
2.  Within 10 days parties will send out the CAFA notice.
3.  Five days after entry of Preliminary Approval Order: class website will go live.
4.  Thirty days after entry of Preliminary Approval Order: class notice will be mailed.
5.  Approximately sixty days after entry of Preliminary Approval Order, and at least thirty days before opt out and objection deadline:  Class Counsel to file attorney fee motion.
6.  Ninety days after entry of Preliminary Approval Order: opt out deadline, objection deadline.
7.  Ten days before Final Fairness Hearing: Dahl files list of opt outs; Plaintiffs file motion for entry of a final approval order.
8.  Final Fairness Hearing:  The parties suggest the Court set a date for the Final Fairness Hearing to occur in mid-May 2017.
9.  Effective Date: follows entry of Final Approval Order.
10. Ten days after Effective Date: Defendants pay half of fund to escrow agent.
11. Seventy days after Effective Date:  Defendant pays the second half of fund to escrow agent.
12. 100 days after Effective Date:  checks mailed to class members.

## VII.    CONCLUSION

For the reasons set forth above, this Court should enter the Proposed Preliminary Approval Order attached hereto allowing notice to be issued to the class and taking this Settlement to the next stage of resolution.

Dated:  December 23, 2016                    **VARNELL AND WARWICK, P.A.**

By:____/s/ Janet Varnell_____
JANET VARNELL, ESQ., FBN:  0071072
janet@varnellandwarwick.com
BRIAN W. WARWICK, ESQ.
bwarwick@varnellandwarwick.com
P.O. Box 1870
Lady Lake, FL
Tel. 352-753-8600
Fax 352-504-3301

**WALLACE AND GRAHAM, P.A.**
MONA LISA WALLACE, ESQ.
mwallace@wallacegraham.com
JOHN S. HUGHES, ESQ.
jhughes@wallacegraham.com
525 North Main Street
Salisbury, North Carolina 28144
Tel. 800-849-5291
Fax 704-633-9434

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify on December 23, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

s/Janet R. Varnell
Janet R. Varnell
